**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

UNITED STATES OF AMERICA,

      Plaintiff,                                  CRIMINAL NO. 09-20264

v.                                                HONORABLE STEPHEN J. MURPHY, III

D-1    MICHELE JOHNSON,
         a/k/a "Nancy Lori Walker"
         a/k/a "Dianne Anne Johnson"
         a/k/a "Angela Jackson"

      Defendant.
_____/

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by its attorneys, Barbara L. McQuade, United States Attorney, and Louis P. Gabel, Assistant United States Attorney, recommends that the Court impose a sentence of imprisonment of six years. Defendant produced and distributed counterfeit currency in large quantities and armed herself with loaded firearms in furtherance of her criminal activity. Once arrested, she lied to investigators and the Court, and attempted to derail the case at every step of the proceedings. A sentence of six years' imprisonment is necessary to reflect the seriousness of Defendant's crimes, protect the public, promote respect for the law, deter Defendant and others from similar future criminal activity, and to provide mental health treatment and vocational training to Defendant.

**I.    FACTUAL AND PROCEDURAL HISTORY**

On May 4, 2009, a Redford Township police officer stopped Defendant for driving a car with improper license plates. When he asked her for identification, she provided him with a photocopy of a license. The license was for a woman named Dianne Elizabeth Wilcosh. Defendant told the officer that she was Ms. Wilcosh and no longer had her actual driver's license

because she had lost it.  She asked the officer to take the photocopy instead.  After Defendant could not answer simple background questions, such as her middle name and address, the officer requested that Defendant provide her real identity.  Defendant provided another fictitious name.  After the officer spent nearly a half hour patiently asking Defendant for her name, Defendant rolled up her window, started the ignition, and fled from the officer through a residential neighborhood.

After a low speed chase, during which Defendant pulled to the side of the road and then swerved around a police cruiser to continue her flight, she was apprehended.  Defendant refused to exit the vehicle and had to be physically removed by officers.  As she was being removed, she held a large purse against her chest.  Officers were able to wrestle it away from her grasp and place Defendant in handcuffs.  A search of the purse revealed two loaded firearms: (1) a handgun loaded with eight rounds in the magazine and one round in the chamber, and (2) a fully-loaded Tech-9 semi-automatic firearm with a flash suppressor attached to it.  In addition, Defendant's purse contained many additional rounds of ammunition, including a magazine that was loaded with ten hollow-point rounds of ammunition.

Her purse also contained evidence that Defendant was engaged in counterfeiting and had successfully passed large amounts of currency.  She had over $5,000 in counterfeit bills inside her purse along with bills that were in the process of being made (*e.g.*, one-sided bills and fake bills with false security strips pasted into them).  She had two flash drives that contained images of counterfeit bills, security strips, and watermarks, all of which could be used to make counterfeit bills appear more realistic.  Along with the fake money, Defendant had $13,794 in

genuine U.S. currency.  As there is no evidence that Defendant had any legitimate source of income at the time of her arrest, this money was most likely the proceeds of her illegal activity.[1]

Defendant's vehicle was towed to the Redford Township Police Department, where officers searched the trunk.  Inside they found approximately $32,750 in counterfeit U.S. currency, a handgun with an obliterated serial number, and a ski mask.  The serial numbers and markings on the counterfeit bills found in the trunk matched some of the bills found in Defendant's purse.  The counterfeit currency was of high quality, and included fake watermarks, fake security strips, and fake fibers.  It also was printed on high quality paper in an attempt to replicate the feel of genuine currency.

After her arrest, Defendant continued to identify herself as Dianne Anne Johnson.  When she was fingerprinted, however, the fingerprints returned as Nancy Lori Walker.  Defendant then adopted that name for purposes of future court proceedings.  Later investigation, including an interview with Defendant's son, revealed that Defendant was at one time known as Michele Johnson.  Investigation after trial revealed that Defendant applied for a CCW permit in 1981 under the name Dianne Loraine Donald.  She was arrested and processed by the Detroit Police Department under this name in 2006 for Resisting and Obstructing an Officer.[2]  In total, Defendant has used at least five aliases.

In addition, at Defendant's detention hearing, Magistrate Judge Morgan determined that Defendant lied to her about her residence, concluding that two of the addresses provided by

---

[1] Although no narcotics were found in Defendant's purse or car, a drug dog indicated positive on the genuine currency and on Defendant's driver-side door.  Thus, along with counterfeiting, Defendant may have been engaged in other illegal activity such as drug dealing.

[2] There is no record of a conviction in connection with this arrest.

Defendant were false. Finally, Defendant accused her attorneys, the government, and the Court of "railroading" her and attempted to thwart the criminal justice process through repeated delays. This prompted the Court to order a competency examination of Defendant. Defendant was transported to a federal institution in Texas for evaluation, but she refused to participate in the examination. She was ultimately deemed competent, stood trial, and was convicted of both counts—possession of counterfeit money and possession of a firearm with an obliterated serial number.

## II. SENTENCING GUIDELINE CALCULATIONS AND § 3553(a) FACTORS

In determining an appropriate sentence, district courts are to consider the factors set forth in 18 U.S.C. § 3553(a). *See United States v. Booker*, 543 U.S. 220, 264 (2005). The Guidelines, although advisory, "should be the starting point and the initial benchmark in determining a sentence and a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Lalonde*, 509 F.3d 750, 763 (6th Cir. 2007) (quoting *Gall v. United States*, 128 S.Ct. 586, 601 (2007) (internal quotations omitted)).

In determining the appropriate sentence, the Court should look beyond the Guidelines and consider all of the factors in the Sentencing Reform Act and, in particular, those set forth in 18 U.S.C. § 3553(a). These factors include: (I) the nature and circumstances of the offense and the history and characteristics of the defendant; (II) the need for the sentence imposed – (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant;(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most

4

effective manner; and (III) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty.

### A. Sentencing Guidelines

The Guideline range calculated by the Probation Department, 37 to 46 months, is correct. Defendant does not object to the base offense level of nine set forth in paragraph 22 of the Presentence Investigation Report (PSR), the six-level increase set forth in paragraph 23, or the two-point increase set forth in paragraph 28 for obstruction of justice. Through her attorney, Defendant has objected to the two-point increases set forth in paragraphs 24 and 25. These objections lack merit and should be rejected.

First, the evidence presented at trial clearly establishes that Defendant possessed materials used for counterfeiting and is thus subject to the two-point enhancement provided in U.S.S.G. § 2B5.1(b)(2)(A). Defendant was clutching her purse when she was arrested. The purse contained Defendant's personal items and false identification documents with her photo. Along with those items, law enforcement found counterfeit bills that were in various states of production, including one-sided bills, bills that had the security strips pasted on them, and a so-called "master bill" that was kept in pristine condition so that Defendant could run multiple copies of the counterfeit bill. In addition, two flash drives containing digital images of fake identification cards and images that could be used in counterfeiting were found in Defendant's purse. Those flash drives contained images of bills, watermarks, security strips, and other security features used on genuine currency.

Defendant argues that this enhancement should not apply because the counterfeit bills possessed by Defendant were of such poor quality that they were unlikely to be accepted as real. *See* U.S.S.G. § 2B5.1, Application Note 3 ("Subsection (b)(2)(A) does not apply to persons who

5

produce items that are so obviously counterfeit that they are unlikely to be accepted even if subjected to minimal scrutiny."). This defense was presented to the jury—when Defendant argued that the fake bills possessed by Defendant did not meet the definition of counterfeit because they could not have fooled anyone. It was rejected when the jury found beyond a reasonable doubt that the bills qualified as counterfeit, and for good reason. Defendant went to great lengths with the bills that she possessed, and the counterfeiting items that she possessed, to fool unsuspecting victims. As stated above, the bills attempted to recreate the watermarks, security strips, fiber threads, color, look, and feel of genuine U.S. currency. The bills were so well done that counsel feared mixing up the genuine currency with the counterfeit currency at trial for fear of not recovering the genuine bills amongst the numerous counterfeit bills. Finally, Secret Service Agent George Powell testified at trial that the counterfeit bills were of good quality and that bills with the same serial number as those possessed by Defendant had actually been successfully passed to victims around metro-Detroit. Defendant's argument has already been rejected by the jury and should now be rejected by the Court.

     Defendant's second objection is to the two-point enhancement for possession of a firearm in connection with the counterfeiting offense. This objection should likewise be rejected because the evidence demonstrates that Defendant possessed three loaded firearms in connection with her counterfeiting operation. Specifically, Defendant has twice admitted that she passed the counterfeit money to "runners" who would then pass the fake bills around metro-Detroit—once to the agent when she was arrested (an admission that was suppressed at trial) and once during a proffer with the agent and the undersigned. In the course of dealing with these other criminals, Defendant armed herself with loaded firearms to protect her money and herself. She had two loaded firearms in her purse along with nearly $14,000 in genuine currency and over $5,000 in

fake bills.  One of those firearms was a Tech-9 with an extended clip and flash suppressor.  And Defendant not only had guns in her immediate possession, she had another gun in the trunk of her car.  This gun was located in close proximity to her counterfeit funds (*i.e.*, in the very same laundry bag that contained thousands of dollars of counterfeit money) so that she would have access to a weapon when dealing the counterfeit bills out of the trunk of her car.  This gun also had an obliterated serial number, making it more useful for crime because it would be untraceable.  The evidence is clear that Defendant possessed these firearms, at least in part, to protect herself and her money while distributing counterfeit money on the street.

Finally, it is worth noting that the Guideline range does not take into account a number of aggravating factors present in this case.  For instance, there is no enhancement for using numerous aliases, repeatedly lying to a police officer at the scene, fleeing from law enforcement, and for the number of firearms Defendant possessed and their lethality.  Moreover, Defendant is scored in Criminal History Category I because she has not sustained any prior convictions.  She has, however, previously been arrested for assault (2009) and obstructing an officer (2006).  Neither case was prosecuted presumably because Defendant could not be located by authorities.  Both cases were dismissed in 2010 after Defendant was facing federal charges in this case.

  **B.**  **Seriousness of Offense**

Defendant's conduct is far more serious than the typical counterfeiting case and thus requires a period of imprisonment beyond those usually imposed for violations of 18 U.S.C. § 472.  She possessed a small arsenal of loaded firearms, which created a serious risk of danger to the public and the officers who apprehended Defendant.  One of the firearms had an obliterated serial number.  As one court has recognized:

> Such guns pose a special threat to the community. As one court has explained: It is no secret that a chain of custody for a firearm greatly assists in the difficult process of solving crimes. When a firearm is stolen, determining this chain is difficult and when serial numbers are obliterated, it is virtually impossible. Therefore, stolen or altered firearms in the hands of people recognized as irresponsible pose great dangers. . . .

*United States v. Richardson*, 309 F. Supp. 2d 1093, 1096 (E.D. Wis. 2004) (citation omitted). She also repeatedly lied to a police officer at a traffic stop, fled from the officer while he was attempting to remove her from her vehicle, and caused a low-speed police chase through a residential neighborhood. Defendant used multiple identities, including fictitious names and identities that she stole from other people.

All of this activity was to protect and conceal Defendant's lucrative counterfeiting activity. During difficult economic times, she successfully duped numerous victims throughout Detroit and its suburbs. Proof of her success was found in her purse in the form of a bundle of real money totaling nearly $14,000. Defendant's offense of conviction, 18 U.S.C. § 472, carries a 20-year statutory maximum. On the continuum of 0 to 20 years, Defendant's conduct justifies a sentence approaching the mid-point of the range of sentences available to the Court.

  **C.**  **Characteristics and History of Defendant**

While Defendant's background remains largely a mystery, her conduct in this case demonstrates that she is manipulative, deceitful, and dangerous. She has consistently lied to law enforcement, prosecutors, and the Court. She attempted to derail the proceedings against her and has been uncooperative at every step. Despite her refusal to participate in an interview with the probation department, the probation department uncovered two previous arrests of Defendant. She was arrested for obstructing an officer at age 52 and assault at age 55. *See* PSI ¶¶ 38, 39. Peculiarly, the seriousness of Defendant's criminal conduct has increased with age.

Accordingly, the proposition that recidivism decreases with age is not applicable in this case. Defendant, on the other hand, has presented no mitigating factors regarding her background that would support leniency in her sentencing.

### D. Deterrence and Respect for the Law

Given Defendant's escalating criminal conduct and her blatant disrespect for the law and these proceedings, a significant sentence must be imposed to protect society from future crimes of Defendant and deter her from returning to illegal activity. Defendant has expressed no remorse for her offense and there is nothing to demonstrate that she will not return to crime if given the opportunity. A sentence of six years will achieve the goals of promoting respect for the law, deterrence, and just punishment.

### E. Vocation Training and Mental Health Treatment

Throughout the duration of this case, Defendant has exhibited that she is not prepared to be a productive member of society. Mental health and vocation programs offered by the Bureau of Prisons will hopefully prepare Defendant for reentry into society. A substantial period of incarceration will allow Defendant to take advantage of these programs.

**III.   CONCLUSION**

For all of the above reasons, the government respectfully recommends that the Court impose a sentence of imprisonment of six years.

                                                   Respectfully submitted,

                                                   BARBARA L. MCQUADE
                                                   United States Attorney

                                                   /s   Louis P. Gabel
                                                   LOUIS P. GABEL
                                                   Assistant United States Attorney
                                                   211 W. Fort St., Suite  2001
                                                   Detroit, Michigan  48226
                                                   Telephone:  (313) 226-9756
                                                   Facsimile:   (313) 226-2372
                                                   E-mail: louis.gabel@usdoj.gov

Dated: June 24, 2010

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

UNITED STATES OF AMERICA,

       Plaintiff,                          CRIMINAL NO. 09-20264

v.                                       HONORABLE STEPHEN J. MURPHY, III

D-1    MICHELE JOHNSON,
          a/k/a "Nancy Lori Walker"
          a/k/a "Dianne Anne Johnson"
          a/k/a "Angela Jackson"

       Defendant.
_____/

**CERTIFICATE OF SERVICE**

I hereby certify that on June 24, 2010, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing to the following:

**SUZANNE KOSTOVSKI**

                                        /s Louis P. Gabel
                                        LOUIS P. GABEL
                                        Assistant United States Attorney
                                        211 West Fort Street, Suite 2001
                                        Detroit, Michigan  48226-3211
                                        (313) 226-9756