1

2                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
3                          SOUTHERN DIVISION

4    **UNITED STATES OF AMERICA,**

5                    Government,            **Case No. 09-cr-20264**
          **-v-**
6
     **MICHELE JOHNSON, also known as**
7    *Angela Jackson*, **also know as**
     *Dianne Anne Johnson*, **also know as**
8    *Nancy Lori Walker*,

9                    Defendant.
     _____/
10
                         **JURY TRIAL**
11                        Volume II
          BEFORE THE HONORABLE **STEPHEN J. MURPHY, III**
12             United States District Judge
          Theodore Levin United States Courthouse
13             231 West Lafayette Boulevard
                    Detroit, Michigan
14             **Wednesday, March 10, 2010**

15   **APPEARANCES:**

16   FOR THE              **Mr. Louis Gabel**
     GOVERNMENT:          **Ms. Sara Robichaud**
17                        U.S. Attorney's Office
                          211 West Fort Street
18                        Detroit, MI  48226
                          (313)226-9756
19   FOR THE DEFENDANT:   **Ms. Suzanna Kostovski**
                          Law Offices of Suzanna Kostovski
20                        220 Bagley
                          Suite 1015
21                        Detroit, MI  48226
                          (313)965-6050
22
          Also Present:  Ms. Alissa Greer, Courtroom Deputy
23                        Ms. Susan McNeill, Law Clerk
                          Special Agent George Powell
24
                  **To Obtain a Certified Transcript Contact:**
25        Karen Klerekoper, CSR, RPR - (313)961-1119

1                        TABLE OF CONTENTS

2       _____

3       WITNESS FOR THE GOVERNMENT:

4                       **OFFICER BRAD KENNEDY**
        Direct Examination (Con't) by Mr. Gabel.............  21
5       Cross-Examination by Ms. Kostovski...................  44
                            **JAMES RHODES**
6       Direct Examination by Ms. Robichaud..................  71
        Cross-Examination by Ms. Kostovski...................  76
7                           **WILLIE REEVES**
        Direct Examination by Mr. Gabel......................  88
8       Cross-Examination by Ms. Kostovski................... 94
                        **OFFICER BRIAN JONES**
9       Direct Examination by Ms. Robichaud................. 106
        Cross-Examination by Ms. Kostovski.................. 114
10      Redirect Examination by Ms. Robichaud............... 127
                          **TRACY MCINTOSH**
11      Direct Examination by Mr. Gabel..................... 129
        Cross-Examination by Ms. Kostovski ................. 144
12                     **AGENT CURTIS BRUNSON**
        Direct Examination by Ms. Robichaud................. 150
13      Cross-Examination by Ms. Kostovski.................. 155
                   **SPECIAL AGENT GEORGE POWELL**
14      Direct Examination by Mr. Gabel..................... 158

15

        **EXHIBITS RECEIVED:**
16      Government's Exhibit 3 (purse/fanny pack)............  27
        Government's Exhibit 4 (Beretta)....................  29
17      Government's Exhibit 5 (Tech-9 handgun).............  30
        Government's Exhibits 6-8 (.9 mm/.40 caliber/ammo)...  31
18      Government's Exhibs 9, 9A (genuine currency/tinfoil).  33
        Government's Exhibit 10 (Angela Jackson license).....  35
19      Government's Exhibit 12 (video of traffic stop/arrest) 39
        Defendant's Exhibit A (photocopy of ticket).........  67
20      Government's Exhibit 20 (Buick bill of sale)........  91
        Government's Exhibit 13 (black duffel bag).......... 109
21      Government's Exhibit 14 (Ruger obliterated serial #). 110
        Government's Exhibit 15 (counterfeit currency)....... 112
22      Government's Exhibit 15A, B (counterfeit bills)...... 113
        Government's Exhibit 21 (Florida ID M. Johnson)...... 166
23      Government's Exhibit 22 (Florida ID V. Moore)....... 167
        Government's Exhibit 16, 16A (counterfeit currency).. 171
24      Government's Exhibit 17, 17A (counterfeit from purse) 178

25      **CERTIFICATE OF COURT REPORTER**....................... 185

*Jury Trial 3/10/10*                                                     3

1    Detroit, Michigan

2    March 10, 2010

3    At 8:37 a.m.

4                         *       *       *

5            (Call to Order of the Court)

6            MS. GREER:  You may be seated.

7            THE COURT:  Good morning, everybody.  We had a

8    late juror but she is here now.  I think all 14 of them are

9    back there but we have two minor issues.  First is a legal

10   issue I need to see Mr. Gabel and Ms. Kostovski up here

11   about, please.

12           (A sidebar on the record)

13           THE COURT:  I don't need the government for this

14   but I don't want to have an ex-parte communication.  The

15   defendant hired Ms. Kostovski to represent her starting

16   January, something like that, February.

17           MS. KOSTOVSKI:  I think the end of January.

18           THE COURT:  And the arrangement, from what

19   Alissa, my court manager/case manager, told me is that you

20   were paid a certain amount of money to take it to motion

21   and plea.

22           MS. KOSTOVSKI:  That's correct.

23           THE COURT:  All right.  Then the money ran out,

24   and you want to be appointed by the Court from the day

25   after the pretrial conference until the end of the case?

```
 1              MS. KOSTOVSKI:  That's correct.

 2              THE COURT:  All right.  I'm very happy to do

 3    that.

 4              MS. KOSTOVSKI:  Thank you, Judge.

 5              THE COURT:  I'm going to sign the order; however,

 6    I think it's my duty just to inquire, and if you want to do

 7    an affidavit, if you want to talk to me off the record,

 8    talk to Alissa -- I just think I have a duty on behalf of

 9    the public to inquire what the previous fee arrangement is

10    so we are not getting any, you know, double payment, or

11    anything like that.  You know what I mean?

12              MS. KOSTOVSKI:  Do you want to know what the

13    amount was, or do you want --

14              THE COURT:  I don't know.  I mean, I don't know

15    if you're going by the hour or -- my only -- I'm not

16    concerned --

17              MS. KOSTOVSKI:  No.  It was a flat fee.

18              THE COURT:  I'm not concerned about this at all.

19    I just -- maybe just let Alissa know what the flat fee was

20    and then I'll make a finding and sign the paper --

21              MS. KOSTOVSKI:  Okay.

22              THE COURT:  -- and assure the Court, the public

23    and everybody else that everything is appropriate and

24    nobody is, you know, there is no -- I don't think there

25    are, but that there is no financial issues, or anything
```

1    like that.  Okay?

2              MS. KOSTOVSKI:  That's fine.

3              THE COURT:  That's all I wanted to say.

4              MS. KOSTOVSKI:  Just for the record, I did speak

5    with Mr. Gabel on Monday, and Sarah, and told them that I

6    was contemplating doing that.

7              THE COURT:  I don't have a problem at all.

8    Again, I'm extremely grateful for your hard work.  I think

9    it would be a very, very difficult case if we did not have

10   a lawyer involved, if she paid you to achieve a guilty plea

11   and she didn't want one and now she has got to go to

12   trial -- or I should say she wants to go to trial and you

13   have to represent her, I think you should be paid for that.

14             MS. KOSTOVSKI:  Thank you, Judge.

15             THE COURT:  All right.  Anything?

16             MR. GABEL:  No.

17             THE COURT:  Good.

18             MR. GABEL:  Thank you, Judge.

19             MS. KOSTOVSKI:  Thank you.

20             (End of discussion at sidebar)

21             THE COURT:  Okay.  We have a juror issue, and I

22   think it's straightforward but let me tell you what I have

23   and then what I had in mind.  March 9, 2010 was yesterday.

24   I received a note with that date on it, reads as follows:

25   "Judge, while hearing the Redford police officer's

1    testimony, it occurred to me that I may have seen the

2    defendant in church.  While I do not live in the Redford

3    area, I do attend Christ the King RC" -- I take it that's

4    Roman Catholic Church -- "near Grand River and McNichols,

5    about a mile south from where the defendant was stopped.

6    Annoyingly, I have always been very bad at remembering

7    names and faces so I may very well be wrong.  If she is a

8    woman that attends the same church as I do, I cannot

9    remember ever having spoken to her or having had any kind

10   of interaction.  It is vague at best."

11          And this is from Mr. Bruttell.  He is the rather

12   intelligent man from Huntington Woods who has his own

13   business, and a number of other things.

14          So I guess my first issue would be to you,

15   Ms. Kostovski.  Do we know whether or not Ms. Johnson

16   attends Christ the King Roman Catholic Church near Grand

17   River and McNichols, and if she has been in there, I would

18   get Mr. Bruttell in here to inquire of him specifically.

19   But if not, then I don't think we need to go any further.

20          MS. KOSTOVSKI:  Let me --

21          THE COURT:  Of course.

22          MS. KOSTOVSKI:  -- speak with her, Judge.

23          (Brief pause in the proceedings)

24          THE COURT:  Okay.  Ms. Kostovski?

25          MS. KOSTOVSKI:  Judge, I did speak with

1  Ms. Johnson and she said that several years ago she used to

2  attend Boy Scout meetings at this church as a den mother.

3  She said the meetings were about once a month.  She was not

4  a church member per se attending mass but the meetings for

5  the Boy Scout troops that her son was involved in were

6  being held at this church.  And she doesn't remember if she

7  has ever seen Mr. Bruttell or not, but she has been in that

8  church and was on a regular basis.

9       THE COURT:  All right.  Do you want me to bring

10  Bruttell in?  There is no indication that he has any issues

11  but I will be happy to inquire of him if you want me to,

12  Ms. Kostovski.

13       MS. KOSTOVSKI:  I think for the record and good

14  recordkeeping, I think we should at least make a record

15  of --

16       THE COURT:  We'll do that.  Absolutely.  Thank

17  you.  Will you go get Mr. Bruttell, please?

18       MR. GABEL:  Your Honor, we will have a couple

19  legal issues to address before the jury is brought in, just

20  to make sure exams aren't interrupted.

21       THE COURT:  Okay.  Come on in, Mr. Bruttell.

22  Have a seat in number one there, sir.  I'm sure you're not

23  surprised to be called in.  We got your note this morning.

24  We talked a little bit about it.  Let's hear a little bit

25  about your involvement at Christ the King.  Do you attend

1   church there regularly?

2           JUROR BRUTTELL:  I do.

3           THE COURT:  Do you go to any meetings in the

4   church hall/school?

5           JUROR BRUTTELL:  I do.

6           THE COURT:  Parish council?

7           JUROR BRUTTELL:  Not parish council, but I chair

8   a church committee.

9           THE COURT:  Involved in the Boy Scouts at all?

10          JUROR BRUTTELL:  No.

11          THE COURT:  Remarkably, my findings on this are

12  that we've read your note into the record and we now know

13  that you attend Christ the King Roman Catholic Church

14  regularly.  My understanding is that the defendant,

15  Ms. Johnson, has indeed been at Christ the King Roman

16  Catholic Church, not for religious services but at

17  meetings, and things of that nature, in the church hall, so

18  you may have come across her.

19          Now, when is the first time you attended Christ

20  the King?

21          JUROR BRUTTELL:  Early '90s.

22          THE COURT:  Okay.  So it's been at least almost

23  close to 20 years?

24          JUROR BRUTTELL:  Yes.

25          THE COURT:  All right.  Well, then I will find,

*Jury Trial 3/10/10*                                                9

1    for the record, that it is entirely possible, although we

2    cannot establish from either you or the conversation I've

3    had with Ms. Kostovski on behalf of Ms. Johnson that you

4    actually have seen each other, but just for the record, do

5    you know Ms. Johnson personally, intimately?

6                JUROR BRUTTELL:  I don't.

7                THE COURT:  You do not.

8                JUROR BRUTTELL:  I don't know her personally.  I

9    wouldn't have known her name and --

10               THE COURT:  All right.  Is anything about your

11   involvement at Christ the King relevant to your views of

12   this case?  Is it influencing you in any way?

13               JUROR BRUTTELL:  No way.

14               THE COURT:  Okay.  And you are able to put aside

15   all of your interactions, if you have had any, with

16   Ms. Johnson at that church and judge her case based on the

17   evidence and give both the government and her a fair trial?

18               JUROR BRUTTELL:  I think that's true and I think

19   I have had no interaction.

20               THE COURT:  Very good.

21               Any other questions, Ms. Kostovski?

22               MS. KOSTOVSKI:  No, Your Honor.

23               THE COURT:  Do you want to ask anything,

24   Mr. Gabel?

25               MR. GABEL:  No, thank you, Your Honor.

1          THE COURT:  Okay.  Well, I think that establishes

2     the record and makes things clear and I'd just like to say

3     thanks for bringing this up.  These types of things are not

4     unusual.  There is a way to handle them.  We have handled

5     them and the record is clear now.  Okay?

6          Thank you, Mr. Bruttell.

7          JUROR BRUTTELL:  All right.

8          THE COURT:  Could you bring Mr. Bruttell, escort

9     him back to the jury room, please, Alissa?  Thank you very

10    much.

11         I have coffee and water here for counsel.  What

12    is on your mind, Mr. Gabel?

13         MR. GABEL:  This is one piece of evidence that I

14    mentioned to Ms. Kostovski this morning that anticipated

15    she may have an issue with.  It is the introduction of a

16    ski mask.  And actually it's going to be a witness that

17    Ms. Robichaud is putting on the stand so she would be

18    arguing the admissibility of the ski mask in the wake of

19    what I assume is going to be an objection from the

20    defendant.  I think it could be a lengthy exchange on the

21    ski mask so I wanted to bring it up instead of interrupting

22    the examination.

23         THE COURT:  Government's Exhibit 19.  Go ahead,

24    Government, why do you want to put the ski mask in

25    evidence?

1          MS. ROBICHAUD:  It's -- we find there is a

2     legitimate specific purpose for the admission of the

3     evidence and the reasoning is supported by Sixth Circuit

4     case law, which I have if you would like a copy.  The

5     government is required to prove that defendant had knowing

6     possession of a firearm and the mere presence of the gun in

7     the car is not sufficient to prove the defendant had the

8     possession.  This evidence is required to prove that the

9     defendant had the intent to control the gun.  The ski mask

10     shows that the weapon was in the car for an illegal purpose

11     and shows that the defendant knew the gun was present and

12     intended to use it and should be admitted for that reason.

13     The ski mask is admissible because it's inextricably

14     intertwined with the firearm and counterfeit money in this

15     case and is evidence necessary to complete the story of the

16     crime.  It would conceal the defendant's identity and it's

17     suggestive of criminal intent as it relates to the

18     defendant's effort to conceal her identity while possessing

19     counterfeit money.

20          THE COURT:  There has got to be a foundation for

21     404(b) evidence and I don't -- and to be res gestae or

22     inextricably intertwined there also has to be some

23     suggestion that she was concealing her identity, that she

24     was robbing a bank, that she was involved in violent crime

25     disguising herself, that she was fleeing with a ski mask

1    on.  Do you have any of that?

2             MS. ROBICHAUD:  No.

3             THE COURT:  Do you have anything that suggests

4    that is not her son's ski mask that he wore in cold

5    weather?

6             MS. ROBICHAUD:  No, we don't.

7             THE COURT:  Okay.  You want to be heard,

8    Ms. Kostovski?

9             MS. KOSTOVSKI:  Yes.

10            THE COURT:  Go ahead.

11            MS. KOSTOVSKI:  Well, Judge, I'm surprised in

12   this case on a daily basis.  Now they are really piling it

13   on.  I'm not sure what the foundational basis is for the

14   ski mask, someone having a ski mask in a vehicle is as

15   innocent as someone having a bottle of pop in a vehicle.

16   There is nothing incriminating about a ski mask.  That's

17   number one.

18            Number two, there is no history, as Your Honor

19   pointed out, of any violent crime, any criminal activity by

20   this defendant.  In fact, all the cases that they just

21   presented to me, the ski masks -- and those cases were part

22   and parcel of the crimes that these people were charged

23   with, so I don't see the basis for this other than, again,

24   trying to paint a picture of maybe Bonnie, of Bonnie and

25   Clyde.  I'm not really sure of what the relevancy of all

1    this is.

2              THE COURT:  Okay.  I'm excluding the ski mask.

3              MS. KOSTOVSKI:  Thank you.

4              THE COURT:  I don't find it appropriately tied in

5    on an evidentiary basis under 401, 404 or any other rule to

6    the crimes charged in the indictment.  I make that finding

7    based on the government's argument, as well as my

8    discretion.  If the government thinks I'm wrong and wants

9    to renew its motion based on cases that are clear where you

10   don't have the sorts of connections that I just asked

11   Ms. Robichaud about, and she conceded were absent here,

12   then I would be more than willing to reconsider the ruling.

13   But for now, government's Exhibit 19 is excluded pursuant

14   to objection.  Okay?  Anything else?

15             MR. GABEL:  There was one other issue raised

16   during my opening statement regarding the admissibility of

17   the defendant's admissions.

18             THE COURT:  Yes.

19             MR. GABEL:  It appears that there is an

20   objection.  I'm not sure exactly what the objection is but

21   we are planning on getting into that later this afternoon

22   when Agent Powell testifies.

23             THE COURT:  Okay.  Powell --

24             MR. GABEL:  He'll be testifying after the 11:00

25   break.

1          THE COURT:  He is a Secret Service agent who is

2     called to the scene; is that right?

3          MR. GABEL:  He was called after the defendant was

4     arrested.  I'm happy to have him on the stand for a voir

5     dire on this but I can proffer what occurred.

6          THE COURT:  What happened?

7          MR. GABEL:  And we can go from there.

8          He was called to the scene and was there to

9     collect some evidence because it was clear it was a

10    counterfeiting case.  He went to Redford Township Police

11    Department and wanted to interview the defendant.  Redford

12    Township has the lockup facilities on the first floor -- is

13    that correct, George?

14         MR. POWELL:  Yes.

15         MR. GABEL:  First floor.  And the second floor is

16    where the detectives' offices are.

17         They brought her up to the second floor, read --

18    Agent Powell read her Miranda rights with the Miranda

19    waiver form.  She signed it but she declined to engage in

20    the interview.  They said okay, sent her back down to the

21    lockup down to the first floor.  Agent Powell stayed on the

22    second floor to talk with the detectives and gather -- they

23    were bringing out the evidence to him.

24         At that point one of the civilian employees who

25    works in the lockup contacted the second-floor detectives

1    and said, this woman down here in lockup now wants to speak

2    with the detective and Secret Service agent.  So she

3    reinitiated.

4          Agent Powell went back down to lockup and

5    essentially said, what's up, to her.  That was the only

6    thing he posed to her because she had said she wanted to

7    talk to him.  At that point she said I know whose money

8    that is.  It belongs to this man named Dee.  He is a drug

9    dealer.  He has got lots of money.  I was essentially

10   passing it for him to street runners and then I would come

11   back and collect the real money that the street runners

12   would get when they exchanged the counterfeit.

13         I anticipate the objection is that she --

14         THE COURT:  Let's hear, let's hear, what is the

15   matter, Ms. Kostovski?

16         MS. KOSTOVSKI:  First of all, Judge, I think the

17   factual background is a little bit different than what

18   Mr. Gabel told you.  Agent Powell was contacted by

19   Detective Schiller the day after the arrest and the

20   discovery of the alleged counterfeit money.  He went down

21   to the Redford Township Police Department and

22   apparently -- and I'm looking at Agent Powell's report or

23   summary.

24         THE COURT:  All right.

25         MS. KOSTOVSKI:  And apparently he was advised by

1    either what his report says Kimberly Considine, that

2    Ms. Walker wanted to speak to him.  So he and the detective

3    went to the lockup to try to speak to her.  Apparently,

4    they said that Miranda rights were given to her.  She

5    signed the Miranda waiver form.  I have not seen that form

6    and it was not produced to me.  But beyond that, she

7    requested an attorney.

8            THE COURT:  Let's take that issue, what is up

9    with the Miranda form, Mr. Gabel?

10            MR. GABEL:  She refused to sign it and

11   refused -- do you have the copy of, at least, the waiver

12   form?

13            MS. KOSTOVSKI:  No.

14            THE COURT:  I thought you said she signed it.

15            MR. GABEL:  I must have misspoken.  She refused

16   to sign it and refused to engage in --

17            THE COURT:  This is when she's up on the second

18   floor?

19            MR. GABEL:  In questioning while she was on the

20   second floor and then was returned to lockup.

21            THE COURT:  All right.  So she's read her rights,

22   she invokes them?

23            MR. GABEL:  Correct.

24            THE COURT:  She refuses to waive them, the

25   interview is terminated and she goes back downstairs.  So

*Jury Trial 3/10/10*                                                    17

1    there is no Miranda waiver form signed, right?

2              MR. GABEL:  That's correct.

3              THE COURT:  That's why they didn't give it to you

4    Ms. Kostovski.  But go ahead.

5              MS. KOSTOVSKI:  Apparently, according to Agent

6    Powell's report, he says that before he leaves the police

7    department, Ms. Walker contacts, again, Officer Considine,

8    Kimberly Considine, and requests to speak to the agent.  He

9    and the detective then go to her cell and ask her what she

10   needed.  And he says she spontaneously said that the money

11   is not mine, and I'm quoting, and I know the guy it belongs

12   to, his name is Dee.  And she went on to say some other

13   different issues about the counterfeit money.  And at that

14   point, Agent Powell says he terminated the interview or

15   discussion and told her she needed to get an attorney and

16   the attorney should contact him.

17             So my objection here is she invoked her Fifth

18   Amendment right and she also invoked her right to counsel

19   under the Sixth Amendment.

20             THE COURT:  Now, wait just a minute.  When did

21   she invoke her right to counsel, after Powell listened to

22   her?

23             MS. KOSTOVSKI:  No, after -- when Powell advised

24   her of her Miranda rights, she requested an attorney.

25             THE COURT:  All right.

*U.S.A. v Johnson 09-cr-20264*

1            MS. KOSTOVSKI:  And --

2            THE COURT:  Now, I didn't hear that from

3    Mr. Gabel.  Are you willing to accede to that, Mr. Gabel?

4            MS. KOSTOVSKI:  That's in the agent's report.

5            THE COURT:  So the report says, and your argument

6    is, that she asked for an attorney.  Right?

7            MS. KOSTOVSKI:  That's correct.

8            THE COURT:  Go ahead.

9            MS. KOSTOVSKI:  And so knowing that, Agent Powell

10   should not have engaged in any further communication or

11   contact with her, because assuming that she, quote/unquote,

12   spontaneously started to utter all these statements, as is

13   alleged in this report, the agent did not give her another

14   reading of her Miranda rights and he knew at the time that

15   she wanted an attorney.  And, in fact, he terminated her

16   spontaneous statements because he told her you should get

17   an attorney and then have the attorney speak to me.  Again,

18   this is all in his report, Judge.

19           THE COURT:  All right.  Okay.  I'm ready to rule.

20   The issue in my view is a factual issue.  I note that

21   discovery was provided, the circumstances of the custody

22   and the interview were written up in the report and no

23   motion to suppress was filed by any of Ms. Johnson's five

24   lawyers in a timely fashion.  We now have an issue at trial

25   as to the use of the statements.

1           It seems to me that the statements would be

2     admissible.  Invoking her Fifth Amendment rights in the

3     lockup on the second floor, the agent and the officer acted

4     properly in terminating the interview and returning her to

5     her cell downstairs.  By saying that she wanted to speak

6     with the agents, they -- she waived her Fifth Amendment

7     right and they properly listened to what she had to say,

8     then terminating the interview after she made incriminating

9     remarks.

10          Now, the issue of counsel is a little stickier to

11    me.  The report apparently says that she invoked her desire

12    to have an attorney represent her on the second floor.

13    Notwithstanding that, she wanted to talk to the agents.

14    The agent went downstairs and listened to her.  He did not,

15    to my knowledge, advise her again of her right to counsel.

16    But that may be a factual issue that needs to be determined

17    when he testifies.

18          My instinct is that all this testimony, or excuse

19    me, my instinct is that this one statement from Ms. Johnson

20    is likely admissible but there are some problems with it

21    and I would caution the government about its use and I

22    would ask both sides to clarify for the Court, given that

23    we are at a very late stage in the proceedings, whether or

24    not there are any cases that mandate Agent Powell to

25    re-advise Ms. Johnson of her Sixth Amendment rights before

*Jury Trial 3/10/10*                                                        20

1    taking the statements that he did.  Because I think that

2    she clearly waived her Fifth Amendment rights but I don't

3    have any authority from either side in front of me saying

4    that when he goes downstairs and she has invoked her

5    request for counsel that he's free to ignore or mandated

6    not to ignore that.  So I would strongly urge the parties

7    to get this cleared up before Agent Powell takes the stand.

8    Okay?

9            What's next, Mr. Gabel?

10           MR. GABEL:  I don't believe there are any other

11   issues, unless defense is going to raise an objection that

12   I'm not aware of.

13           MS. KOSTOVSKI:  Nothing at the moment.

14           THE COURT:  Okay.  Good.  Let's get going.

15   Alissa, ready?

16           MS. GREER:  Ready.

17           THE COURT:  Okay.  Thank you.

18           MR. GABEL:  Would you like Officer Kennedy on the

19   stand?

20           THE COURT:  No, he can stay there.

21           MS. GREER:  All rise for the jury, please.

22           (Jury in 9:05 a.m.)

23           THE COURT:  Go ahead and take your seats.  Okay,

24   everybody may be seated.  All right.  You're not going to

25   forget those seats again.

1          Good morning, ladies and gentlemen.  How is

2     everybody?  Welcome to you and thank you very very much for

3     being on time.  I know we're about 30 minutes past when the

4     last juror arrived but we had some legal issues that we had

5     to knock out this morning and we did that from 8:30 to

6     9:00.  I know it's a pain to sit there while those things

7     are going on but the fact of the matter is if we're able to

8     take care of legal issues before you come in here, it

9     streamlines things when you are here so we do that in the

10    interest of your time.

11         Today we are going to bring Officer Kennedy back

12    up to the stand.  Mr. Gabel is going to continue his

13    examination.  Then we will have defendant cross-examine and

14    we will go to our next government witness after that.

15         Officer Kennedy, you may have a seat.  Thank you,

16    ladies and gentlemen, continue to keep your minds open and

17    pay close attention.

18         Mr. Gabel, the mic is yours.

19         MR. GABEL:  Thank you, Your Honor.

20              **DIRECT EXAMINATION** (Con't)

21    BY MR. GABEL:

22    Q.  Where we cut off yesterday you had mentioned that you

23    had already determined that the ID that was passed to you

24    that had the name Dianne Elizabeth Wilcosh was a bogus ID;

25    is that correct?

*Direct of Officer Kennedy 3/10/10*                                    22

1    A.   Yes.

2    Q.   And after that point she had given you another name?

3    A.   Yes.

4    Q.   That name was?

5    A.   Dianne Anne Johnson.

6    Q.   Did you check that new name that she had given you in

7    your system?

8    A.   Yes, I did.

9    Q.   What were the results?

10   A.   It came back no record on the computer, no record

11   through the Secretary of State computer, which means that

12   that name -- nowhere in the Secretary of State computer,

13   either with identification card or with Michigan operator's

14   license, is that a legitimate name.

15   Q.   Now, while you were speaking with her did you notice

16   anything inside of her car?

17   A.   Yes, I did.

18   Q.   What was that?

19   A.   On the floorboard I observed a very large purse, or a

20   carryall bag, sitting near her feet on the driver's side

21   floorboard.

22   Q.   After you checked the name Dianne Anne Johnson, what

23   did you do next?

24   A.   I determined that I was going to place the driver

25   under arrest at this point, not knowing her true identity,

1    for no operator's license on person.  Then I approached the

2    vehicle to make that arrest.

3    Q.  And could you please describe what happened at that

4    point?

5    A.  I walked up to the driver's side door.  I made contact

6    with the driver, stated that -- step out of the vehicle,

7    that she was going to be placed under arrest for driving

8    with no operator's license on person.

9         At that point she turned on the ignition of the

10   car to start it up again and started rolling up the window,

11   and I was right by it.  I directed her several times to

12   stop and to just step out of the vehicle.

13   Q.  She turned on the ignition.  What did she do after

14   that?

15   A.  She rolled up the window and she put the vehicle into

16   gear and then she proceeded to drove away from me.

17   Q.  Did you pursue her at this point?

18   A.  Yes, I did.  I advised my dispatch over my handheld

19   radio, as I was returning to my vehicle, that the vehicle

20   was fleeing the traffic stop.  Then I got into my vehicle

21   and pursued behind it.

22   Q.  Could you estimate how fast the cars were traveling in

23   this pursuit?

24   A.  It was 15 to 25 miles per hour, no more than 25 miles

25   per hour.

1    Q.  Was it on a commercial strip or was it in a

2    neighborhood?

3    A.  It was a residential neighborhood.

4    Q.  Could you describe the pursuit from the beginning

5    until its conclusion?

6    A.  Yeah.  The vehicle fled southbound, I believe, two

7    blocks.  Then went, turned left, which would be eastbound.

8    At this point another vehicle came in, pulled in front of

9    both of our vehicles and kind of pulled in front to try to

10   stop.

11   Q.  When you say another vehicle, is that a police --

12   A.  Yeah, a fully marked patrol vehicle, yes.  They

13   activated their overhead lights, emergency lights.  At this

14   point I got on my PA, which is my radio loudspeaker.  I

15   advised the driver of the vehicle to stop the car and exit

16   the vehicle.

17          A few seconds after that, the vehicle pulled

18   around the front patrol car that was parked in front of it

19   and then continued eastbound.  At this point over the radio

20   I requested that this patrol car take over as the lead, as

21   they were directly behind the vehicle I was pursuing at

22   that point, so I asked that they take the lead, which they

23   did.

24          The vehicle went, I believe, one more block east

25   and then turned southbound onto -- I forget -- I believe

1    it's Salem Street?

2    Q.   How many police vehicles in total were ultimately

3    involved in this pursuit?

4    A.   There is myself and two other fully marked patrol

5    vehicles.  There happened to be -- just coincidently there

6    happened to be two other unmarked undercover units that

7    just happened to be in the area, but they were not involved

8    in the pursuit.  They just arrived once the vehicle got

9    stopped.

10   Q.   Now, you mentioned that you had another officer take

11   the lead.  What were your reasons for having another

12   officer take the lead?

13   A.   Because I had the passenger Mr. Rhodes secured in my

14   back seat.  And up to that point, I was able to follow

15   behind at a safe speed.  The speeds were pretty slow.

16   There was no drastic turns, or anything, but another

17   vehicle was there.  I wanted to keep the vehicle in my view

18   but once another vehicle came -- police car came in front,

19   you know, for safety matters I let them do it.

20   Q.   Mr. Rhodes was in the back of your cruiser; is that

21   right?

22   A.   Yes, he was.

23   Q.   He was there because you had taken him into custody on

24   the traffic warrants?

25   A.   That's correct.

*Direct of Officer Kennedy 3/10/10*                                    26

1    Q.   Now, did the defendant's vehicle eventually come to a

2    stop?

3    A.   Yes.

4    Q.   Could you describe what happened at that point?

5    A.    Well, as I pulled around the corner, as I was

6    basically secondary, another officer, the second, which

7    would have been the third patrol vehicle, came in second.

8    They got the vehicle stopped.  As I pulled around the

9    corner, the defendant was -- she was -- they were wrestling

10   with her on the ground and I could see that she was

11   visibly -- she was actively resisting.  She had the purse

12   or the bag with her.  I ran on up, you know, to assist, and

13   she was --

14        MS. KOSTOVSKI:  Your Honor, I don't mean to

15   interrupt the officer's testimony but I think we need some

16   questions and answers and not a narrative.

17        THE COURT:  I would agree with that.  Your

18   witness is giving a narrative answer, Mr. Gabel.  If you

19   could break it up a little bit we'd certainly appreciate

20   it.

21        MR. GABEL:  Sure.

22   BY MR. GABEL:

23   Q.   You said you saw her resisting arrest as the officers

24   were pulling her from the car.  Could you describe what she

25   was doing to resist arrest?

*U.S.A. v Johnson 09-cr-20264*

1    A.   She was ignoring verbal orders and directives to put

2    her hands behind her back.  She was pulling her arms up

3    under her.

4    Q.   As she was pulling her arms up under her, did she have

5    anything in her hands?

6    A.   Yeah, hooked around her arm was the purse straps.

7    Q.   Was she holding the purse with both arms?

8    A.   I can't recall.

9    Q.   Did you order her to stop resisting arrest?

10   A.   Yes, I did, several times, at least three times.

11   Q.   With did you say to her?

12   A.   Stop resisting, or I threatened to tase her.

13   Q.   I place in front of you what's previously been marked

14   as Government's Exhibit 3.  Have you seen Government's

15   Exhibit 3 prior to today?

16   A.   Yes, I have.

17            THE COURT:  Is there any objection there,

18   Ms. Kostovski?

19            MS. KOSTOVSKI:  No objection.

20            THE COURT:  Okay.  Government's 3 is received.

21   Go ahead, Mr. Gabel.

22            (Government's Exhibit 3 received)

23   BY MR. GABEL:

24   Q.   What is Government's Exhibit 3, please?

25   A.   This is the purse that the defendant had on her at the

1    time of the traffic stop and the arrest.

2    Q.   Is that the same purse that you saw sitting at her

3    feet when you were looking into the car when you initially

4    stopped her?

5    A.   Yes.

6    Q.   And is it the same purse that she was clutching as she

7    was pulled out of the car after the chase concluded?

8    A.   Yes.

9    Q.   Now, after she was pulled from the car, were officers

10   ultimately able to place her in handcuffs?

11   A.   Yes.

12   Q.   And what was your role at this point?

13   A.   This point just assisted getting her handcuffed and

14   she was secured in a different patrol vehicle.

15   Q.   Once she was placed in handcuffs, was there a search

16   of the purse conducted?

17   A.   Yes, there was.

18   Q.   You were present during that search?

19   A.   Yes, I was.

20   Q.   Could you describe what you located during the course

21   of the search that's relevant to this case?

22   A.   Yeah, another officer and I located one handgun.

23   There was a Beretta .40 caliber handgun.  It had a magazine

24   in it and there was a round chambered, so it was ready to

25   fire.  Also, I believe the brand name of the other weapon

```
 1    was an Intra Tech 9, which I knew as a Tec-9, which is a

 2    .9mm handgun.  It had an extended clip -- or an extended

 3    magazine inside also, and it was loaded.  And then also in

 4    a fanny pack, there was attached to the purse, we ended up

 5    locating the large sum of money.

 6    Q.  Did you find any ammunition in the addition to the

 7    firearms you've described?

 8    A.  Yes.  We located an extra magazine that was filled

 9    with bullets for the Tec-9, and also for the .40 caliber,

10    and then also a box of ammunition.

11    Q.  I'm handing you what has previously been marked as

12    Government's Exhibit 4, and I understand there is no

13    objection to this exhibit so I move for its admission at

14    this time.

15              THE COURT:  Correct?

16              MS. KOSTOVSKI:  Correct, no objection.

17              THE COURT:  Government's 4 is received.  Thank

18    you, Mr. Gabel.

19              (Government's Exhibit 4 received)

20    BY MR. GABEL:

21    Q.  Please take a look inside the bag.  You can pull it

22    out of the bag.

23              Have you seen Government's Exhibit 4 prior to

24    today?

25    A.  Yes.
```

1    Q.   Could you please tell us when you did see that

2    firearm?

3    A.   When I was -- after the arrest when I was looking

4    through the purse, I found it inside the purse.

5    Q.   And could you describe it for the jury and actually

6    hold it up so they could take a look at it, please?

7    A.   It's a Beretta .40 caliber handgun, semiautomatic.

8    And this is a magazine, this was inside of the handle, and

9    it was -- also had, I believe, eight or nine rounds in it.

10   Q.   Was there a bullet in the chamber of that --

11   A.   Yes, there was.

12   Q.   I'm handing what has previously been marked as

13   Government's Exhibit 5, and I understand there is no

14   objection to this, therefore, I move for its admission into

15   evidence.

16          THE COURT:  No objection?

17          MS. KOSTOVSKI:  No objection.

18          THE COURT:  Okay.  Thank you, both.  Government's

19   5 is received.  Go ahead, Mr. Gabel.

20          (Government's Exhibit 5 received)

21   BY MR. GABEL:

22   Q.   Take a look at Government's Exhibit 5.  Please let me

23   know if you have seen it before today.

24   A.   Yes, I have.

25   Q.   When was the first occasion that you saw that firearm?

*Direct of Officer Kennedy 3/10/10*                                    31

1    A.   Located at -- inside the purse after the arrest.

2    Q.   It was located inside of the defendant's purse?

3    A.   Yes, it was.

4    Q.   Could you please hold it up and describe it to the

5    jury?

6    A.   It's an Intra Tech .9 millimeter.  This is the

7    magazine.  This also had I believe 28 or 29 rounds in it.

8    It goes in here.  It's an extended clip so it hangs out.

9    Q.   Was there a bullet in the chamber of that firearm as

10   well?

11   A.   Yes, there was.

12   Q.   I'm handing you a bag of evidence that's previously

13   been marked Government's Exhibit 6, and there is Exhibit 7,

14   8 and 9 in that bag.  I understand there is no objection to

15   this evidence so I move for its admission at this time.

16             MS. KOSTOVSKI:  That's correct, no objection.

17             THE COURT:  Government's 6 through 9 are

18   received.  Go ahead, Mr. Gabel.

19             MR. GABEL:  Actually, I misspoke, it's 6 through

20   8.

21             THE COURT:  6 through 8 are received, okay.

22   Thank you.

23             (Government's Exhibits 6-8 received)

24   BY MR. GABEL:

25   Q.   Please take a look at that evidence and tell me if you

1    have seen it before today.

2    A.   You want me to take them all out?  I do remember there

3    is several packages like this of ammunition boxed up.

4    There were additional magazines in the purse as well.

5    These rounds, I'm guessing, are .9 millimeter and .40

6    caliber rounds.  I know there was some from the magazines

7    that are now empty from the other weapons, so, yeah I

8    remember this.

9    Q.   There is one clip there that has a sticker on it

10   marked Government's Exhibit 6.  Do you see that clip?

11   A.   Yes.

12   Q.   And what type of magazine is that; do you know?

13   A.   I would say this, a .9 millimeter magazine.

14   Q.   And that would have fit in the Tec-9, the Government's

15   Exhibit 5?

16   A.   Yes.

17   Q.   Okay.  There is also another clip that is marked

18   Government's Exhibit 7.  Do you see that?

19   A.   Yes, I do.

20   Q.   Okay.  And do you know what caliber that clip is?

21   A.   That appears to be a .40 caliber.

22   Q.   And that would have fit in the other firearm, the .40

23   caliber Beretta?

24   A.   Yes.

25   Q.   I'm going to take that away from you.

1    A.   This is from the other, the one you just took.

2    Q.   You mentioned that there was also currency found and a

3    fanny pack attached to the purse; is that correct?

4    A.   Yes.

5    Q.   I would like you to show me on the purse where

6    specifically this currency was found, and this is

7    Government's Exhibit 3, for the record.

8    A.   It was in this fanny pack that was attached to the

9    strap as it is now, and it was -- the money was wrapped up

10   in tinfoil inside here.

11   Q.   I'm handing you what has previously been marked

12   Government's Exhibit 9, with Subexhibit 9A.

13        MR. GABEL:  I understand there is no objection to

14   this exhibit and I move for its admission, Your Honor?

15        MS. KOSTOVSKI:  No objection.

16        THE COURT:  9 and 9A are received.  Thank you.

17        Please proceed, Mr. Gabel.

18        (Government's Exhibits 9 & 9A received)

19   BY MR. GABEL:

20   Q.   Have you seen Exhibit 9 before?

21   A.   I believe so.

22   Q.   And when was the occasion that you saw it?

23   A.   On -- after the arrest, after the search of the purse

24   and the fanny pack.

25   Q.   Could you describe what Exhibit 9 is?  You can take it

*Direct of Officer Kennedy 3/10/10*                                        34

1    out of that bag if you would like.

2    A.   Here is the tinfoil on this large sum of money.

3    Primarily all 100s and 50s, primarily 100s.

4    Q.   Does it appear to be genuine U.S. currency to you?

5    A.   Yeah, it does to me.

6    Q.   Did it appear that way when you discovered it at the

7    scene of the arrest?

8    A.   Yeah.  My first instinct was that it was legitimate

9    money.

10   Q.   Within that money there is one that's separated out in

11   a sheet.  The government is marking that one separately as

12   a Subexhibit 9A for use later.  But that bill, was that

13   included amongst the bills that were retrieved from her --

14   the fanny pack and her purse?

15   A.   I honestly can't remember.

16   Q.   But there were a large number of bills?

17   A.   Yeah, it was a large stack of money.

18   Q.   Now, in further search of the purse, did you find any

19   other suspicious documents such as any false

20   identification?

21   A.   Yes, I did.

22   Q.   Do you recall what the name was on that ID?

23   A.   No, I don't.

24   Q.   I'll hand you what has previously been marked as

25   Government's Exhibit 10.

*Direct of Officer Kennedy 3/10/10*                                    35

1           MR. GABEL:  And I understand there is no

2    objection so I move for its admission at this time, Your

3    Honor.

4           MS. KOSTOVSKI:  That's correct, Your Honor.

5           THE COURT:  Thank you.  Government's number 10 is

6    received.

7              (Government's Exhibit 10 received)

8    BY MR. GABEL:

9    Q.   Have you seen Government's Exhibit 10 prior to today?

10   A.   Yes, I have.

11   Q.   And when did you see it?

12   A.   This is at the police station doing a further search

13   of the purse.

14   Q.   And it was found in the defendant's purse?

15   A.   Yes, it was.

16   Q.   Could you describe what it is?

17   A.   It's a, to me, a clearly fake Michigan operator's

18   license.  The coloring is off.  The picture doesn't look

19   correct.  It doesn't feel correct.  It doesn't feel like a

20   legitimate driver's license.

21   Q.   What's the name on the ID?

22   A.   Angela Christine Jackson.

23   Q.   Were you able to make a determination whether this ID

24   was a genuine ID or fake or altered ID?

25   A.   Determined that it was fake.

1    Q.   You can go ahead and set that down.  After the

2    defendant was placed in custody, what happened to her car?

3    A.   It was transported directly from the scene to the

4    basement of the Redford Township station, which is secured.

5    Q.   Am I correct that the trunk was not opened at the

6    scene?

7    A.   That is correct.

8    Q.   Was it towed back to the Redford Township Police

9    Department so a search could be conducted there?

10   A.   Yes.

11   Q.   Am I correct, though, that you were not involved in

12   the search of the trunk?

13   A.   That is correct.

14   Q.   Other officers did that?

15   A.   Yes.

16   Q.   The keys that were in the car, did you leave those

17   keys in the car when it was towed?

18   A.   Yes.

19   Q.   The police car that you were driving that day, could

20   you describe it for the jury, please?

21   A.   My -- it was patrol car 59.  It's a fully marked

22   police vehicle with Redford Township Police Department.  It

23   has a light bar, siren.

24   Q.   Was your patrol car equipped with a video camera?

25   A.   Yes, it was.

1    Q.   Where was that video camera in your car?

2    A.   It's above the dash.  It's connected, so right to the

3    windshield.

4    Q.   So when it's recording, what does it record?

5    A.   Everything right in front of -- directly in front of

6    the vehicle.

7    Q.   Was your encounter with the defendant videotaped that

8    day?

9    A.   Yes, it was.

10   Q.   Have you reviewed the videotape previously?

11   A.   Yes, I have.

12   Q.   Was it an accurate depiction of your encounter with

13   the defendant?

14   A.   Yes, it was.

15            (Brief discussion off the record)

16   BY MR. GABEL:

17   Q.   I'm handing you what has been marked as Government's

18   Exhibit 12.  Have you seen this compact disk prior to

19   today?

20   A.   Yes.

21   Q.   How can you be sure of that?

22   A.   Because my initials are on it.

23   Q.   Did you review the contents of this compact disk?

24   A.   Yes, I did.

25   Q.   What was on this compact disk?

*Direct of Officer Kennedy 3/10/10*                              38

1    A.   The traffic stop and everything afterwards, the

2    pursuit.

3    Q.   It accurately depicts your encounter with the

4    defendant?

5    A.   Yes, it does.

6         MR. GABEL:  Your Honor, the Government moves to

7    admit and publish to the jury Government's Exhibit 12.

8         THE COURT:  Objection?

9         MS. KOSTOVSKI:  Your Honor, I don't believe I

10   have an objection.  I think I just need some clarification

11   here before I make a decision on whether I want to object.

12   It's my understanding that this particular CD of the

13   traffic stop has been modified to remove, I guess, time

14   lapses or activity when nothing was going on, if I'm

15   speaking correctly.  So it's not a complete and accurate

16   representation of what went on that day.  So I guess that's

17   my objection, that's it's been edited for content.

18        THE COURT:  All right.  Is that true, Mr. --

19        MR. GABEL:  Your Honor, it has been edited to

20   take out a lot of the dead space to save time for the jury

21   where the officer simply goes back to his patrol car and

22   you see nothing of consequence happening.  I'm happy to

23   play the entire encounter, including those spaces, if it's

24   an issue.

25        THE COURT:  All right.  The object is noted and

1    overruled.  The videotape is received.  It may be played

2    and I will instruct the jury appropriately, both after it's

3    played and in the final charge of this case.  Okay?

4              MS. KOSTOVSKI:  Okay.  Thank you.

5              THE COURT:  Thank you, both.

6              (Government's Exhibit 12 received)

7              THE COURT:  Go ahead, Mr. Gabel.

8              MR. GABEL:  Would it be helpful to dim the

9    lights?

10             THE COURT:  Absolutely.  Are you ready to play

11   it?

12             MR. GABEL:  Yes, we are.

13             THE COURT:  Ladies and gentlemen, the government

14   has moved, and I have admitted over the objection that you

15   heard of counsel, a videotape that Officer Kennedy

16   testified was taken from the dashboard of his car on the

17   day of arrest.  We are going to play that now.  The

18   government has conceded that certain parts of it have been

19   omitted to save time and Ms. Kostovski will have an

20   opportunity to cross-examine and argue to you the relevance

21   of this particular tape, but I ask you to consider it for

22   what it's worth and is with all evidentiary items, its

23   weight shall be determined entirely by you at the end of

24   the case.  Okay?  All right.  Go ahead, Susan.  Thank you.

25             (Videotape played to the jury)

*Direct of Officer Kennedy 3/10/10*                                    40

1            MR. GABEL:  Your Honor, we're having trouble with

2       the volume.  We are going to start it over once we get the

3       volume on.

4            THE COURT:  Okay, take your time.

5            (Videotape played to the jury at 9:36 a.m. and

6            concluded at 9:39 a.m.)

7       BY MR. GABEL:

8       Q.  That's the conclusion of the first clip, Officer

9       Kennedy.  Is it correct that what would next be seen is

10      just a view of the car and nothing of consequence occurring

11      between you and Ms. Walker?

12      A.  Yes.

13           MR. GABEL:  I ask that the second clip be played

14      now.

15           (Videotape played to the jury at 9:40 a.m. and

16           concluded at 9:41 a.m.)

17      BY MR. GABEL:

18      Q.  At that point you had taken Mr. Rhodes into custody.

19      Was that on the traffic warrants?

20      A.  Yes.

21      Q.  Do you recall him saying something regarding his

22      tools?

23      A.  Yes.

24      Q.  What was that?

25      A.  I believe he asked the driver to take them, give them

1    to somebody, a family member of his, or something.  I can't

2    remember exactly.

3    Q.  Do you understand the reason that he had those tools

4    that day?

5    A.  Well, I understand why he told me he had them.

6    Q.  What was that?

7    A.  He said he was in the vehicle -- they were just

8    leaving the Coach and Lantern Motel because he was there to

9    assist the defendant in fixing her car.

10        MR. GABEL:  Ms. Gentry, could you please play the

11    next clip.  Thank you.

12        (Videotape played to the jury at 9:42 a.m. and

13        concluded at 9:49 a.m.)

14    BY MR. GABEL:

15    Q.  Again, Officer Kennedy, at this point in the

16    videotape, what would be seen if it weren't clipped?

17    A.  Just the front of the vehicle.

18    Q.  And there was nothing of consequence or no interaction

19    between you and Ms. Walker during that timespan?

20    A.  No.

21        THE COURT:  Is it true, Officer, that these

22    lapses constitute the time when you're back in to your car

23    and nothing is going on next to the car on the tape?

24        THE WITNESS:  Yes, Your Honor.

25        THE COURT:  Go ahead, Mr. Gabel.

*Direct of Officer Kennedy 3/10/10*                                42

1              MR. GABEL:  Thank you.  Ms. Gentry, could you

2     please play the next clip.

3              (Videotape played to the jury at 9:50 a.m. and

4              concluded at 9:50 a.m.)

5     By MR. GABEL:

6     Q.  At this point, Officer Kennedy, is it true that you

7     didn't activate the microphone that you had on you?

8     A.  That's correct.

9     Q.  What was the reason for that?

10    A.  Well, as you can see, she opened the driver-side door

11    and exited the vehicle.  So my officer safety -- I just

12    went up there.  I didn't even think about turning on the

13    microphone.

14    Q.  Do you recall what the exchange you had with her

15    during this time period was?

16    A.  No, I don't.

17             (Videotape playing to the jury at 9:51 a.m. and

18             concluded at 9:59 a.m.)

19    BY MR. GABEL:

20    Q.  Again, this is back in your patrol car and there is no

21    interaction between you and the defendant, that's the

22    portion that is clipped out?

23    A.  That's correct.

24             MR. GABEL:  Would you please play the next clip,

25    Ms. Gentry.  Thank you.

*Direct of Officer Kennedy 3/10/10*                            43

1          (Videotape resumed at 9:59 a.m. and concluded at

2          10:03 a.m.)

3          MR. GABEL:  There are no more video clips, Your

4    Honor, if we want to bring the lights back up.  Thank you.

5          THE COURT:  Go ahead, Mr. Gabel.

6    BY MR. GABEL:

7    Q.  In that clip we hear you saying, stop resisting, you

8    are going to be tased.  Did you ultimately have to tase the

9    defendant?

10   A.  No, I did not.

11   Q.  So officers were able to secure her hands in handcuffs

12   behind her back?

13   A.  Yes, we were.

14   Q.  At that point is that when the purse was taken from

15   her?

16   A.  Yes.

17   Q.  And that's the purse where the Tec-9, the Beretta, the

18   ammunition, the genuine currency and the fake ID was found

19   in a later search?

20   A.  Yes.

21         MR. GABEL:  I have no additional questions.  I

22   pass the officer for cross-examination.

23         THE COURT:  Thank you, Mr. Gabel.  It's your

24   turn, now Ms. Kostovski.

25                    **CROSS-EXAMINATION**

*Cross of Officer Kennedy 3/10/10*                                    44

1    BY MS. KOSTOVSKI:

2    Q.   Good morning, Officer Kennedy.

3    A.   Good morning.

4    Q.   When did you first observe the Buick that day?

5    A.   It was exiting the Coach and Lantern Motel in the area

6    of Grand River and Seven Mile.

7    Q.   Could you tell us what time of day this was?

8    A.   It was approximately 7:15 p.m.

9    Q.   I'm sorry?

10   A.   7:15 to 7:30 p.m.

11   Q.   Was it still daylight?

12   A.   Yes.

13   Q.   Okay.  What did you observe about the Buick Park

14   Avenue that, I guess, caught your attention?

15   A.   Well, there was exiting the motel.  And then I just

16   ran the plate because I saw that it had a white 2009

17   sticker on it and I ran it to see if it was expired.

18   Q.   Did you observe the occupants of the Buick before you

19   observed the Buick?

20   A.   No.

21   Q.   You just observed the vehicle coming out of the motel?

22   A.   Yes.

23   Q.   All right.  And when did you observe it?  Was it

24   already out on the street or was it still in the parking

25   lot of the motel?

1    A.   It was actually, like, exiting the drive and entering

2    onto eastbound Grand River when I observed it.

3    Q.   Where were you coming from?

4    A.   I was already on eastbound Grand River driving

5    eastbound.

6    Q.   All right.  So it was pulling out of the motel and you

7    were behind?

8    A.   Yes.

9    Q.   Okay.  How far of a distance were you from the Buick

10   when it was exiting the motel?

11   A.   Not very far, 20 feet, 25 feet.

12   Q.   Okay.  So from that distance you could observe the

13   tag, the white tag that you testified to; is that correct?

14   A.   Well, no, not from that distance but that -- when it

15   exited the parking lot, that's probably about how far it

16   was away.  I drove up closer to the vehicle.  That's when I

17   observed the white tags.  That's when I ran it.

18   Q.   What was the white tag?  Can you describe that to the

19   jury?

20   A.   Yeah.  It's just a white tab, every year from the

21   Secretary of State you get it, and it's a different color

22   for each year.  For the year 2009 it's white and you have

23   to put it on your license plate.

24   Q.   So it was a renewal tag --

25   A.   Yes.

*Cross of Officer Kennedy 3/10/10*                                         46

1    Q.   -- is that correct?

2             And it had a 2009 expiration date?

3    A.   Yes.

4    Q.   So, why did you decide to run the license plate on

5    this vehicle?  I mean, it was 2009, correct, when --

6    A.   Yes.

7    Q.   -- this happened?  May 4th, 2009?

8    A.   Yes.

9    Q.   Did you suspect that the tag was no good?

10   A.   No, not offhand.

11   Q.   You just decided to run it for no reason other than

12   just to do it; is that fair?

13   A.   Well, it's expired in 2009, but as you said, it was

14   May 4th, so it could have expired January, February, March,

15   April.

16   Q.   Right.  And it could have expired June, July, August,

17   September, October, November, December of '09, correct?

18   A.   That's true.

19   Q.   Just so we're clear, the Secretary of State, to your

20   knowledge, does not put expired -- I think -- is the

21   microphone on?

22             THE COURT:  You just have to move back a bit.

23             MS. KOSTOVSKI:  I'm sorry.

24             THE COURT:  That's okay.

25   BY MS. KOSTOVSKI:

1    Q.   The Secretary of State does not put, like, the

2    expiration date on the tags, correct?

3    A.   Correct.

4    Q.   Just the year?

5    A.   Yes.

6    Q.   All right.  So, you determined that to examine this

7    vehicle based on, I assume, your observation that there was

8    a 2009 expiration tag on there; is that correct?

9    A.   Yes.

10   Q.   All right.  And after you examined the tag, what did

11   it come back?

12   A.   It came back "no title information on computer"

13   through Secretary of State.

14   Q.   And you examined the plate, right?  I mean, you

15   weren't close enough to read the numbers on the tag,

16   correct?

17   A.   I don't recall.  I don't think so.

18           What do you mean, "the tag"?  On the actual

19   license plate, was able to read --

20   Q.   Yeah.  That's what I'm asking.  There are numbers on

21   the tag on each renewal tag, at least to my knowledge.  You

22   weren't able to see those, you were just able to see the

23   license plate itself, correct?

24   A.   Yeah, I believe so.

25   Q.   All right.  So you ran the plate?

1   A.   Yes.

2   Q.   Do you recall what the plate identification was, the

3   lettering, the numbering?

4   A.   Not offhand.

5   Q.   Is that noted in your report?

6   A.   It would be in my report.

7   Q.   If it's not noted in your report, is that because you

8   didn't write it down or you didn't think it was

9   significant, or --

10   A.   Well, it would be where I put the vehicle information.

11   It's not in the narrative so it might be under a separate

12   vehicle category.  You know, there is information for the

13   property and the vehicle is separate from the narrative.

14   Q.   Okay.  And so the tag -- or the plate, you said, came

15   back to -- well, strike that.

16           Whose name did the plate come back to; do you

17   recall?

18   A.   I don't recall.  I know it was -- it came, I believe,

19   off of Evergreen, off an apartment in the City of Detroit

20   but I don't --

21   Q.   Does Toni Delores Alexander ring a bell?

22   A.   The Toni does, with an "i".  I can't recall the last

23   name.

24   Q.   All right.  So why did you decide to stop the vehicle?

25   A.   Because there was no vehicle information attached to

*Cross of Officer Kennedy 3/10/10*                                   49

1    the plate at all so it didn't belong on a vehicle.

2    Q.   What did the vehicle plate come back to?

3    A.   Just the name of that Toni, whatever the last name

4    was, and an address, but there was no vehicle information.

5    Q.   So what does that mean exactly?  Can you tell the jury

6    what that means?

7    A.   Yeah.  Well, when usually you run a license plate, it

8    comes back to the registered owner and it comes back to

9    their address, and it also comes back with the year of the

10   vehicle, the vehicle identification number, information

11   like that.

12   Q.   All right.  So because this one just came back to a

13   name, is that what you're testifying?

14   A.   Yes.

15   Q.   You said that that was improper?

16   A.   Yes.

17   Q.   And so you decide to initiate the traffic stop,

18   correct?

19   A.   Yes.

20   Q.   And how far away from the motel did that take place,

21   the traffic stop?

22   A.   I initiated the traffic stop within, I don't know, 100

23   feet.  The vehicle turned onto Seven Mile, which Grand

24   River and Seven Mile kind of meet right there.  And then

25   the vehicle stopped within, like, two, three blocks.

*Cross of Officer Kennedy 3/10/10*                                    50

1    Q.   Did you turn on your sirens before the traffic stop --

2    A.   I don't recall.

3    Q.   -- the first stop?

4    A.   Yeah, I don't recall.  I know I turned on my overhead

5    emergency lights.

6    Q.   Okay.  And did the vehicle immediately stop?

7    A.   In a timely manner, yeah.

8    Q.   And the driver pulled over to the side of the road as

9    was shown in the video?

10   A.   Yes, ma'am.

11   Q.   Okay.  You come out of your vehicle and you approach

12   the driver's side, correct?

13   A.   Yes.

14   Q.   How many occupants did you see in the vehicle?

15   A.   There was two.

16   Q.   All right.  Can you tell us their gender?

17   A.   Yeah, there is a female driver and a male passenger.

18   Q.   All right.  And did you get the name of the passenger?

19   A.   Yes, I did.

20   Q.   What was his name?

21   A.   James Rhodes.

22   Q.   All right.  We saw in the video that you placed

23   Mr. Rhodes under arrest; is that correct?

24   A.   Yes.

25   Q.   Why was he arrested?

*Cross of Officer Kennedy 3/10/10*                                    51

1    A.   He had outstanding warrants out of Redford for traffic

2    citations, I believe.

3    Q.   Did he have other warrants as well?

4    A.   I believe he had some Detroit warrants.

5    Q.   Did you search Mr. Rhodes at the time of the arrest,

6    pat him down for weapons and --

7    A.   Yes.

8    Q.   -- contraband?

9         You didn't find anything on him?

10   A.   No.

11   Q.   Now, I think we also heard on the tape Mr. Rhodes

12   making a comment to the driver about tools --

13   A.   Yes.

14   Q.   -- is that correct?

15        Where were the tools?

16   A.   I don't recall.

17   Q.   Did you see any tools?

18   A.   No.

19   Q.   Did you inventory any tools in this case?

20   A.   No.  I didn't do a search of the vehicle.

21   Q.   Do you recall if any tools were found?

22   A.   I don't recall.

23   Q.   Okay.  Did you look inside the vehicle while you were

24   at the traffic stop?

25   A.   Yes.

*Cross of Officer Kennedy 3/10/10*                                            52

1    Q.   What did you observe inside the vehicle?

2    A.   The main thing that stood out was the purse or bag by

3    the driver's feet, nothing else really stands out in my

4    memory of it.

5    Q.   Which side of the driver's feet did you say the bag

6    was seen?

7    A.   I believe it would be on -- it would be on her left

8    side, like both her feet would be here and the bag was

9    right here, to the left of her.

10   Q.   Were you able to observe if the bag was opened or

11   closed?

12   A.   It was open.

13   Q.   The bag was open?

14   A.   Yeah.

15   Q.   When you first approached the vehicle and you asked

16   the driver, who you have identified as Ms. Johnson here,

17   for driver's license, registration, the usual documents at

18   a traffic stop, did she have that -- those items in her

19   hand, did she have to open something to get them; do you

20   recall?

21   A.   I believe she got them from the glove compartment.  I

22   mean, she handed me, I believe, a title.  There was no

23   registration, no insurance paperwork, or anything.

24   Q.   You did see a title to the vehicle?

25   A.   I believe so.

*Cross of Officer Kennedy 3/10/10*                                53

1   Q.   So when you came up she -- was her window rolled down

2   or up?

3   A.   When I first approached?

4   Q.   Yes.

5   A.   I believe it was down.

6   Q.   Okay.  And was she just sitting there waiting for you

7   to approach the vehicle?

8   A.   Yes.

9   Q.   Okay.  And you come up.  What is the first thing you

10  do?

11  A.   I asked for driver's license, registration and proof

12  of insurance.

13  Q.   All right.  What was her response?

14  A.   Well, she handed me the photocopy of a driver's

15  license and she stated something about that she just

16  recently purchased the vehicle.

17  Q.   Now, was the photocopy of this license in her hand or

18  did she reach inside the vehicle or --

19  A.   It was already in her hand.

20  Q.   It was already in her hand.

21       So how is it that you say that she opened the

22  glove compartment box?

23  A.   I don't understand.

24  Q.   Well, I think you said that she opened the glove box

25  earlier when I asked you if she had reached somewhere --

1    A.   Yeah, after.

2    Q.   -- to locate some documents.

3    A.   Yeah.  After my initial contact with her, she had the

4    photocopy already.  Then when I asked for her vehicle

5    paperwork, she went into the glove compartment.

6    Q.   What did she produce from the glove compartment?

7    A.   Just the title.

8    Q.   Whose name was the title in?

9    A.   I don't recall.

10   Q.   Was that taken as part of the search of this vehicle?

11   A.   Yeah, everything was --

12   Q.   That was inventoried?

13   A.   I don't recall.

14   Q.   You didn't have anything to do with that, right?

15   A.   I brought in everything from the purse.

16   Q.   But you didn't bring anything in from inside the

17   vehicle?

18   A.   No, other than the purse that was, you know, she

19   brought out with her.

20   Q.   All right.  Now after you looked at the title, what

21   happened?  Did that go back in the glove box or did you

22   take it?

23   A.   I don't recall.  I know I had it at some point to

24   verify the vehicle identification number on the paper with

25   what was actually on the vehicle.

1    Q.   And they matched?

2    A.   Yeah.

3    Q.   Okay.  So you had no reason to suspect that there was

4    anything wrong with the vehicle; is that correct?

5    A.   That's correct.

6    Q.   Now, you said that you placed Mr. Rhodes under arrest

7    because he had outstanding traffic warrants in Redford; is

8    that right?

9    A.   Yes.

10   Q.   Did you get a chance to speak with Mr. Rhodes as to

11   how he ended up with Ms. Johnson in her vehicle?

12   A.   Yes.

13   Q.   What did he tell you?

14   A.   He told me that he was there just to assist her in

15   fixing her vehicle and --

16   Q.   And did you ask him how they met up that day?

17   A.   I don't recall the exact conversation but it was,

18   basically they were -- they weren't, like, close personal

19   friends, it sounded like vague acquaintances, and that

20   somehow maybe through mutual friends he was assisting her.

21   Q.   Do you know if he did any work on her vehicle?

22   A.   No, I don't know.

23   Q.   You testified that you didn't see any tools or

24   retrieve any tools; is that correct?

25   A.   Yeah.  I don't recall seeing any tools in the vehicle.

1    Q.   Okay.  But we did hear Mr. Rhodes tell Ms. Johnson,

2    notify whoever and get the tools to them; is that right?

3    A.   Yes.

4    Q.   Okay.  Did you ask him where he was going with

5    Ms. Johnson on this ride?

6    A.   I probably did.  I don't recall.

7    Q.   You don't recall if you asked him or you don't recall

8    his answer?

9    A.   I don't recall his answer.

10   Q.   But you recall asking?

11   A.   Yeah.  I asked where they were going, where they were

12   coming from.  That's when I found out that they were coming

13   from the Coach and Lantern.

14   Q.   Well, why would you ask them where they were coming

15   from if you had seen them coming out of the Coach and

16   Lantern?

17   A.   Just a standard question.  I also do that.

18   Q.   To confirm your observation?

19   A.   Yeah.

20   Q.   Now, after you arrested Mr. Rhodes, what happened with

21   the driver?

22   A.   I'm sorry, after I arrested him?

23   Q.   Yes.  What happened with the driver --

24   A.   Okay.

25   Q.   -- Ms. Johnson?

1    A.   Then I walked back up and had conversations about her

2    name, her date of birth, her address, stuff like that.

3    Q.   And I think you testified yesterday that she appeared

4    to be slow in responding to your questions; do you recall

5    that?

6    A.   Yes.

7    Q.   Now, we viewed the tape here and is it still your

8    testimony that she was slow in responding to your

9    questions?

10   A.   At certain times, yes.

11   Q.   And so the tape, and the jurors can judge for

12   themselves, appears to show that she was answering your

13   questions fairly promptly; is that fair to say?

14   A.   From my recollection of it, some of it's muffled.

15   There is at times, I was asking her specific questions,

16   from my recollection she appeared to be slow and

17   deliberate, in my opinion, thinking what she was going to

18   say.

19   Q.   Is that unusual, Officer, when citizens are

20   encountered by the police and they're at a traffic stop?

21   Is that unusual for people to respond slowly and be nervous

22   in front of police officers, even if they have done nothing

23   wrong?

24   A.   It's not unheard of but it's not -- it struck

25   me -- it struck me as odd when I'm asking somebody basic

1    questions that they should be able to answer immediately.

2    Q.   But that's happened, even people that you have pulled

3    over that have been nervous and anxious, and you've let go;

4    is that correct?

5    A.   I'm not going to say it's never happened before, if

6    that's what you're asking.

7    Q.   So the answer is yes, it's happened?

8    A.   Sure.

9    Q.   So, simply because she was slow in answering doesn't

10   mean she was doing something wrong at that point; is that

11   correct?

12   A.   Correct.

13   Q.   All right.  Now, the tape showed several times where

14   you went back to your vehicle; is that correct?

15   A.   Yes.

16   Q.   What were you doing at your vehicle during the -- I

17   guess those are the breaks in the clips.  What were you

18   doing?

19   A.   I was running the names through LEIN and Secretary of

20   State computer that the driver had given me.

21   Q.   Can you approximate for the jury how long these gaps

22   were?  I mean, just a few minutes or a half hour?

23   A.   Yeah, a few minutes, three, four minutes.

24   Q.   What was the total length, if you recall, of the first

25   encounter here on the tape?

1    A.   What do you mean?  The entire thing or the first time

2    I went -- I had contact with her and went back to my patrol

3    vehicle.

4    Q.   I'm talking about the entire encounter here on the

5    video, the traffic stop, from the beginning to the time

6    then that the car drives away; if you can recall?

7    A.   It was, like, about 20, 25 minutes.

8    Q.   So during that time period, you were trying to

9    establish identification and the vehicle, correct?

10   A.   Yes.

11   Q.   All right.  Did you feel threatened at any point?

12   A.   No.

13   Q.   Were you able to see inside the vehicle?

14   A.   Yes.

15   Q.   And did you see any weapons in the vehicle?

16   A.   No.

17   Q.   Now, may I approach the witness, Judge?

18        THE COURT:  Absolutely.  Continuing permission

19   granted.

20        MS. KOSTOVSKI:  Thank you.

21   BY MS. KOSTOVSKI:

22   Q.   Is Government's Exhibit 10 here?

23   A.   Yes.

24   Q.   You testified about this.  This is a driver's license

25   that was, according to your testimony, found in the purse

*Cross of Officer Kennedy 3/10/10*                                    60

1    at the station?

2    A.   Yes.

3    Q.   Now, you testified that this was a -- you could

4    determine it was a fake license, right?

5    A.   Uh-huh.

6    Q.   How can you do that?  Tell us.

7    A.   Well, to me, just after, you know, seeing so many

8    driver's licenses, it appears -- the colors appear a little

9    bit off on the very top and also the picture seems kind of

10   hard to pinpoint but it doesn't seem quite right.  It's a

11   little blurry.  The best I can describe is, if I look at

12   this, it looks clearly fake to me.

13   Q.   Is this now after you've determined, I assume in this

14   case, that it's a fake, or can you say -- let's assume you

15   didn't know this was fake.  You look at this license, you

16   would be able to determine that it's fake from the get-go?

17   A.   Yes.  I would look at this and --

18   Q.   If that had been presented to you, you would say

19   that's a fake license?

20   A.   Yeah.

21   Q.   And that's because of the coloring?

22   A.   Yeah.  The feel of it, the coloring is little bit off,

23   the coloring where it says "operator license," the number,

24   the yellow on here looks a little bit darker than it

25   usually does on a driver's license.

*U.S.A. v Johnson 09-cr-20264*

1    Q.   So you didn't -- you didn't do any -- well, strike

2    that.

3              Did you do any independent forensic examination

4    of that license to determine whether it was fake?

5    A.   No.  Just looked at it from my experience.

6    Q.   All right.  Did you run a check of that license

7    through the Secretary of State's office?

8    A.   Yeah.

9    Q.   What did it come back --

10   A.   I don't recall.

11   Q.   Do you have any documentation?

12   A.   There might be with the case file but I don't have it

13   with me.

14   Q.   Okay.  Is there an Angela Christine Jackson, to your

15   knowledge?

16   A.   I don't know.

17   Q.   You said you don't recall what came back when you ran

18   that license; is that right?

19   A.   Yes.

20   Q.   Why is that?

21   A.   Well, this occurred, you know, May 4th last year.  I

22   don't recall.  There is lots of names --

23   Q.   Did you bring your file or your report, or anything,

24   in this case?

25   A.   I believe the prosecution has it.

1    Q.   Okay.  So is there any indication, if you can recall,

2    if you ran a check on this particular license and what

3    information was gleaned?

4    A.   I don't recall.  I know the name would have been run.

5    I know I would have ran it but I don't recall what it came

6    back as.

7    Q.   So you don't recall as to whether or not you

8    determined whether there is an Angela Christine Jackson or

9    not; is that correct?

10   A.   I don't recall what came back through the Secretary of

11   State computer, no.

12   Q.   And you're saying that the person on that photograph

13   is not Angela Christine Jackson; is that right?

14   A.   I'm saying that this appears to be a fake driver's

15   license to me.

16   Q.   So the answer to my question is, yes or no, you don't

17   know?

18   A.   Do I know if this picture is Angela Christine Jackson?

19   No, I don't know that.

20   Q.   Okay.  Now, after you came back I guess the final time

21   to the vehicle, you had already made a determination that

22   you were going to arrest the driver; is that correct?

23   A.   Yes.

24   Q.   And what was the basis for your determination that you

25   were going to arrest her?

*Cross of Officer Kennedy 3/10/10*                                    63

1    A.   Because the names she had given me had changed several

2    times and they came back no record on computer.  So I felt

3    like she was not telling me her real name and she didn't

4    have a valid driver's license on her.

5    Q.   So that was the basis for placing the driver under

6    arrest?

7    A.   Yeah, for no operator's license on person.

8    Q.   Okay.  And as you came to the vehicle, you said she

9    put the key in the ignition, rolled up the window and then

10   drove off and we saw -- well, we saw the driving off.  We

11   didn't see the other activities in the vehicle, but is that

12   a fair statement?

13   A.   Yes.

14   Q.   All right.  Now, you engaged in pursuit and I believe

15   we heard that you called for backup; is that correct?

16   A.   Yes.

17   Q.   Okay.  How fast was she driving?

18   A.   Primarily, like, 15, 20 miles per hour, 25.

19   Q.   We also noticed that she was stopping at the stop

20   signs.  Did you notice that?

21   A.   Yes, uh-huh.

22   Q.   Now, she's stopped.  There's another vehicle that we

23   saw ahead of yours; is that correct?

24   A.   Yes.

25   Q.   Whose vehicle was that?

1   A.   That was Officer Mansfield, K-9 officer.

2   Q.   Male or female?

3   A.   Female.

4   Q.   So Officer Mansfield is in front of your vehicle; is

5   that correct?

6   A.   Yes.

7   Q.   And there was another vehicle, I believe, in front of

8   the driver's vehicle; is that correct?

9   A.   Yeah, coming the opposite direction.  Is that what

10  you're referring to?

11  Q.   Yes.  Who was in that vehicle?

12  A.   That was Officer Haas, male.

13  Q.   You were a little bit further behind Officer

14  Mansfield's vehicle; is that correct?

15  A.   Yes.

16  Q.   So where is Mr. Rhodes during this time?

17  A.   He was in the back seat of my patrol vehicle.

18  Q.   Okay.  So you were engaged in pursuit with a suspect

19  in custody; is that correct?

20  A.   Yes.

21  Q.   So it was difficult to see, would it be fair to say,

22  based on the distance, of exactly what was happening on the

23  ground after the driver was pulled out of the vehicle; is

24  that correct?

25  A.   No, not really.

 1    Q.   Okay.  Well, tell us what you saw?

 2    A.   I saw a struggle between the two officers trying to

 3    arrest the driver.

 4    Q.   How many officers were there?

 5    A.   There was two officers.

 6    Q.   And including you, is that three?

 7    A.   Yes.

 8    Q.   Two males and one female?

 9    A.   Yes.

10    Q.   How big was the defendant at the time this happened

11    about a year ago?  I mean, was -- do you remember?

12    A.   Yeah.  I don't know, 5'6" to 5'8", 180 pounds maybe.

13    Q.   5'6" and 180 pounds?

14    A.   Approximately, I don't know.

15    Q.   Okay.  Did you see how Ms. Johnson was pulled out of

16    the vehicle?

17    A.   No.

18    Q.   You had nothing to do with pulling her out of the

19    vehicle, right?

20    A.   No.  When I arrived, they're struggling on the ground.

21    Q.   Okay.  So you didn't see if the purse that was by the

22    driver's side was actually taken by Ms. Johnson as she was

23    pulled out of the vehicle or it was a reflective movement,

24    or the officers grabbed it when they grabbed her out of the

25    vehicle?

*Cross of Officer Kennedy 3/10/10*                                    66

1    A.   She had it wrapped -- she had it in her arm when we

2    were trying to place her under arrest.

3    Q.   That's not my question.  My question is --

4    A.   I did not see how --

5    Q.   How it ended up wrapped on her arm, that's correct?

6    A.   I didn't see her exit the vehicle.

7    Q.   Now, you testified earlier this morning that there was

8    a lot of ammunition based on the government's exhibits

9    there and the weapons that were in the purse; is that

10   correct?

11   A.   Yes.

12   Q.   Did you actually hold the purse with all the contents

13   in there?

14   A.   Yeah.

15   Q.   Was it pretty heavy?

16   A.   Yeah.

17   Q.   So, there was three officers and this heavy purse and

18   this lady and you said that she was struggling and fighting

19   and you guys ended up having to engage in some physical

20   force; is that correct?

21   A.   Well, we had to forcibly pull her arms to handcuff

22   her.

23   Q.   Wasn't she struck in the ribs a couple times by one of

24   the other officers?

25   A.   Not that I'm aware of.

1    Q.   Okay.  Now, were you involved at all in the search of

2    the vehicle at the time it was taken to the Redford garage?

3    A.   No, ma'am.

4    Q.   Your involvement was strictly the search of the purse;

5    is that correct?

6    A.   Yes.

7    Q.   Now, she was arrested at the scene, officially

8    arrested; is that correct?

9    A.   Yes.

10   Q.   All right.

11        MR. GABEL:  Your Honor, I'm going to show Officer

12   Kennedy Defendant's Proposed Exhibit A, which I have given

13   to Mr. Gabel previously.

14        MR. GABEL:  No objection from the government.

15        THE COURT:  Defendant's Exhibit A is admitted.

16        (Defendant's Exhibit A received)

17        MS. KOSTOVSKI:  Thank you.

18   BY MS. KOSTOVSKI:

19   Q.   Can you identify this?

20   A.   Yeah.  It appears to be a photocopy of the ticket I

21   wrote.

22   Q.   More than one ticket?

23   A.   Yes.

24   Q.   All right.  And this is what she was arrested for and

25   cited, correct?

1   A.   Yes.

2   Q.   Can you tell the jury what those citations are for?

3   A.   It's flee and elude, no operator's license, never

4   acquired, improper plate, no seatbelt, no proof of

5   insurance and no proof of registration.

6           MS. KOSTOVSKI:  Your Honor, my I publish this to

7   the jury?

8           THE COURT:  Absolutely.

9   BY MS. KOSTOVSKI:

10  Q.   So as far as you were concerned, she violated some

11  traffic laws and the fleeing and eluding at the time that

12  she was arrested; is that correct?

13  A.   Well, that was just the traffic portion of the arrest

14  charges.  When I looked through the purse and found the

15  firearms, obviously that was going to be a charge.

16  Q.   But that's all that she was charged with?  I mean,

17  that's all she was ticketed for; is that correct?

18  A.   Yeah, but, I mean, we don't issue a citation for a,

19  you know, weapon's charge.

20  Q.   I understand.  But no other charges were filed by your

21  department; is that correct?

22  A.   No, not to my knowledge.

23  Q.   Okay.  And at some point the matter was then referred

24  to the Secret Service; is that correct?

25  A.   That's correct.

*Cross of Officer Kennedy 3/10/10*                          69

1   Q.  All right.  Were you involved in any of that with the

2   Secret Service?

3   A.  No.

4   Q.  Okay.  Did you speak to anybody from the Secret

5   Service about your involvement in this case?

6   A.  I did.

7   Q.  Who did you speak to?

8   A.  I forget the agent's name.

9   Q.  Agent Powell?

10  A.  Yes.

11  Q.  And your conversation revolved around the traffic stop

12  and the search of her purse?

13  A.  I believe so.

14          MS. KOSTOVSKI:  One second, Judge.

15          (Brief pause)

16          MS. KOSTOVSKI:  We have no more questions.

17          THE COURT:  Thank you, Ms. Kostovski, Officer.

18          MR. GABEL:  I do have brief redirect.

19          THE COURT:  I generally don't have redirect, the

20  way I conduct things under 611, but if you have some

21  justification for a crucial question or two.

22          MR. GABEL:  If it's not the Court's practice to

23  normally have redirect, that's fine.

24          THE COURT:  Yeah, I generally -- if there is

25  something crucial that you are going to miss, that's fine

*Cross of Officer Kennedy 3/10/10*                                    70

1    but generally we just don't allow redirect.  Okay?

2              MR. GABEL:  Okay.

3              THE COURT:  Sorry.  I should have told you that.

4    I apologize.

5              Officer, you're finished.  Thank you for your

6    time today.

7              I'm sorry about that, too.  Both counsel, I

8    should have gone over that in the pretrial but it just

9    helps to move things along, I find.

10             Who is next, Mr. Gabel?

11             MS. ROBICHAUD:  Your Honor, the government would

12   like to call James T. Rhodes.

13             THE COURT:  Come on up this way, Mr. Rhodes.

14             How are you feeling today.

15             THE WITNESS:  I'm in pain.

16             THE COURT:  What's the matter?

17             THE WITNESS:  I didn't get to the doctor's office

18   yesterday to get another prescription.

19             THE COURT:  Look at me, please, sir.  Raise your

20   right hand, if you can.  Can you raise your right hand?

21             THE WITNESS:  Yes, sir.

22                            **JAMES RHODES**

23             (The Witness is sworn)

24             THE COURT:  Please, have a seat.  Now, if you get

25   uncomfortable or need a break, you let me know, okay?

1         THE WITNESS:  Thank you.

2         THE COURT:  What's wrong with your foot?  You got

3    tendinitis?

4         THE WITNESS:  No, sir.  I was doing -- see, I do

5    scrap.  And I was taking aluminum siding off of my old

6    lady's cousin's house and I fell off the ladder.  The

7    ladder got away from me.

8         THE COURT:  If you need anything for your leg, if

9    you're in pain, you let me know and we will take a break.

10   Okay?

11        Ms. Robichaud, go ahead.

12        MS. ROBICHAUD:  Thank you, Your Honor.

13                    **DIRECT EXAMINATION**

14   BY MS. ROBICHAUD:

15   Q.  Can you please state your name?

16   A.  James Rhodes.

17   Q.  Mr. Rhodes, where do you live?

18   A.  19900 Stout.

19   Q.  Is that in Detroit?

20   A.  Yes, ma'am.

21   Q.  How long have you lived in Detroit?

22   A.  I've been living in Detroit all my life.  I was born

23   and raised in Detroit.

24   Q.  What do you do for a living?

25   A.  I a scrapper.

*Direct of J. Rhodes 3/10/10*                                           72

1    Q.   Do you do any other things to earn money?

2    A.   Yes, ma'am.  You know, I do odd jobs, like work on

3    cars.

4    Q.   How long have you done this type of work?

5    A.   I been doing this all my life.

6    Q.   So how do you get your business?  So how do you get

7    work?

8    A.   How do I get work?

9    Q.   Word of mouth or just --

10   A.   People, friends that know me usually -- I'm not no

11   certified mechanic, you know, I just, you know, know how to

12   work on cars, you know, and people just know that I work on

13   cars and they come and ask me to fix a car, something like

14   that.

15   Q.   I'd like to talk about May 4th, 2009 with you.  Where

16   you asked that day to look at a car that needed repair?

17   A.   Yes, ma'am.  I just was asked to come and see if I can

18   start a car for this lady.

19   Q.   Do you see that lady in the courtroom today?

20   A.   Yes, ma'am.

21   Q.   Can you point to her and describe what she is wearing?

22   A.   Right there.

23        MS. ROBICHAUD:  Please let the record reflect

24   that the witness has identified the defendant.

25        THE COURT:  The defendant has been identified by

*U.S.A. v Johnson 09-cr-20264*

1    the witness.  Go right ahead.

2    BY MS. ROBICHAUD:

3    Q.  Did she tell you her name?

4    A.  Yes, ma'am.  She said her name was Angela.

5    Q.  Was May 4th the first day you had ever seen the

6    defendant?

7    A.  May 4?

8    Q.  Was that the first time --

9    A.  Yes.  I had seen her before but, you know, the first

10   time I had worked on her car.

11   Q.  Did she offer to pay you for doing the work?

12   A.  Yes, ma'am.  She paid me $10.  That's all.  It was

13   just to start the car.

14   Q.  So she told you what the problem was?

15   A.  No, she, she just carried me to the car and I went to

16   the car and I started it.  I carry my pliers and two

17   screwdrivers.  That's all I needed, because I figured, you

18   know, by the time I got there, I asked her what was the car

19   doing.  By my knowledge of the car, you know, all she had

20   to do was just tell me what it was doing and I figured what

21   kind of tools I need to go take with me.  So I took a pair

22   of pliers and two screwdrivers.

23            As soon as I got there, all I did was adjusted

24   the carburetor and it turned over and it cranked up.

25   Q.  Was anyone else with you in the car when she took you

*Direct of J. Rhodes 3/10/10*                                                74

1    to do the repair?

2    A.   No, ma'am.

3    Q.   Did she pick anyone else up along the way?

4    A.   No, ma'am.

5    Q.   Did you bring anything else with you other than your

6    tools?

7    A.   No, ma'am.  All I had was just pliers and two

8    screwdrivers.

9    Q.   When you were finished then with the repair what

10   happened?

11   A.   She was going to take me home, that was it.

12   Q.   So when she was taking you home what happened?

13   A.   The next thing I know, the police stopped us.

14   Q.   So when she was pulled over, were you asked for

15   identification?

16   A.   Yes, ma'am.

17   Q.   And did you provide your real identification?

18   A.   Yes, ma'am.

19   Q.   Were you placed under arrest after the officer ran

20   your identification?

21   A.   Yes, ma'am.

22   Q.   Why is that?

23   A.   Because I had warrants in Redford because of my tags

24   on my truck had expired and my insurance had expired, and

25   they had gave me a ticket because of the fact that I --

1    they said I didn't use it; also, my turn signal.  So they

2    had gave me a ticket, okay.  And I went and got my

3    insurance and got my tags and everything straight, but you

4    know, instead of going and getting it canceled --

5            MS. KOSTOVSKI:  Your Honor, we are engaging in

6    narrative again.

7            THE COURT:  Why don't you limit the witness's

8    answers by asking some intermittent questions, please,

9    Ms. Robichaud.

10   BY MS. ROBICHAUD:

11   Q.  Did you see that the defendant had a large purse with

12   her that day?

13   A.  Ma'am?

14   Q.  Did you see that the defendant was carrying a purse

15   with her that day?

16   A.  Yes, ma'am.

17   Q.  And are you aware of what was in the purse?

18   A.  No, ma'am.  She always kept her purse sitting on the

19   side of the door over there where she was.

20   Q.  Did you place anything in the defendant's purse?

21   A.  No, ma'am.

22   Q.  Was the trunk of the car opened while you were with

23   the defendant?

24   A.  I never seen the trunk.

25   Q.  Did you know what was in the trunk?

*Cross of J. Rhodes 3/10/10*                                        76

1    A.    I never know what was in the trunk.

2    Q.    Did you have any guns on you that day?

3    A.    No, ma'am.  I was out there working, tearing down some

4    washers and dryers when they came over there and asked me

5    to fix her car.

6    Q.    Did you have any money on you other than --

7    A.    I had about 3, $4 on me.

8    Q.    Did the defendant give you anything else at all?

9    A.    No.  She just -- when I got through she just gave me

10   $10.

11          MS. ROBICHAUD:  Thank you.  I have no further

12   questions.  I pass the witness for cross-examination.

13          THE COURT:  Thank you very much.

14          Ms. Kostovski, your turn.

15          MS. KOSTOVSKI:  Thank you, Judge.

16                    **CROSS-EXAMINATION**

17   BY MS. KOSTOVSKI:

18   Q.    Good morning, Mr. Rhodes.  You testified that you were

19   with this lady here, the defendant on --

20   A.    Yes, ma'am.

21   Q.    -- the day is May 4th?

22   A.    Yes, ma'am.

23   Q.    Do you recall what time of day that was?

24   A.    I don't -- I don't recall what time of day it was.

25   Q.    Was it daylight?

1    A.   Yes, ma'am.

2    Q.   And where were you that day before you ended up

3    with --

4    A.   I was in my driveway and I was working on the washer

5    and dryer.  See, I do scrap.  I'm a scrapper.  So I break

6    all my stuff down so I can take my metal in, my copper and

7    my aluminum.  See, I don't just take my dryers in whole.

8    You take them whole, you ain't getting nothing.  You know,

9    you got your motors, and everything.  You don't got nothing

10   if you take it all in like that.  You are just getting paid

11   for the weight.

12   Q.   All right.  Ms. Rhodes, so you were in your driveway

13   doing some work on appliances to scrap them at some point?

14   A.   Yes, ma'am.

15   Q.   And you were in your driveway in Detroit?

16   A.   Yes, ma'am.

17   Q.   On Stout Street?

18   A.   See, Stout Street and Pembroke, because Pembroke, you

19   know, runs right where my driveway is.

20   Q.   Is that the west side of the city?

21   A.   Yes, ma'am.

22   Q.   And how close is that to Seven Mile and Grand River?

23   A.   Seven Mile is this way.  It's about -- Seven Mile

24   about four block, five blocks up.  Eight Mile is about five

25   -- five -- they right next to each other.

1    Q.    So you were about five blocks away?

2    A.    From each of them, and then Evergreen.

3    Q.    What?

4    A.    Evergreen.

5    Q.    From Evergreen?

6    A.    Evergreen.  All them around in the same area.

7    Q.    All right.  Now, you said they came to get you

8    regarding a car; is that right?

9    A.    The lady I knew in the neighborhood.

10   Q.    What lady?

11   A.    It was a lady I knew in the neighborhood that it be

12   over there, over there on the side of the street.  See,

13   because I live -- if you look at my house, my house is

14   right here.  Okay.  Right across the street -- Stout runs

15   this way and then you go down a little bit and then Stout

16   runs that way.  You got to go about half, quarter of a

17   block and Stout runs this way.

18   Q.    Okay.  But you said a lady that lived in --

19   A.    In the neighborhood.

20   Q.    -- in the neighborhood.

21         Do you know her name?

22   A.    No, I don't, I don't know her name.  I just know --

23   Q.    Is she African-American or --

24   A.    Yes.

25   Q.    -- is she a white lady?

1    A.   She's African-American.

2    Q.   How old is this lady?

3    A.   I don't know.

4    Q.   30, 40, 50s?

5    A.   I just know of her.

6    Q.   You know --

7    A.   I just know of her.  She seen me work on cars.  That's

8    all.

9    Q.   So she comes to you.  Did she walk to your house?

10   A.   Me and her and this lady, Ms. Angela, came to me and

11   she asked me, she say, would you like -- would you help

12   this lady with her car, and I said --

13   Q.   Okay.

14   A.   I said yeah.

15   Q.   Mr. Rhodes, I don't mean to interrupt you but we have

16   to do this in a question and answer so it will flow and so

17   everyone will understand, so I apologize for interrupting

18   you.

19   A.   Okay.

20   Q.   You said a lady from the neighborhood and the

21   defendant here, they came to you and requested your

22   services for fixing a vehicle?

23   A.   Right.

24   Q.   Right.  How did they come to you, did they walk?

25   A.   Yeah, just walked right across the street because, you

1    know, they're just right across the street, you know, the

2    block is right here and my drive is right there.  My

3    driveway is right down Stoepel.

4    Q.   Okay.  So they come to you, they say --

5    A.   She asked me.

6    Q.   Who?

7    A.   Angela.

8    Q.   She asked you to fix her car?

9    A.   Right.

10   Q.   Now, what happened after she asked you to fix her car?

11   A.   I told her, I said, okay, I said, let me finish

12   breaking this washer and dryer up and put it on my trailer

13   and I will go with you.  So I broke everything up and after

14   I broke everything up, I put it on the trailer and then I,

15   you know, closed the gate on my trailer and got in the car

16   with her.

17   Q.   What car did you get in with her?

18   A.   I don't know.  It was a brown car.  It was -- I don't

19   know if it was an Oldsmobile, or what.

20   Q.   A brown car?

21   A.   It was sort of like tan.

22   Q.   And where did you go with her to --

23   A.   She had me out on Seven Mile and -- across Grand River

24   to a motel.

25   Q.   Okay.

1   A.   That's where we went.

2   Q.   And the car that needed fixing was there?

3   A.   Yes, it was.

4   Q.   Okay.  And what kind of car was that?

5   A.   It was a green car.  I don't recall the name of it.

6   Q.   So she drove you to this --

7   A.   She drove me to the car.

8   Q.   Okay.

9   A.   Got to the car, and I told her pull the hood.  We got

10   in there, I pulled the hood myself, pulled the hood and

11   then I got up in there and told her to try and crank it,

12   and she tried.  So I saw what it was.  I just took my

13   screwdriver, tuned it up a little bit with the screwdriver

14   and messed with the carburetor, adjusted the carburetor.

15   Q.   What happened to that car that was there?

16   A.   I don't know.

17   Q.   You started it and that was it?

18   A.   I started it and we left it there.

19   Q.   I see.

20   A.   We left it there and she was supposed to take me back

21   to the house.

22   Q.   Then she drove you back, or started to drive you back?

23   A.   We didn't get to the house.  You see what I'm saying?

24   Q.   Uh-huh.

25   A.   After I fixed the car, she was supposed to take me

1    back to the house.  We never got to the house because as

2    soon as I turned around, the next thing I know the police

3    is behind us.

4    Q.  Now, did you see the defendant here carrying a purse

5    that day?

6    A.  Yes, ma'am.

7    Q.  What kind of purse was it?

8    A.  I don't know.

9    Q.  Do you remember the color?

10    A.  It was a purse -- it was a tan purse, I'm quite sure.

11    Q.  Do you remember how --

12    A.  It was a big purse.  It was a big purse.  That's all I

13    seen.

14    Q.  It was a big purse.  Was it on --

15    A.  No, she carried it on this side, and this side on the

16    driver's side is by the door.  That's where she kept the

17    purse, right there on that side.

18    Q.  That's where the purse was?

19    A.  Yeah.

20    Q.  Now, you said you had some tools?

21    A.  I just had a pair of pliers and two screwdrivers, and

22    that's it.

23    Q.  Where were those?

24    A.  I set my pair of pliers and my screwdriver right there

25    on the floor, on the floorboard right there.

*Cross of J. Rhodes 3/10/10* 83

1    Q.   Were you were sitting on the passenger side?

2    A.   Yes, ma'am.

3    Q.   Did you ever look in the car that she was driving?

4    A.   I had no business looking in the car.  I was going to

5    do one thing.  I was going to fix her car and then I was

6    coming back home because I had -- I was trying to make me

7    some money.  And just that little $10, if I had knowed I

8    was going get in trouble for going to help a lady out, I

9    would have never went with her.

10   Q.   Now, did you have any weapons on you that day?

11   A.   I don't carry no weapons.

12   Q.   Do you have any weapons, sir?

13   A.   No, ma'am.

14   Q.   Have you ever been convicted of any kind of a crime --

15        MS. ROBICHAUD:  Objection.

16   BY MS. KOSTOVSKI:

17   Q.   -- involving theft or dishonesty?

18        THE COURT:  Sustained.

19        THE WITNESS:  No, ma'am.

20        THE COURT:  Don't answer a question if I sustain

21   an objection, Witness.

22        Go ahead, Ms. Kostovski.

23   BY MS. KOSTOVSKI:

24   Q.   Did you say anything to who you call Angela after you

25   were arrested?  Did you ask her to do anything?

1    A.   I didn't ask her to do nothing.  I just told her -- I

2    said -- when I saw the police, I say I'm going to jail

3    because I got warrants in Redford, and I just told her

4    that, and that's it, and I sit still in the car.  And when

5    the officer came, he got my ID.  After he got my ID, I sit

6    there in the car.  He told me sit still.  I sit in the car

7    and the next thing I know he came and got me and got me out

8    of the car and put me in his car.

9    Q.   Did you say to the defendant, tell my family I've been

10   arrested and take care of my tools?

11   A.   No, I didn't tell her to say -- I didn't ask her to do

12   nothing.

13   Q.   How long had you know --

14   A.   My old lady don't even know her.

15   Q.   How long had you known her?

16   A.   I don't know her.

17   Q.   You don't know --

18   A.   I don't know her.  I never met her before, but just

19   that time.  And, see, I'm this kind of guy, if you want me

20   to help you and I -- I'm -- I got time to do it, I do it.

21   If you need some help, I'll do it.

22   Q.   So you said you were arrested for traffic tickets; is

23   that correct?

24   A.   (Indicating).

25   Q.   Is that all you were arrested for?

1    A.   Yes, ma'am.

2    Q.   Do you remember what you were wearing that day?

3    A.   No, I actually don't, I don't.

4    Q.   Were you dressed like you are now in court?

5    A.   No, I wasn't.

6    Q.   Were you dressed in work clothing?

7    A.   Work clothing, yes.

8    Q.   What kind of work clothing?

9    A.   Some jeans.  I think it was hot that day, kind of warm

10   that day, and probably, you know, a body shirt.

11   Q.   Did you talk to any of the officers after you were

12   taken to the station?

13   A.   Did I talk to any of the officers?

14   Q.   Yes.

15   A.   I was mad because I -- you know, I was just mad

16   because of the fact I was out there trying to make some

17   money and then I ended up going to jail.  I was mad, so I

18   didn't have time to talk to nobody but the officer that

19   asked me would I testify, and I told him yeah.

20   Q.   My question is, did you talk to any officers about the

21   defendant that day?

22   A.   No, ma'am, because I don't know the defendant.

23   Q.   Did they ask you any questions about her?

24   A.   No, not that I remember, not that I recall.

25   Q.   Did they ask you to cooperate against her in some way?

1    A.   No, ma'am.

2    Q.   So basically you were not interviewed at the station

3    about the defendant?

4    A.   No, because I didn't know what they arrested her for.

5    Q.   Did you know she had been arrested?

6    A.   Yes.  When I saw -- I'm sitting in the back car in the

7    police car -- I'm in the back seat of the police car when

8    she took off, so I figured she was going to get arrested,

9    too.

10   Q.   You watched the arrest?

11   A.   I was sitting in the back seat of the car.

12   Q.   What did you see regarding the arrest, what did you

13   see?

14   A.   I saw her taking off.

15   Q.   You saw her take off?

16   A.   -- jumped in the car and chased her, that's all.

17   Q.   Then what happened after the chase ended?

18   A.   I couldn't see because all the police cars was up

19   there.

20   Q.   You couldn't see what was happening?

21   A.   No.

22   Q.   So you knew she had been arrested?

23   A.   Yeah.

24   Q.   Did they talk to you about her at all?

25   A.   No, they didn't talk to me about nothing.

Cross of J. Rhodes 3/10/10                                    87

1    Q.   They didn't ask you why you were with her in the car

2    that day?

3    A.   Oh, yeah, they asked me that.   One officer asked me

4    that.

5    Q.   Do you remember which officer?

6    A.   No, ma'am, and I just told the officer, I said, I went

7    to fix her car after.   And after I got through fixing the

8    car, she was supposed have been taking me home.

9    Q.   And that's all you knew?

10   A.   That's all I told him.

11           MS. KOSTOVSKI:  No other questions.

12           THE COURT:  Thank you very much.

13           MS. KOSTOVSKI:  Thank you.

14           THE COURT:  Okay, Mr. Rhodes, you are all done.

15           THE WITNESS:  Thank you, sir.

16           THE COURT:  Thank you.  I am grateful for you

17   coming down.

18           THE WITNESS:  I appreciate.

19           THE COURT:  You need any help?  Are you okay.

20           THE WITNESS:  No.  I'm going to try to make it,

21   doctor's appointment.  I canceled it yesterday because you

22   had jury selection.  I didn't know -- I could have made it

23   yesterday and got me a prescription but I --

24           THE COURT:  We know that and we are grateful.

25   Now, I want you to get yourself taken care of, get to the

1    doctor.  Thank you.

2            Who is next, Mr. Gabel?

3            MR. GABEL:  I know, Your Honor, you mentioned

4    taking a break at 11:00 but I have a witness that I should

5    take no longer that five minutes.  It's Willie Reeves.

6            THE COURT:  Let's do that witness and we will go

7    to our morning break.

8                          **WILLIE REEVES**

9            (The Witness is Sworn)

10           THE COURT:  Don't get too close to the mic but

11   speak up so everybody can hear you.

12           Go ahead, Mr. Gabel.

13                       **DIRECT EXAMINATION**

14   BY MR. GABEL:

15   Q.  Good morning.  Could you please tell the jury your

16   name, sir?

17   A.  Willie Reeves.

18   Q.  Mr. Reeves, do you sell cars on occasion?

19   A.  I have, yes.

20   Q.  I would like to talk about one specific car.  Back in

21   the spring of 2009, were you trying to sell a particular

22   car at that time?

23   A.  Yes.

24   Q.  Could you describe the car for the jury, please?

25   A.  It was a Buick Electra 225, Park Avenue.

1    Q.   Was it a 1984 Buick?

2    A.   Yes.

3    Q.   You offered it for sale?  How long was it for sale

4    before you sold it?

5    A.   Probably a couple days.

6    Q.   What did you do to the car to get it prepared to offer

7    it for sale?

8    A.   I cleaned it up, cleaned it out.  I think I changed

9    the oil and just, basically, checked over the car and got

10   it ready to sell.

11   Q.   Did you clear out all of your personal items and items

12   of value that you would have in the car?

13   A.   Yes.

14   Q.   And did that include from the trunk area?

15   A.   Yes, the entire car.

16   Q.   So when you offered the car for sale, was there

17   anything in the trunk?

18   A.   A spare tire.

19   Q.   Nothing besides the spare tire?

20   A.   Exactly.

21   Q.   How did you advertise the car for sale?

22   A.   I had for sale signs on it and I parked it at AutoZone

23   near my house.

24   Q.   Did someone eventually contact you after they saw the

25   car?

1    A.   Yes.

2    Q.   And was it a male or female?

3    A.   Female.

4    Q.   Do you see the individual in court today who purchased

5    your car?

6    A.   Well, I haven't look around.

7    Q.   Take a look.

8    A.   Yes.

9    Q.   Would you please point to her and describe what she's

10   wearing for the record?

11   A.   She's wearing a brown suit, sitting to my right.

12          MR. GABEL:  Please let the record reflect the

13   defendant was acknowledged by the witness.

14          THE COURT:  The witness identified the defendant.

15          Go ahead, Mr. Gabel.

16   BY MR. GABEL:

17   Q.   How did she contact you to initiate the purchase of

18   the car?

19   A.   From the phone number which was on the car she called

20   me, and I met her at the car.

21   Q.   When you met her at the car, did she tell you what her

22   name was?

23   A.   She did but I don't really even recall.

24   Q.   Did you put together any paperwork to memorialize the

25   sale of the car?

1    A.   Yes, I did.

2    Q.   I'm handing you what has previously been marked as

3    Government's Exhibit 20.  I understand there is no

4    objection to it, therefore, I move for its admission at

5    this time, Your Honor.

6              THE COURT:  Is that right, Ms. Kostovski?

7              MS. KOSTOVSKI:  That's correct.

8              THE COURT:  Okay.  Government's Exhibit Number 20

9    is received.

10             (Government's Exhibit 20 received)

11   BY MR. GABEL:

12   Q.   Mr. Reeves, could you please tell us what this

13   document is?

14   A.   It was used as a bill of sale from me to the person

15   that purchased the car.

16   Q.   And did you write this up yourself?

17   A.   Yes, I did.

18   Q.   And is the name that was given to you by the person

19   who purchased the car on that document?

20   A.   Yes.

21   Q.   What is that name?

22   A.   Well, Angela Jackson -- am I looking at it correct?

23   Q.   Take your time.

24   A.   Okay.  Angela Jackson.

25   Q.   Does that refresh your recollection on whether that's

1    the name that was provided to you when this individual came

2    to buy your car?

3    A.   I believe so.  It's been a long time ago, but I

4    believe so.

5    Q.   Would you have written down Angela Jackson if she

6    provided a different name?

7    A.   No, I wouldn't.

8    Q.   Had you met the defendant before she responded to the

9    car that was for sale?

10   A.   No, I hadn't.

11   Q.   This was the first time you had seen her?

12   A.   Exactly.

13   Q.   How much did she purchase the car for?

14   A.   I believe -- well, she gave me $700.

15   Q.   And was that the asking price for the car?

16   A.   No, it wasn't.  Actually, I wanted quite a bit more.

17   I was trying to sell the car hurriedly because I needed to

18   purchase a van, and I accepted less.  I accepted 8,

19   although she only paid me 7.  She left owing me a balance

20   of $100.

21   Q.   And she was to pay that to you sometime later?

22   A.   Yes.

23   Q.   Do you recall what the denominations were of the bills

24   that she paid you with?

25   A.   Hundred dollar bills.

*Direct of W. Reeves 3/10/10*                                    93

1    Q.   Seven, $100 bills?

2    A.   That's correct.

3    Q.   Do you recall the date in which you sold this to her?

4    A.   Not really.  Looking at the date, it looks like the

5    fifth month.  I guess that's the -- I'm going to take that

6    to be the 21st day of '09.

7    Q.   Okay.  So it's a little illegible on the dates?

8    A.   Exactly.

9    Q.   But your independent recollection is separate from

10   this document.  Do you recall the exact date?

11   A.   No, I do not.

12   Q.   Now, did you leave any firearms in the car or the

13   trunk?

14   A.   No, I did not.

15   Q.   Did you leave any money whatsoever in the car or

16   trunk?

17   A.   No, I did not.

18   Q.   Did you leave any counterfeit or fake money anywhere

19   in the car?

20   A.   No, I did not.

21   Q.   Have you ever had counterfeit money?

22   A.   Not knowingly.

23        MR. GABEL:  I have no additional questions for

24   the witness and pass him for cross-examination.

25        THE COURT:  Thank you.  Ms. Kostovski?

1                    MS. KOSTOVSKI:  Yes.  Cross-examination.

2                    Can you put the bill of sale back?  Thank you.

3                         **CROSS-EXAMINATION**

4    BY MS. KOSTOVSKI:

5    Q.   Good morning, Mr. Reeves.

6    A.   Good morning.

7    Q.   Now, you testified that you sold a Buick Park Avenue

8    to this lady here; is that correct?

9    A.   Yes.

10   Q.   You are absolutely sure it was this lady?

11   A.   Yes.

12   Q.   Okay.  And looking at Government's Exhibit 20, which

13   is the bill of sale, is that your writing on that document?

14   A.   Yes, it is.

15   Q.   Is that all of your writing on the document?

16   A.   Well, no.  I don't believe -- I don't think the bottom

17   here is all mine, but everything above the line is mine.

18   Q.   And that's your signature?

19   A.   Yes.

20   Q.   Okay.  And you said the bottom, is that underneath the

21   signature line to the right?

22   A.   Yes.

23   Q.   That's not your writing?

24   A.   No, that's not my writing.

25   Q.   Do you know whose writing that is?

1    A.   I'm not sure.

2    Q.   Okay.  Do you know who -- it says, attention

3    contractor, is that what says down there above the phone

4    number?

5    A.   Yes.

6    Q.   Do you know anything about that?

7    A.   No, I do not.

8    Q.   Is that your address there and your driver's license

9    number?

10   A.   Okay.  My address.

11   Q.   Where it says Willie Odel Reeves, there's a DL number?

12   A.   Yeah, that's my driver's license number, yes, that's

13   my address, and all that, yes.

14   Q.   Okay.  But that's not your writing?

15   A.   That's correct.

16   Q.   Is that your phone number down there or a number you

17   recognize?

18   A.   Yes, that's my phone number.

19   Q.   Okay.  So you don't know who wrote this?

20   A.   The bottom, that's correct.

21   Q.   Okay.  And you don't know when it was written?  Was it

22   after you signed it?

23   A.   I'm sure it was, yes.

24   Q.   Okay.  Now, you said that the vehicle was sold

25   sometime in May?

1   A.   Well, looking at the -- at the date up here.  I don't

2   actually recall the date.  I've been very busy and I just

3   don't -- I'm sure it was -- I know it was spring of the

4   year, early part of the year.

5   Q.   Well, the bill of sale says, right, I sold to -- it's

6   A-N-G-L-A Jackson on 5 -- can you make out that second --

7   A.   I'm going to say -- I'm thinking that's the 21.  It

8   was scratched out and changed, apparently, by me.  I did

9   that part of the receipt, and I think that's the 21st.

10  Q.   So you think this vehicle was sold to her on the 21st?

11  A.   I'm just looking at the receipt, that's all.  I'm not

12  recalling the exact date.

13  Q.   Okay.  Now, but you're sure it wasn't sold to her in

14  April of '09; is that correct?

15  A.   Am I sure?

16  Q.   Yes.

17  A.   I'm only going by the receipt.  I'm not --

18  Q.   Take a look at the receipt.

19  A.   Okay.  Well, the date here says fifth month, so that

20  would be -- that would be May.

21  Q.   Right.

22  A.   Right.

23  Q.   Now, it also says something about, can't make out, I

24  something, from Ida M. Epps, on 4-12-09, I sold to Angela

25  Jackson.

```
 1              What is that word after "I", can you make that

 2    out?

 3    A.   I purchased from -- that was the person I got the car

 4    from.

 5    Q.   So you bought the vehicle from an Ida Epps on April

 6    12th of '09; is that correct?

 7    A.   That's correct.

 8    Q.   And then you turned around and sold it to an Angela

 9    Jackson sometime in May of '09 --

10    A.   Yes.

11    Q.   -- is that correct?

12    A.   That's correct.

13    Q.   You said you came in contact with the purchaser of the

14    vehicle based on an ad?

15    A.   Based on a for sale sign.

16    Q.   You had a for sale sign on the vehicle?

17    A.   Yes.

18    Q.   Where was the vehicle sitting?

19    A.   On AutoZone parking lot.

20    Q.   What location, what area?

21    A.   Eight Mile and Evergreen.

22    Q.   Okay.  And you left a phone number and --

23    A.   Phone number and for sale sign.

24    Q.   And the defendant called you?

25    A.   That's correct.
```

1    Q.   And then you met?

2    A.   Yes.

3    Q.   And did she buy the vehicle right there at the first

4    meeting?

5    A.   Yes.  After driving it and checking it out, she

6    purchase the vehicle immediately after.

7    Q.   Okay.  Were there plates on this vehicle?

8    A.   Were there plates on it?

9    Q.   Yes.

10   A.   Yes, there were, which were mine.  I took them off and

11   she placed plates onto the vehicle.

12   Q.   She placed her own plates on the vehicle?

13   A.   Yeah.

14   Q.   Okay.  You didn't give her your plates?

15   A.   No.

16   Q.   Now, subsequently you met with Secret Service about

17   this case; is that correct?

18   A.   That's correct.

19   Q.   And you talked to them about your involvement in this

20   case?

21   A.   Yes, I --

22   Q.   -- or with this vehicle?

23   A.   Yes.

24   Q.   Okay.  Do you remember what Secret Service asked you

25   about this vehicle?

*Cross of W. Reeves 3/10/10*                                          99

```
 1    A.   Well, they asked me the questions that's been asked
 2    here today, did I sell the vehicle?  And my answer was yes.
 3    Q.   Did they ask you if you knew the defendant --
 4    A.   Yes.
 5    Q.   -- before the vehicle sale?
 6    A.   Yes, they asked me that as well.  And I answered no, I
 7    didn't --
 8    Q.   Did you have any other contact with --
 9    A.   No.
10    Q.   -- the defendant after you sold the vehicle?
11    A.   No.
12    Q.   Okay.  How long was the vehicle in your possession
13    before you sold it to Ms. Johnson?
14    A.   I would approximate about three weeks.
15    Q.   Was it sitting in the AutoZone parking lot the whole
16    time?
17    A.   No.  Actually, it was in my garage.
18    Q.   And you testified that you didn't have any guns or
19    money, or anything, in the vehicle when you sold it to
20    Ms. Johnson; is that correct?
21    A.   This is correct.
22         MS. KOSTOVSKI:  No other questions.  Thank you.
23         THE COURT:  Okay.  Thank you very much,
24    Ms. Kostovski.  Mr. Reeves, you are finished now.  Thank
25    you for your time in front of court today.  You are free to
```

 1    leave and have a pleasant day.

 2            All right.  Ladies and gentlemen, it's 11:10 and

 3    we are going to take our first break of the day.  I

 4    appreciate your patience, your concentration and your

 5    continuing willingness to serve.  We should be about 20

 6    minutes tops, I would think.  While you are in your jury

 7    room, please do not discuss the case among yourselves, or

 8    anyone else, do any reading about it.

 9            If you need anything from Alissa, she will take

10    care of you and we should be back here in about 20 minutes

11    or so.

12            (Jury out at 11:10 p.m.)

13            THE COURT:  Let's everybody be seated, please.

14    Alissa, we're going to be a couple minutes.

15            MS. GREER:  Okay.

16            THE COURT:  Okay.  The first thing is when the

17    U.S. Marshals take the defendant Johnson -- are you going

18    to take her back to lockup, do you know?

19            MARSHAL:  Yes, sir.

20            THE COURT:  Let me know if you're going to do

21    that when we break so I can let my staff know because I

22    don't want the jurors running into Ms. Johnson in the

23    hallway.

24            MARSHAL:  We'll take her down --

25            THE COURT:  We'll just communicate that.

1          I feel guilty about not permitting, or at least
2     not advising you that I don't permit redirect.  I adopted
3     that policy after our second civil case where I found it
4     contributed little and it prolonged the proceedings
5     extraordinarily.  With that in mind, I will look to the
6     direct examiner at the close of cross-examination and if
7     you want to redirect, let me know, given that I didn't let
8     you know about our policy ahead of time but I really frown
9     about that redirect.  It generally, on very few occasions
10     in my mind, leads to additional truth that helps the jury
11     and that's why, absent unusual circumstances, we don't go
12     with it here but -- and I do believe I'm permitted to do
13     that under 611 but you just let me know since I didn't tell
14     either of you about that.  Okay?
15          On the evidentiary issue, we did some research
16     and found the following:  Once a defendant's right to
17     counsel is asserted, a subject in custody may not be
18     interrogated outside counsel's presence and, quote, unless
19     the accused herself initiates further communication,
20     exchanges or conversations with the police.  *Edwards versus*
21     *Arizona,* U.S. Supreme Court 451 U.S. 477, 484, 1981 case.
22     It's been construed by the Sixth Circuit, a defendant
23     lawfully initiates discussion of a crime, if absent any
24     prompting to talk by law enforcement officers, the
25     defendant evidences a willingness and a desire for a

1   generalized discussion about the investigation.  That's the

2   standard for initiating discussions set forth by *U.S.*

3   *versus Ware*, 338 F3d 476, page 481, U.S. Court of Appeals

4   in Cincinnati, 2003.

5          *Whaley, U.S. versus Whaley*, 13 F3d 963 at 967,

6   essentially the Sixth Circuit there in 1994 in

7   circumstances slightly different stated that initiation

8   occurs only when without influence by authorities a suspect

9   shows a willingness and a desire to talk generally about

10  the case and, of course, I am fully aware of *Kordenbrock*

11  *versus Scroggy*, 919 F2d 1091, because I stated my

12  familiarity with this principle earlier, a suspect's right

13  to cut off questioning must be scrupulously honored.  There

14  may not be police persistence in efforts to wear down

15  resistance to questioning.

16         With those principles in mind I am going to

17  permit the government to question Secret Service Agent

18  Powell about the conversation he had with Ms. Johnson in

19  the first floor lockup in Redford on May 5, 2009.  If he is

20  not able to establish in his testimony that the standard

21  set forth in *Edwards* and *U.S. versus Ware*, as well as the

22  *Kordenbrock* language that I just set forth, if he is not

23  able to establish those standards were met in his

24  testimony, then I'm not going to permit the additional

25  statements of Ms. Johnson to come in.

 1              All right?  With that, it's 11:15, let's take 15

 2      minutes and then meet back here.  Okay.  We will be in

 3      recess.

 4              MS. MCNEILL:  Court is in recess.

 5              (Recess taken at 11:15 a.m. until 11:37 p.m.)

 6              MS. GREER:  All rise.  Court is back in session.

 7      You may be seated.

 8              THE COURT:  Thank you, Alissa.  You may all be

 9      seated.

10              Listen, Mr. Gabel, I got Robichaud's appearance

11      on the record on the docket today.  I appreciate that.  Who

12      is this person?

13              MR. GABEL:  She actually is a special AUSA from

14      Social Security and she rides the same bus that I ride and

15      she mentioned that she didn't expect any of her civil cases

16      to go to trial and was really eager to get some trial

17      experience so on the bus we hashed out an agreement that

18      she could be my co-counsel in this case.  This is her first

19      criminal trial.  First trial, right?

20              THE COURT:  Well, congratulations to you,

21      Ms. Robichaud.

22              MS. ROBICHAUD:  Thank you very much.

23              THE COURT:  I know that I didn't hire you so I

24      had to inquire about your background.

25              (Discussion off the record)

*Cross of W. Reeves 3/10/10*                                    104

1           MS. GREER:  All rise for the jury.

2           (Jury in at 11:40 a.m.)

3           THE COURT:  Ladies and gentlemen, I forgot to

4    talk to the lawyers regarding something so I need Mr. Gabel

5    and Ms. Kostovski for just a second.  You get to listen to

6    some beautiful background white noise.  Relax.

7           (At sidebar on the record)

8           THE COURT:  I looked at the voucher and I'm 100

9    percent satisfied regarding your prior payment and your

10   petition, so I've appointed you effective 3-4-09, I think,

11   something like that, so you fill out your voucher from that

12   date and figure it out and we will get you paid.  Okay?

13          MS. KOSTOVSKI:  Okay.

14          THE COURT:  You got Brunson, a fingerprint

15   person.  And then what?

16          MR. GABEL:  Brunson should be very brief.  Agent

17   Powell, he is going to take longer.

18          THE COURT:  Yeah, yeah.

19          MR. GABEL:  Then right now we're calling Officer

20   Jones, who searched the trunk.  That's just to get in all

21   the evidence he found.

22          THE COURT:  We may have to interrupt around 12:30

23   with Powell for about half an hour.  And if so, we will go,

24   you know, 1:30.  I actually don't have anything going on

25   this afternoon.

 1          MR. GABEL:  I could go as late as the jury can

 2     go.

 3          THE COURT:  How about you?  You got something

 4     going on here?

 5          MS. KOSTOVSKI:  I don't have something going on

 6     here but I have something going on in my office at 2:30.

 7          THE COURT:  So we will go to 2:00 max.  Okay.

 8     Good.  Thank you all.

 9          (End of discussion at sidebar)

10          THE COURT:  Show of hands on the jury, anyone

11     adverse to staying here until 2:00 today, half hour longer

12     than planned?  What's up, Ms. Palmeri?

13          JUROR PALMERI:  Would I be able to make a call

14     before then?

15          THE COURT:  Of course.  If you're able to make a

16     call, you can stay until 2:00?  Anyone unable to stay until

17     2:00?  Good, that will help us stay on track.  Something

18     has come up and I may have to break for a little bit at

19     12:30.  The government and the defense are working well

20     together and we're really getting a lot accomplished.

21     Okay.  Who is next, Mr. Gabel?

22          MS. ROBICHAUD:  The government calls Officer

23     Brian Jones.

24          THE COURT:  Mr. Brian Jones.

25          And thank you for your willingness, ladies and

*Direct of Officer Jones 3/10/10*                              106

1    gentlemen.

2

3                        **OFFICER BRIAN JONES**

4              (The Witness is Sworn)

5              THE COURT:  Have a seat in the chair.  Be

6    comfortable with your leg, and let us know if you need

7    anything there, and don't speak too close to the

8    microphone.  I take judicial notice of the fact that half

9    of the government's witnesses to date have incapacitated

10   right legs.

11             You may proceed, Ms. Robichaud.

12                      **DIRECT EXAMINATION**

13   BY MS. ROBICHAUD:

14   Q.   Could you please tell us your name?

15   A.   Brain Jones.

16   Q.   Were do you work?

17   A.   Redford Township Police Department.

18   Q.   What's your position?

19   A.   I work Special Investigations Bureau.

20   Q.   How long have you been in law enforcement?

21   A.   Over 12 years.

22   Q.   Can you just briefly run through the positions you've

23   had over that time?

24   A.   My first five years I was on road patrol.  Last seven

25   and a half years I spent in Special Investigations Bureau.

1    I'm also the team leader on our S.W.A.T. team.

2    Q.  I would like to turn your attention to May 4th, 2009.

3    Were you working for Redford Township Police Department

4    that day?

5    A.  Yes, I was.

6    Q.  Were you informed that a 1984 Buick was being

7    impounded as a result of the arrest of the defendant?

8    A.  Yes.

9    Q.  Was the Buick brought to Redford Township Police

10   Department on May 4th?

11   A.  Yes.

12   Q.  Were you one of the detectives on duty at that time?

13   A.  Yes.

14   Q.  How did it get to the station?

15   A.  It was towed by North Redford Towing.

16   Q.  Once it arrived, were you part of the team that

17   conducted the search of the car?

18   A.  Yes.

19   Q.  I'd like to focus on the trunk.  Was the trunk closed

20   when the car arrived at the station?

21   A.  Yes.

22   Q.  How did you get in the trunk?

23   A.  I don't recall if we used a key or push button in the

24   car.  I don't recall.

25   Q.  What did you see in the trunk once you opened it?

*Direct of Officer Jones 3/10/10*                                       108

1    A.   It seemed like it would be a lot of trash stuff like

2    that, but then there was a big white, like, laundry bag in

3    there.

4    Q.   What did you do with the bag?

5    A.   Took it out of the trunk.

6    Q.   What else did you find?  Did you look in the bag?

7    A.   Yeah, inside the bag.  I dumped the contents of the

8    bag out, saw a little bit of ammunition in the bag and then

9    there was another black duffel bag inside the white bag.

10   And then inside that, there were, as I recall, there were

11   three, like, U.S. postal bags, and then there was also a

12   white, like, a Meijer-type shopping bag.  And inside that

13   there was a pistol that was wrapped in some kind of cloth.

14           MS. ROBICHAUD:  Your Honor, may I approach the

15   witness?

16           THE COURT:  You may, continuing permission

17   granted.

18           JUROR PESTA:  May I have a pen?  Mine just died.

19           THE COURT:  Yes, absolutely.  Ms. Pesta's pen has

20   run out and our law clerk is going to give her a new one.

21   Thanks for raising your hand and letting us know.  Sorry

22   for the interruption.  Government, go right ahead.

23   BY MS. ROBICHAUD:

24   Q.   I have handed you what's been marked as Government's

25   Exhibit 13.  Have you seen this before?

*Direct of Officer Jones 3/10/10*                                    109

1    A.   Yes.

2    Q.   What is that?

3    A.   It's a black duffel bag.

4    Q.   Is this the black bag that was found in the

5    defendant's trunk?

6    A.   Yes.

7    Q.   In the bag that contained the gun?

8    A.   Yes.

9         MS. ROBICHAUD:  I would like to move to admit

10   Government's Exhibit 13 published to the jury.

11        THE COURT:  Objection?

12        MS. KOSTOVSKI:  No objection.

13        THE COURT:  Okay.  13 is received.

14        (Government's Exhibit 13 received)

15   BY MS. ROBICHAUD:

16   Q.   I have handed you what's been marked as Government

17   Exhibit 14.  Have you seen this before?

18   A.   Yes.

19   Q.   And what is it?

20   A.   It's a pistol.

21   Q.   Is there a serial number on that gun?

22   A.   I'd have to pick it up.  It looks to be etched off,

23   etched off right there.

24   Q.   Could you open the white bag for me and tell me what

25   else you have there.

*Direct of Officer Jones 3/10/10*                                    110

1    A.   A magazine and one bullet.

2              MS. ROBICHAUD:  I'd like to move to admit

3    Government's Exhibit 14 and publish to the jury.

4              THE COURT:  Objection?

5              MS. KOSTOVSKI:  No objection, except perhaps the

6    officer might want to identify what's in the bag.  I

7    mean --

8              THE WITNESS:  Take it out?

9              MS. KOSTOVSKI:  Yeah, so we are clear for the

10   record.

11             THE COURT:  You're stipulating to the admission

12   of Exhibit 14?

13             MS. KOSTOVSKI:  Yes.

14             THE COURT:  14 is received and, Ms. Robichaud,

15   you can ask him to get into the bag and show that to the

16   jury, which Ms. Kostovski properly wants done.  Okay.

17             (Government's Exhibit 14 received)

18   BY MS. ROBICHAUD:

19   Q.   Is this the weapon you found in the black bag?

20   A.   Yes.

21   Q.   Are those other items also things that were in the

22   bag?

23   A.   I don't recall seeing this.  I don't remember if the

24   pistol was loaded or not.

25             MS. ROBICHAUD:  I would like to move again to

*U.S.A. v Johnson 09-cr-20264*

```
1    admit Government's Exhibit 14 and publish to the jury.

2              THE COURT:  Any objection to 14?  Wait a minute,

3    14 is in.

4              MS. ROBICHAUD:  I'm sorry.

5              MS. KOSTOVSKI:  With the exception, I think he

6    said -- I'm not sure what the question here --

7              THE COURT:  All right.  Listen, what is Exhibit

8    14 that's been identified, Ms. Robichaud?

9              MS. ROBICHAUD:  That weapon.

10             THE COURT:  What weapon?

11             MS. ROBICHAUD: (Indicating).

12             THE COURT:  All right, that Government's Exhibit

13   number 14 on it?

14             MS. ROBICHAUD:  Yes.

15             THE COURT:  That's offered and stipulated to?

16   All right, 14 is in.

17             Now, you are not going to 15, you are just

18   working on 14, right?

19             MS. ROBICHAUD:  Yes.

20             THE COURT:  All right.  Go ahead.

21   BY MS. ROBICHAUD:

22   Q.  I've handed you what's been marked as Government's

23   Exhibit 15.  Can you open that, please, and take out what

24   is in there?

25   A.  Want me to take it all out?
```

*Direct of Officer Jones 3/10/10*                    112

1    Q.   What is this?

2    A.   Counterfeit currency.

3    Q.   Where was that located?

4    A.   That was in the postal bags.

5    Q.   And where were the postal bags?

6    A.   In the black duffel bag.

7             MS. ROBICHAUD:  I would like to move to admit

8    Government's Exhibit 15.

9             THE COURT:  Objection to 15?

10            MS. KOSTOVSKI:  No objection.

11            THE COURT:  Received.

12            MS. ROBICHAUD:  Thank you.

13            (Government's Exhibit 15 received)

14            MS. ROBICHAUD:  Your Honor, may I have permission

15   to publish one of the stacks and pass this to the jury?

16            THE COURT:  If it's in evidence, you can do what

17   you'd like with it in terms of showing the jury and just

18   make sure you show the defendant what you are doing as

19   well.

20            MS. ROBICHAUD:  Okay.  We've also marked within

21   15, 15A and B.  They were pulled from the stacks of money.

22            MS. ROBICHAUD:  Any objections to 15A and B,

23   Ms. Kostovski?

24            MS. KOSTOVSKI:  If I could see 15A and B.

25            No objection.

*Direct of Officer Jones 3/10/10*                                      113

1          THE COURT:  Okay.  15 is in, 15A and B are now

2     received without objection.  And you can show what you

3     would like to the jury.  Just don't touch them or invade

4     personal space, or anything like that, Ms. Robichaud.

5          (Government's Exhibits 15A & B received)

6     BY MS. ROBICHAUD:

7     Q.  Officer Jones, did you suspect that this money was not

8     genuine U.S. currency?

9     A.  Yes, I did.

10    Q.  What made you suspect that it was counterfeit?

11    A.  Looking at the 50s and it was bleeding red pretty

12    good.  It didn't look -- didn't appear to be a -- looked

13    like a regular $50 bill.

14    Q.  Did you count the total?

15    A.  No, I did not.

16    Q.  Why not?

17    A.  I just didn't think all the total was counterfeit

18    money.  I didn't see any reason to.

19    Q.  When you were done searching the trunk, what did you

20    do with items that you had located?

21    A.  We put it up in our locked office.

22    Q.  And do you understand that the U.S. Secret Service

23    came to collect the evidence --

24    A.  Yes, I do.

25    Q.  -- Detective Schiller's office the next day?

1   A.   Yes, I do.

2            MS. ROBICHAUD:  Thank you.  I have no further

3   questions.

4            THE COURT:  Thank you very much.

5            MS. ROBICHAUD:  Pass for cross-examination.

6            THE COURT:  Just to be clear, my records show we

7   are up to Government's Exhibit 15, and the next exhibit

8   after that that's in is Government's Exhibit 21, correct,

9   government?

10           MR. GABEL:  Government's Exhibit 20 is what I

11  have, the bill of sale.

12           THE COURT:  I'm sorry, you're right; 20 is in, 15

13  is in and nothing in between that.  Correct?

14           MR. GABEL:  We have 1 through 10.  We have not

15  yet admitted Exhibit 11.  Then we have 12 through 15 in.

16           MS. KOSTOVSKI:  That's what I have.

17           THE COURT:  Great.  Thank you.

18           Go ahead, Ms. Kostovski, your turn.

19           MS. KOSTOVSKI:  Thank you.

20           MR. GABEL:  May we approach, Your Honor, to

21  recover an evidence tag?

22           THE COURT:  Absolutely.

23           MR. GABEL:  Thank you.

24                         **CROSS-EXAMINATION**

25  BY MS. KOSTOVSKI:

*Cross of Officer Jones 3/10/10*                                    115

1    Q.   Good afternoon.

2    A.   Good afternoon.

3    Q.   You said you were in Special Investigations Bureau?

4    A.   Correct.

5    Q.   What is the Special Investigations Bureau?

6    A.   We handle narcotics, prostitution, gambling, all sorts

7    of different crimes.

8    Q.   So you were not involved in firearms or anything of

9    that nature --

10   A.   Yeah, we have firearm cases.

11   Q.   Is that part of your --

12   A.   Yes.

13   Q.   -- Investigation Bureau?

14   A.   Yeah.  We have -- seems like most of all our cases,

15   firearms are involved, yes.

16   Q.   And you said you became involved in this case with

17   respect to a vehicle that had been impounded and towed and

18   taken to Redford police garage; is that correct?

19   A.   Correct.

20   Q.   And were you asked by one to become involved or were

21   you part of the arresting team?

22   A.   We -- my partner and I were actually doing a separate

23   deal.  We'd actually be right down the street when the

24   traffic stop -- when he was in the middle of his traffic

25   stop.  So when the pursuit happened, it went right by us.

*Cross of Officer Jones 3/10/10*                                          116

```
1    So we just followed the pursuit as it went along.  And then

2    they arrested her and then we went back to the police

3    station and they asked for our assistance and --

4    Q.   So someone asked you to search the vehicle?

5    A.   Yes.

6    Q.   And who was that?

7    A.   One of the sergeants or lieutenants asked to search

8    the vehicle.

9    Q.   Okay.  Did you search the vehicle with someone else?

10   A.   Yes.

11   Q.   Who was that?

12   A.   My partner, Dan Bailey.

13   Q.   Dan Bailey?

14   A.   Yes.

15   Q.   I think you were asked on direct whether you actually

16   used a key or you gained entry some other fashion.  Do you

17   remember that?

18   A.   Correct.

19   Q.   Do you remember how you got into the trunk?

20   A.   No, I don't remember.

21   Q.   Did you search anything else, or her part of the

22   vehicle besides the truck?

23   A.   I'm sure I did but I don't recall if I did or not.

24   Q.   So you opened the trunk and you said you noticed a lot

25   of debris or garbage?
```

1   A.   Yeah, it appeared to, yeah.

2   Q.   What kind of debris or garbage?  Paper, clothes?

3   A.   Fast food wrappers, bags, stuff like that; that's what

4   I recall, yes.

5   Q.   Did you see any tools?

6   A.   No, I don't recall any tools.

7   Q.   Did you see any spare tire?

8   A.   I don't recall a spare tire, no.

9   Q.   Do you see anything other than garbage and what you

10   say is a white laundry bag?

11   A.   Yeah, that's all I recall.

12   Q.   Can you describe the laundry bag?

13   A.   It seemed to be a bigger one, white plastic kind,

14   maybe yay big.

15   Q.   Where was it in the trunk?  Was it in the right, the

16   left, the center, in the back?

17   A.   That, I don't recall.

18   Q.   You don't you recall?

19   A.   No.

20   Q.   Was there anything else around the white laundry bag?

21   A.   That, I don't recall.

22   Q.   And so did you take out the laundry bag?

23   A.   Yes.

24   Q.   Where was this happening, in the garage?

25   A.   In the basement, yes.

*Cross of Officer Jones 3/10/10*                                      118

 1    Q.   In the basement.  And were you next to the vehicle?

 2    In other words, once you took the laundry bag out, did you

 3    actually then open it there or did you take it to -- inside

 4    the station?

 5    A.   No, opened it right there.

 6    Q.   You opened it right there?

 7    A.   Correct.

 8    Q.   Your partner, Officer Bailey, was there, too?

 9    A.   Correct.

10    Q.   So what did you -- what did you notice first when you

11    opened the bag?

12    A.   Opened the bag, I recall seeing some ammunition, I

13    don't know what kind, and then the black duffel bag.

14    Q.   You said you saw some ammunition?

15    A.   Some ammunition.  I just don't recall what it was,

16    yes, on the bottom of it.

17    Q.   On the bottom of the laundry bag?

18    A.   Yes.

19    Q.   Did you use any gloves when you were doing this

20    search?

21    A.   No.

22    Q.   Did you have any concerns about contaminating the

23    evidence by not using gloves?

24    A.   I didn't think of it at the time, no.

25    Q.   Do you know if your department did any fingerprint

*U.S.A. v Johnson 09-cr-20264*

1    check on the bag, the duffel bag, or anything that was

2    found inside?

3    A.    That, I don't know.

4    Q.    Did you ask for a fingerprint analysis?

5    A.    No, I did not.

6    Q.    You did not?

7    A.    No.

8    Q.    Did your partner also touch the bag without wearing

9    gloves?

10   A.    That, I don't recall.

11   Q.    You don't know?

12   A.    No.

13   Q.    Okay.  So, you look in, you see some ammunition and

14   then you see the black duffel bag, which is Government's

15   13, right?

16   A.    Correct.

17   Q.    And then was this zipped, zipped closed?

18   A.    That, I don't --

19   Q.    The black duffel bag?

20   A.    That, I don't remember.  I don't remember if it was

21   closed or not.

22   Q.    So you start looking inside the black duffel bag,

23   right?

24   A.    Correct.

25   Q.    And what's the first thing you see inside the black

*Cross of Officer Jones 3/10/10*                                    120

1    duffel bag?

2    A.   I don't remember the first thing I saw.  I don't

3    remember the exact first thing I would have saw in the

4    duffel bag.

5    Q.   What did you see?

6    A.   I saw three -- three postal bags.

7    Q.   What do you mean by postal bags?

8    A.   U.S. -- the postal bags.

9    Q.   Are you talking about express mail or --

10   A.   That, I don't recall.  I don't recall what kind they

11   were.

12   Q.   Are they letter size, are they large size?  Because

13   you said postal bags.  I'm not clear what that means.

14   A.   I don't recall.  I don't recall what kind, I don't

15   recall what kind they were.

16   Q.   Were they envelope size?

17   A.   That, I don't recall.

18   Q.   You don't recall?

19   A.   No.

20   Q.   Was there any writing on any of these postal bags?

21   A.   It would have been the little postal -- postal -- I

22   believe I saw the postal eagle on the bag.

23   Q.   Any handwriting?

24   A.   That, I don't recall.

25   Q.   You don't recall?

1   A.   No.

2   Q.   And you didn't check to see if there was any -- to try

3   to lift any prints off of those bags, right?

4   A.   No.

5   Q.   Were they sealed shut or were they opened?  The postal

6   bags now.

7   A.   That, I don't recall if they were sealed shut.  I

8   don't recall that.  I don't recall them being sealed shut.

9   Q.   Were they at the bottom of the duffel bag or right on

10  top when you looked in?

11  A.   That, I don't recall.  I don't recall that.  I don't

12  know.  I'm not sure if they were on the bottom or on the

13  top.

14  Q.   Did you save these postal bags as part of the

15  evidence?

16  A.   Would have been taken upstairs, yeah.

17  Q.   Okay.  So, you started opening the postal bags, right?

18  A.   Correct.

19  Q.   And your testimony was, I think you said you found

20  counterfeit money?

21  A.   Correct.

22  Q.   Which is Government's Exhibit 15A and 15B?

23  A.   Uh-huh.

24  Q.   Is that right?

25  A.   Uh-huh.

*Cross of Officer Jones 3/10/10*                                        122

```
1    Q.   How did you know that this was counterfeit?

2    A.   I didn't know for sure, just looking at the 50s, the

3    way the red ink bled on it.  It just didn't look right at

4    all on most of the 50s there.

5    Q.   So it was pretty obvious to you that this was a pretty

6    poor quality of genuine currency, right?

7    A.   Yes, if it would have been, yes.

8    Q.   Pretty bad?

9    A.   Yeah, correct.

10   Q.   And did you feel the -- any of this?

11   A.   Yes.

12   Q.   Did you touch it?

13   A.   That I did, too, yes.

14   Q.   You touched it?

15   A.   Yeah.

16   Q.   What did you think of the paper quality?  I know

17   you're not an expert, just asking for your opinion.

18   A.   It didn't feel like a regular bill.

19   Q.   But you didn't, you know, sit there and examine it

20   closely with a microscope and compare things, right?

21   A.   No.

22   Q.   You just looked at it and said, wow, these are

23   counterfeit?

24   A.   Yeah, appeared to me, yes.

25   Q.   Right?
```

1   A.   Correct.

2   Q.   Because they were a pretty bad grade and quality; is

3   that correct?

4   A.   Yes.

5   Q.   Now, you wouldn't have been fooled if someone tried to

6   pass those to you, would you?

7   A.   I wouldn't think so, no.

8   Q.   Now, did you find all of the counterfeit money in the

9   three bags?

10   A.   Yes.

11   Q.   It wasn't anywhere else in the duffel bag; is that

12   correct?

13   A.   Yeah, that I recall, correct.

14   Q.   And you kept looking in the bag, right?  You pulled

15   these three postal bags out and then you see something

16   else, right?

17   A.   Correct.

18   Q.   What else did you see?

19   A.   It was a white, like Meijer, Meijer bag in there.

20   Q.   A plastic --

21   A.   Plastic.

22   Q.   -- plastic shopping bag?

23   A.   Yes.  One of those kind of bags, yes.

24   Q.   Was that twisted tight or tied --

25   A.   I don't recall.

1   Q.   -- tied up?

2   A.   I don't recall.

3   Q.   You don't remember?

4   A.   No.

5   Q.   Did you look in that bag?  Did you take it out of the

6   duffel bag?

7   A.   That, I don't recall if I took it out or not, no.

8   Q.   Did you look inside the Meijer bag?

9   A.   Yes.

10  Q.   What did you find inside the Meijer bag?

11  A.   A pistol.

12  Q.   That would be Government's Exhibit 14?

13  A.   Correct.

14  Q.   Do you know what kind of pistol this is?

15  A.   It's a .9 millimeter Ruger.

16  Q.   Now, is there anything you noticed immediately about

17  this pistol?

18  A.   I didn't examine it real well, no.

19  Q.   You didn't examine it --

20  A.   No.

21  Q.   -- closely?

22  A.   Nope.

23  Q.   Okay.  You've since examined it, correct?

24  A.   Since, yes.

25  Q.   And you testified, I think, that the serial numbers

1   have been obliterated?

2   A.   Yes.

3   Q.   Or etched off?

4   A.   Yes.

5   Q.   Can you point out where that is on this exhibit, where

6   the serial number would be?

7   A.   Right here.

8   Q.   Okay.  Is that something that someone who has

9   familiarity with weapons would know that, almost

10  immediately, where a serial number is and if it's on a

11  weapon or not?

12  A.   I don't understand.  I don't understand what your

13  question is.

14  Q.   My question is, someone like yourself, who is a police

15  officer, you would know to look -- in seeing a weapon, you

16  would know if there's a serial number missing or not; is

17  that correct?

18  A.   If you examined it enough, sure, yes.

19  Q.   Right.  If someone who is not -- well, not even just a

20  police officer but someone who is inexperienced with

21  weapons, would they be capable of determining whether a

22  serial number is --

23            MS. ROBICHAUD:  Objection, Your Honor.

24            THE COURT:  What's your objection?

25  BY MS. KOSTOVSKI:

*Cross of Officer Jones 3/10/10*                                    126

1    Q.   -- is on a weapon or not?

2              MS. ROBICHAUD:  Calls for speculation.

3              MS. KOSTOVSKI:  No, it doesn't.

4              THE COURT:  I think the way the question is

5    phrased, he can answer if he has knowledge of whether he

6    can make that inquiry on his own, so I will permit it and

7    go ahead and answer.

8              THE WITNESS:  I don't -- I can't answer for

9    someone what someone else might see on that.  I don't know.

10   BY MS. KOSTOVSKI:

11   Q.   Well, would it be fair to say that someone needs to

12   have some experience or knowledge about weapons to

13   understand the existence or nonexistence of serial numbers

14   on weapons?

15   A.   Yes.

16   Q.   Now, do you have any idea who etched out the serial

17   number on Exhibit 14?

18   A.   I have no idea.

19   Q.   Now, just one final question, when you conducted the

20   search of the vehicle, did your department have a search

21   warrant at that time?

22   A.   No.

23   Q.   At some point the matter was then referred to the

24   Secret Service?

25   A.   Correct.

1    Q.   Did you have any involvement with that?

2    A.   No.

3    Q.   Did you speak to the Secret Service about this matter?

4    A.   Not until after the fact, after they had already came.

5           MS. KOSTOVSKI:  No other questions.  Thank you.

6           THE COURT:  Thank you, Ms. Kostovski.

7           MS. ROBICHAUD:  Brief redirect?

8           THE COURT: Pardon me?

9           MS. ROBICHAUD:  May I have brief redirect.

10          THE COURT:  Okay.

11                    **REDIRECT EXAMINATION**

12   BY MS. ROBICHAUD:

13   Q.   Officer Jones, you didn't have to force the trunk

14   open, did you?

15   A.   No.

16   Q.   And you said you only realized it was counterfeit.

17   You said there was -- you noticed bleeding red ink?

18   A.   Correct.

19   Q.   Will you take this?  If you hold it up, do you see a

20   watermark on the bill?

21   A.   I don't know.

22   Q.   It would be like an image of a --

23   A.   Yes, I do.

24          MS. KOSTOVSKI:  Your Honor, now she is leading.

25          THE COURT:  I agree.

1          MS. KOSTOVSKI:  And helping --

2          THE COURT:  Leading, outside the scope of cross.

3    What are trying to establish here?

4          MS. ROBICHAUD:  Your Honor, I'm just -- I'm

5    asking the witness if it --

6          THE COURT:  It's unnecessary.  What do you have

7    that responds to anything that Ms. Kostovski brought up?

8          MS. ROBICHAUD:  If it looks like it's

9    something --

10         THE COURT:  No.  I want to know what you are

11   trying to establish with this witness.  He has gone over

12   the evidence.  He has introduced it, you have shown it to

13   the jury, you have asked him about it.  Ms. Kostovski did

14   not.  So what does it have to do with his cross?

15         MS. ROBICHAUD:  No further questions.

16         THE COURT:  Thank you very much.

17         Officer, you are dismissed.  Thank you very much

18   for your time.  I hope your leg gets better and have a safe

19   afternoon.

20         Who is next, Mr. Gabel?

21         THE COURT:  Your Honor, the government calls

22   Tracy McIntosh.

23                    **TRACY MCINTOSH**

24         (The Witness is Sworn)

25         THE COURT:  Have a seat, be comfortable and

```
 1    don't speak too closely to the mic.  Okay?
 2              MR. GABEL:  Your Honor, if I may, does the Court
 3    have an extra glass so we can pour some water for the
 4    witness?  She has a cough --
 5              THE COURT:  Absolutely.  Will you hand that to
 6    the witness, please?
 7              MR. GABEL:  Excellent.  Thank you.
 8              THE COURT:  You want a cup?
 9              THE WITNESS:  Thank you, Your Honor.
10              You like to drink out of the bottle?  Let
11    Ms. McIntosh have a cup as well.
12              MR. GABEL:  Thank you, Your Honor.
13              THE COURT:  You're welcome.
14                       DIRECT EXAMINATION
15    BY MR. GABEL:
16    Q.  I will let you get situated first.  When you're
17    comfortable and all set, could you please tell the jury
18    your name.
19    A.  My name is Tracy McIntosh.
20    Q.  Ms. McIntosh, where do you work?
21    A.  I'm employed with the Michigan State Police assigned
22    to the Northville laboratory in the Latent Print Unit.
23    Q.  You are not a police officer yourself, are you?
24    A.  No, sir.
25    Q.  What is your job at the Michigan State Police labs?
```

*Direct of T. McIntosh 3/10/10*                                    130

1    A.   I'm supervisor of the Latent Print Unit.  My duties

2    include processing evidence for latent prints, comparing

3    latent prints to known suspects' fingerprints, searching

4    latent prints for unknown suspects, assisting other

5    agencies with crime scene investigations.

6    Q.   You are a supervisor in the Latent Print Unit?

7    A.   Yes, sir.

8    Q.   Could you describe for the jury what a latent print

9    is?

10   A.   On the fingers and palms of the hand and soles and

11   toes of the feet there are raised portions of skin that

12   flow across those areas of skin.  On the surface of those

13   raised portions, which were called friction ridges, there

14   are perspiration pores.  These exude perspiration which

15   cover the raised portions of skin.  When that skin touches

16   an object, that perspiration is left behind in the same

17   shape and formation as that that's located on the skin

18   itself.

19   Q.   And that print that is left behind, is that what you

20   call a latent print?

21   A.   Yes.

22   Q.   How long have you been doing fingerprint analysis and

23   comparison?

24   A.   Approximately 15 years.

25   Q.   Could you break down the positions that have you had

*U.S.A. v Johnson 09-cr-20264*

1    for the jury?

2    A.   My first position that I accepted was with the City of

3    Wyoming Police Department in 1995.  There I was a

4    fingerprint examiner and a crime scene technician for

5    approximately six years, before accepting a position with

6    the Michigan State Police as a fingerprint examiner.  And

7    approximately one year ago I accepted the position of

8    supervisor of the Latent Print Unit.

9    Q.   So over the course of that entire 15-year period, you

10   have been working with fingerprints as a forensic

11   scientist?

12   A.   Yes, sir.

13   Q.   Could you describe the training or educational

14   background you have regarding fingerprint analysis?

15   A.   I have a bachelor of science degree --

16        MS. KOSTOVSKI:  Your Honor, just to shorten this

17   process and, I guess, move it along, we'll stipulate that

18   she is qualified as a latent print examiner.  I have

19   reviewed her curriculum vitae and want to save Mr. Gabel

20   the trouble.

21        THE COURT:  All right.  You'll stipulate to her

22   calcifications to render testimony pursuant Rule 702, is

23   that your position?

24        MS. KOSTOVSKI:  Yes.

25        THE COURT:  Mr. Gabel, you do not have to further

 1    establish her credentials or knowledge.  The defendant has

 2    stipulated, and I agree, that she is a witness qualified

 3    under 702 to offer opinion testimony.  Okay?

 4              MR. GABEL:  Your Honor, could I just have her

 5    just describe her educational background just to give some

 6    context of her testimony?  It will be very brief.

 7              THE COURT:  Yeah, with her degree, that's fine.

 8              MR. GABEL:  Thank you.

 9              THE COURT:  Then I will give a brief instruction

10    to the jury.  Go ahead.

11    BY MR. GABEL:

12    Q.  Could you please describe your educational background?

13    A.  I have a bachelor of science degree in forensic

14    science from Michigan State University, which included a

15    three-month internship in the Latent Print Unit at the

16    Bridgeport laboratory.

17    Q.  Thank you.

18              THE COURT:  Okay.  Ladies and gentlemen, what we

19    have been talking about is what I'm going to instruct you

20    at the end of the case.  Most witnesses are required to

21    come into a case and testify about facts that they have

22    personal knowledge of.  Individuals who have special skill

23    and qualifications that can assist you in understanding the

24    evidence and the testimony may give their opinions to help

25    you do that.  This is one such witness.  And Ms. Kostovski,

*Direct of T. McIntosh 3/10/10*                                    133

1    Mr. Gabel and I all agree that she is a witness who can

2    offer testimony in the form of an opinion under a federal

3    rule that will help you understand the evidence.  Okay?

4         Go ahead, Mr. Gabel.

5    BY MR. GABEL:

6    Q.  Now, do you examine evidence for fingerprints as part

7    of your daily job?

8    A.  Yes.

9    Q.  Approximately how many items have you examined for

10   latent fingerprints over the course of your career, if you

11   can give us an approximation?

12   A.  Thousands of pieces of evidence of varying types.

13   Q.  Specifically with respect to firearms, could you tell

14   us roughly how many firearms you have examined over the

15   course of your career?

16   A.  I have processed several thousand firearms for latent

17   prints.

18   Q.  Have you testified in other cases regarding

19   fingerprint analysis and recovery?

20   A.  Yes, sir.

21   Q.  Approximately how many times?

22   A.  A little over 50 times.

23   Q.  And do you also work with the State of Michigan's

24   automated fingerprint identification system?

25   A.  Yes.

*Direct of T. McIntosh 3/10/10*                    134

1    Q.   Could you please describe for the jury what that is?

2    A.   The automated fingerprint identification system, or

3    AFIS, which is what we call it for short, is a computerized

4    database which houses a number of fingerprint cards from

5    the State of Michigan.  And when a latent print is

6    collected on a case that's not identified to someone, that

7    latent print can be placed in the computer and the computer

8    searches against the thousands -- hundreds of thousands of

9    records on file in order to attempt to find out who left

10   that print behind.

11   Q.   I would like to talk a little bit about the process

12   you undertake when you find a firearm and you are asked to

13   examine it.  When you received an object like a gun, how do

14   you go about attempting to recover the fingerprints?  What

15   are some of the methods?

16   A.   The first thing I would do is be -- to examine the

17   item visually to see if there were any visible prints on

18   it.  Then to process a nonporous item, such as a gun,

19   generally a technique called super glue fuming is used, in

20   which just regular super glue is vaporized and the vapor

21   adheres preferentially to the moisture in a fingerprint

22   left on the surface and makes a small cast on top of the

23   latent print, which would then make it visible for

24   collection.

25   Q.   You mentioned that a gun was a nonporous item.  What

1    do you mean by that?

2    A.   I would choose different techniques to process a

3    porous item versus a nonporous.  A porous item would be

4    something like paper, cardboard, tissue, something that if

5    you spilled water on it, the water would actually absorb

6    into the surface.

7            A nonporous item is going to be a harder surface,

8    such as metal or glass that wouldn't absorb moisture

9    directly into it.

10   Q.   Now, the process used by yourself and other

11   individuals who work in the Latent Print Unit at the

12   Michigan State Police labs, are those generally accepted

13   methods for recovering fingerprints?

14   A.   Yes.

15   Q.   Is it possible for a person to touch a surface and not

16   leave behind a fingerprint?

17   A.   Yes, it is.

18   Q.   Is it actually quite common in your experience?

19   A.   It is fairly common, yes.

20   Q.   Could you describe why that would happen?  What are

21   the factors?

22   A.   There are a number of factors that can affect whether

23   a latent print is deposited on a surface.  One of the

24   factors would be the condition of the skin itself.  If

25   there -- as I said, that the perspiration or some other

1    contaminant can coat the surface of these friction ridges,

2    which is what leaves behind an impression.

3          If there is not enough perspiration on the

4    friction ridges, it will not actually leave behind an

5    impression on the surface.  In converse, if there is too

6    much perspiration, it will all run together and what would

7    be left behind would be a blob in the shape of a finger but

8    not defining those separate ridges.

9          In addition, the method of touching, if something

10   is touched directly and then the skin is removed, it could

11   leave a decent latent print; however, if a surface is

12   touched and then the skin is dragged across it, what it's

13   going to do is smear what it's leaving behind and,

14   therefore, it's not an identifiable latent print.

15         The environment surrounding the surface can

16   affect prints.  Too much or too little humidity can destroy

17   prints on a surface, as well as if it's an area that is

18   often touched.  Duplicate touching on the same area of an

19   item can destroy or smear a print that is left on the

20   surface previous to that touch.

21   Q.  So am I correct in understanding that if a gun

22   touches -- if another person touches a gun and someone had

23   touched it previously, that more recent touch could destroy

24   the earlier fingerprint?

25   A.  It could, yes.

1    Q.  And is the same true for if the gun brushes up against

2    material like cotton or vinyl or it's placed in a bag where

3    it rubs up against the surface?

4    A.  Yes, anything that would rub against the surface has

5    the potential of destroying a print that has been deposited

6    on that surface.

7    Q.  What type of surfaces are more conducive to actually

8    leaving fingerprints?

9    A.  Smooth, clean surface is the best surface.  So if you

10   think about a recently cleaned window, that is going to be

11   the best surface upon which to deposit a latent print.

12   Q.  Now, with respect to firearms, is the material

13   that -- and let's just get to the firearm at issue in this

14   case.  I'm handing you what has previously been marked as

15   Government's Exhibit 14, previously been admitted into

16   evidence.

17          Is that the firearm that your lab examined for

18   latent prints?

19   A.  Yes, it is.

20   Q.  Do you know what process was used to recover latent

21   prints from this firearm?

22   A.  Yes.  The firearm was processed with super glue and

23   followed up by searching with a light, a bright white

24   light, as well as a UV light and then further processed

25   with powders.

Direct of T. McIntosh 3/10/10                                    138

1    Q.  And could you describe how the processing with the
2    light works for the jury?
3    A.  Basically, what the different light does is that
4    bright white light or a UV light will enhance contrast, so
5    if there is a print that has been developed with the super
6    glue, that bright light will make it easier to see.  It
7    increases contrast so that the person searching for prints
8    can find those prints easier.
9    Q.  And you talk about the super glue, can you describe
10   why the super glue is used?
11   A.  Super glue actually forms a protective cast over the
12   latent print, which makes it more difficult to destroy.  So
13   once that cast is on there, several methods can be used to
14   collect a latent print that's found without worrying that
15   the print will be destroyed in further processing.
16   Q.  And you also mentioned powder.  Could you describe for
17   the jury how the powder system works for trying to recover
18   latent fingerprints?
19   A.  Regular fingerprint powders come in various colors.
20   And they really just look like powder.  If you think like
21   baby powder, they just look like that.  What you do is you
22   place a brush into the powder and then put the brush on the
23   surface you're processing and just brush the powder on the
24   surface.  The powder adheres preferentially to the moisture
25   in the latent prints and it increases the contrast, so it

1  once again makes it easier for you to visualize where the

2  latent prints are.

3  Q.   Now, Government's Exhibit 14, would you say that the

4  surface of that firearm is more or less conducive to

5  leaving fingerprints behind?

6  A.   The surface of this firearm has kind of a matte finish

7  and there is textured areas, and those areas that are

8  textured and not very shiny can be a little more difficult

9  to obtain latent prints on.

10  Q.   Now, were you able, though, to identify any latent

11  prints on Exhibit 14?

12  A.   I was able to develop a latent print on the item, yes.

13  Q.   Thank you.  Was that print of suitable quality to try

14  to run a comparison if you had a high-quality known print

15  to compare it with?

16  A.   Yes.

17  Q.   Was the print of suitable quality to enter into that

18  system you mentioned, Michigan's automated fingerprint

19  identify examination system?

20  A.   No, it was not.

21  Q.   Why wasn't it of suitable quality to put into that

22  system?

23  A.   There is a number of -- there is a certain amount of

24  information that must be inputted into the computer along

25  with the latent print so that a proper search can be

1    conducted.  One of those is identifying where on the hand

2    the latent print has come from.  The print, the latent

3    print that was developed in this case was a very narrow

4    section of the ridge structure and it didn't contain enough

5    detail in the flow of those ridges for us to be able to

6    determine which part of the hand that that print would have

7    come from.  So it's too difficult to say whether it came

8    from a tip of the finger, a second joint or an area of the

9    palm.  And without giving the computer that information for

10   searching, it's unable to conduct an appropriate search.

11   Q.  Now, after you were able to recover a portion of that

12   print on Government's Exhibit 14, did you obtain a copy of

13   a fingerprint card for the defendant, Michele Johnson?

14   A.  I had a copy of a fingerprint card bearing the name

15   Nancy Walker.

16   Q.  Nancy Walker.  Well, having that card in your

17   possession, were you then able to run a comparison between

18   the card for Nancy Walker and the print -- the card with

19   the fingerprints for Nancy Walker and the prints that were

20   on the gun?

21   A.  Yes.  I compared the fingerprints on the card bearing

22   the name Nancy Walker to the latent print recovered from

23   this firearm.

24   Q.  And what were your findings?

25   A.  No identification was made to the fingerprints.

1    Q.   Does that mean, though, that the defendant never

2    touched the firearm?

3    A.   No, it does not.

4    Q.   Does that actually mean that the print on the firearm

5    could not have been the defendant's?

6    A.   No.  I did not receive known inked impressions of the

7    entire surface of the hand, which is what I would need to

8    establish the latent print was not made by that person at

9    all.

10   Q.   Now, if in fact it turns out that wasn't her print,

11   which we don't know, but -- and it turns out there wasn't

12   any print from her on the gun, why could that happen?  What

13   could be the reasons?

14   A.   For the same reasons I stated previously.  Just

15   because a person touches an item, does not necessarily mean

16   they will leave a print.  If they don't have a decent

17   amount of perspiration or other contaminant on the ridge

18   structure to leave a print behind on the surface or if, in

19   fact, they had left a print behind that the surface was not

20   protected enough from other touching and/or rubbing that

21   could have destroyed that print.

22   Q.   In your experience examining firearms, is it common

23   that you don't recover full latent fingerprints?

24   A.   Yes.

25   Q.   And could you approximate in examining firearms how

*Direct of T. McIntosh 3/10/10*                             142

1    often you find prints that you can then use for comparison

2    and how often you do not?

3    A.   I don't have any statistics to give an exact number

4    but when I do -- in my experience when I process firearms,

5    I'm more likely to not obtain latent prints than I am to

6    find latent prints.

7    Q.   Do you have an opinion as to what accounts for the low

8    number of comparable latent prints that you are able to

9    pull from firearms?

10   A.   Part of it is the surface itself.  Matte finish on an

11   item like this, where it's not particularly shiny, actually

12   protects this item from rust but at the same time, it makes

13   it a little more difficult to leave prints, as well as the

14   textured areas on the item itself.  These textured areas

15   are very difficult to leave a print deposited on those

16   surfaces.

17   Q.   Is there any factors involving potentially cleaning of

18   the gun that would have an impact on whether prints would

19   be left behind when someone touches it?

20   A.   Yes.  Generally firearms are cleaned with a gun oil

21   when they are cleaned and that oil will coat the surface

22   and can make it more difficult to leave a latent print.

23        MR. GABEL:  Thank you.  I have no further

24   questions and pass the witness for cross-examination.

25        THE COURT:  Before you got started,

1    Ms. Kostovski, I have some information that I need to take

2    a break.  We will be on break for about a half hour.  So

3    you can all relax.

4              Ladies and gentlemen, I hate to do this to you

5    but sometimes we have things that interfere with the flow

6    of the trial.  It's 12:30.  We should be back in by about

7    1:00, 1:05.  And then we will go to until 2:00 and wrap it

8    up.

9              So, candidly, if you want to go outside to the

10   Coney Island or Subway, if you are hungry, if you want to

11   take a walk, we have got about a half hour ahead of us.

12   All right.  Please rise for the jury.

13             (Jury out at 12:31 p.m.)

14             THE COURT:  Okay, folks sorry about the

15   interruption.  Thanks for your patience.

16             MS. MCNEILL:  All rise.  Court is recess.

17             (Recess taken from 12:31 to 1:16 p.m.)

18             THE COURT:  Okay.  Deeply, deeply apologetic.  Is

19   everybody here?  1:15.  When I was an AUSA and judges did

20   that, I used to hate that so I apologize to you.  We will

21   go as far as we can past 2:00 and then wrap it up for the

22   day.

23             Ready, Alis?

24             MS. GREER:  Ready.

25             THE COURT:  Let's bring them in.

1          MR. GABEL:  I could have the witness on the

2    stand.

3          (Jury in at 1:17 p.m.)

4          THE COURT:  We are going to go until 2:00, 2:15

5    as far as we can and then break for the day.  Thanks for

6    your patience.  I hope you had a good break and a little

7    bit of food and drink, relaxation and now we are ready to

8    go -- are we on cross?  Yes, the cross-examination of

9    Michigan fingerprint expert McIntosh by Ms. Kostovski.

10          Ms. Kostovski, you may proceeded.

11          MS. KOSTOVSKI:  Thank you.

12                      **CROSS-EXAMINATION**

13    BY MS. KOSTOVSKI:

14    Q.  Good afternoon.

15    A.  Good afternoon.

16    Q.  At whose request were you given Exhibit 14 to examine?

17    A.  The evidence was submitted by Agent Powell.

18    Q.  And what did Agent Powell ask you to do with Exhibit

19    14?

20    A.  Process the item for latent prints.

21    Q.  Okay.  I believe you testified that, in fact, you did

22    do that?

23    A.  Yes, ma'am.

24    Q.  And you went through a procedure where you said you

25    used super glue?

1   A.   Yes.

2   Q.   And I think your testimony was that you were able to

3   lift a partial latent print?

4   A.   That's correct.

5   Q.   And you were also given a fingerprint card of a lady

6   named Nancy Walker?

7   A.   Yes.

8   Q.   Who gave you the fingerprint card?

9   A.   We obtained the fingerprint card based on a SID number

10  that was read.

11  Q.   You obtained it from where?

12  A.   The archives system, through AFIS.

13  Q.   In your database?

14  A.   Yes.

15  Q.   And you then engaged in a comparison of the latent

16  print and the prints off the fingerprint card, correct?

17  A.   Yes, ma'am.

18  Q.   And you did not find a match?

19  A.   Correct, no identification was made.

20  Q.   Did you get any other fingerprint cards for the

21  defendant to compare?

22  A.   I received another fingerprint card bearing the same

23  name of Nancy Walker two days ago that was clear.

24  Originally I had asked for a clearer copy.

25  Q.   You got a clearer copy?

*Cross of T. McIntosh 3/10/10*                                146

1   A.   Yes.

2   Q.   Who sent you that?

3   A.   The -- it was submitted by Agent Powell.

4   Q.   Okay.  And what -- did you do a comparison of that

5   fingerprint card with the latent print?

6   A.   Yes, ma'am.

7   Q.   What were the results of that comparison?

8   A.   No identification was made.

9   Q.   No match?

10  A.   Correct.

11  Q.   Is that what you mean?

12  A.   Yes.

13  Q.   And I think your testimony was that not always are

14  latent prints available when you're examining weapons or

15  objects that have metal or ridged surfaces, right?

16  A.   Textured surfaces, correct.

17  Q.   But there are occasions when prints are lifted; is

18  that correct?

19  A.   Yes.

20  Q.   And in this case you actually did lift some kind of a

21  print off this weapon, right?

22  A.   Correct.

23  Q.   But you couldn't match it to the defendant, correct?

24  A.   Not with the inked finger impressions I received, no.

25  Q.   Was there something else that you needed in order for

1   you to be able to match that --

2   A.   I could do --

3   Q.   -- from the defendant, I'm sorry?

4   A.   Because I was unable to state definitively which area

5   of the frictioned skin the latent print came from, if I had

6   inked, known inked impressions from the entire hand

7   including the palmar surface, I could do further

8   comparisons to attempt to identify that latent print.

9   Q.   Was that information communicated to Agent Powell from

10  the Secret Service that you needed a better quality

11  fingerprint card?

12  A.   That I needed palm prints, yes.

13  Q.   Yes.  And he did not supply that to you, right?

14  A.   No, ma'am.

15  Q.   Did he tell you why he did not supply that to you?

16  A.   No, ma'am.

17  Q.   Did you ask him why?

18  A.   I did not.

19  Q.   Do you know why?

20  A.   No, ma'am.

21  Q.   Now, were you given any other objects, evidence,

22  documents to examine in this case by the government beside

23  the weapon?

24  A.   The weapon, the magazine and the cartridge that came

25  with the weapon were all processed for latent prints.

*Cross of T. McIntosh 3/10/10*                                          148

1    Q.   So not only did -- you found, you said, a latent print

2    on the weapon, right?

3    A.   Yes, ma'am.

4    Q.   Did you find any latent prints on the magazine or the

5    bullets?

6    A.   No, ma'am.

7    Q.   None at all?

8    A.   Correct.

9    Q.   And you were given nothing else to examine by the

10   government, correct?

11   A.   That's correct.

12   Q.   All right.  Now, you said some surfaces are better

13   receptors of fingerprints than others, correct?

14   A.   Yes, ma'am.

15   Q.   So if you're given, like, documents or paper, is that

16   a pretty good receptor of fingerprints?

17   A.   It can be.

18   Q.   So envelopes, things along -- bags, purses, can you

19   examine those for fingerprints?

20   A.   It depends on what they are made of.  Like you said,

21   bags and purses, if they are more fabric, then no.  So it

22   would depend on the surface itself.

23   Q.   What about something like this, this -- may I

24   approach?

25            THE COURT:  Yes, of course.

*Cross of T. McIntosh 3/10/10*                              149

1   A.   This is a somewhat fabric-y surface and would not be a

2   very good surface for latent prints.

3   BY MS. KOSTOVSKI:

4   Q.   Okay.  So you wouldn't be able to, really -- it's

5   fabric-y but it's kind of shiny?

6   A.   It is kind of shiny but it's also textured and it's a

7   fabric so it would be less conducive for prints than some

8   other surface.

9   Q.   -- lift prints off this, correct?

10  A.   It would be possible, possibly, to identify -- to

11  develop latent prints, yes.

12          MS. KOSTOVSKI:  I have no other questions.  Thank

13  you.

14          THE COURT:  Thank you very much, Ms. Kostovski.

15          Anything else, Mr. Gabel?

16          MR. GABEL:  Nothing else from the government,

17  Your Honor.

18          THE COURT:  Excellent.  Thank you.  Ms. McIntosh,

19  we're grateful for your time today.  You may step down and

20  I hope you have a pleasant afternoon.

21          THE WITNESS:  Thank you, Your Honor.

22          THE COURT:  You're welcome.

23          MR. GABEL:  Mr. Gabel?

24          MS. ROBICHAUD:  The government calls Curtis

25  Brunson.

*Direct of Agent Brunson 3/10/10*                               150

1                    **AGENT CURTIS BRUNSON**

2              (The Witness is Sworn)

3                    **DIRECT EXAMINATION**

4    BY MS. ROBICHAUD:

5    Q.   Good afternoon.

6    A.   Good afternoon.

7    Q.   Please tell the jury your name.

8    A.   My name is Curtis Brunson.

9    Q.   Where do you work?

10   A.   I'm employed as a special agent with the Bureau of

11   Alcohol, Tobacco, Firearms and Explosives here in Detroit.

12   Q.   How long have you been an agent with the ATF?

13   A.   Since 1989.

14   Q.   What are your duties there?

15   A.   I currently -- I'm currently involved in the

16   investigation of alleged federal firearm violations as it

17   relates to firearms and explosives.  In addition, I am also

18   called on to perform interstate-nexus determination on

19   firearms that are seized by local law enforcement officers.

20   Q.   In reference to the research and preparation of

21   statements and testimony regarding interstate nexus and

22   date of manufacture, can you talk a little bit about your

23   duties?

24   A.   My duties are several.  As an interstate-nexus

25   individual, one of my duties are charged with the actual

1    determination of firearms and far as its manufacture, its

2    origins, its place of manufacture, where it was

3    manufactured and the overall interstate nexus as it relates

4    to firearms that are seized in Michigan.

5    Q.   So you identify the firearms including their origin?

6    A.   Yes.

7    Q.   And documentation of their history?

8    A.   That's correct.

9    Q.   And that includes the background of the firearm?

10   A.   It does.

11   Q.   Do you determine their legal or illegal status in

12   reference to federal firearms laws?

13   A.   I do.

14   Q.   What are some of your other duties in relation to

15   firearms and federal firearms laws?

16   A.   I also provide assistance to local federal firearm

17   licensees, as well as offer assistance to county, state,

18   federal and local law enforcement officers relating to

19   firearms and their manufacture.

20   Q.   What formal training have you had in relation to the

21   identification of firearms and the documentation of

22   firearms history?

23   A.   After being hired by ATF, I attended a 16-week law

24   enforcement course at the federal law enforcement training

25   center in Glynco, Georgia.  That course provided me with, I

*Direct of Agent Brunson 3/10/10*                                    152

1    guess you could call it, information regarding firearms,

2    criminal procedures, criminal law.  Prior to my employment

3    with the ATF, I was employed as a Detroit police officer

4    and during that academy training, I was also provided with

5    lengthy experience as it relates to firearms and criminal

6    law.

7    Q.  How many firearms have you examined during your career

8    with ATF?

9    A.  Thousands.

10   Q.  In connection with your duties, have you had the

11   occasion to confer with other individuals, both within ATF

12   and the firearms and ammunitions industries?

13   A.  I have.  I often confer with other interstate-nexus

14   experts throughout the country that are employed by ATF as

15   well as firearm examiners with the Michigan State Police,

16   Detroit Police Department and other law enforcement

17   agencies within southeast Michigan.

18   Q.  Do you review on a regular basis commercial firearms

19   publications and review technical ATF publications dealing

20   with aspects of firearms?

21   A.  I do.

22           MS. ROBICHAUD:  Your Honor, may I approach?

23           THE COURT:  Of course.  Continuing permission

24   granted.

25   BY MS. ROBICHAUD:

*Direct of Agent Brunson 3/10/10*                             153

1   Q.  Agent Brunson, before you I've handed you Exhibit 14.

2   Will you please identify this exhibit?

3   A.  Yes.  Government's Exhibit 14 is a Sturm, Ruger .9

4   millimeter semiautomatic handgun, model number P, as in

5   Paul, 89, D, as in David, C, as in Charlie, with the

6   capabilities of holding a ten round, or more, magazine.

7   Q.  Now, do all guns have serial numbers?

8   A.  Yes.  Mandated by Congress back in 1968, all firearms

9   that are manufactured after 1968 were required to have

10  certain markings.  Those markings include the manufacturer.

11  In addition to the manufacturer, a model number if a model

12  number is governed by the manufacturer.  In addition to

13  that, a serial number is required on all firearms.

14          THE COURT:  Now you know why I said don't speak

15  too close to the mic.

16          THE WITNESS:  Yes, sir, Your Honor.

17          THE COURT:  Thank you.  Go ahead, Ms. Robichaud.

18  BY MS. ROBICHAUD:

19  Q.  Do you see a serial number on this gun?

20  A.  Looking at this particular firearm, and I have

21  examined hundreds of firearms similar to this Ruger style,

22  the firearm in question does not have a serial number; in

23  other words, this particular serial number on this firearm

24  was actually drilled out, which makes it illegal.

25  Q.  So it should be there right under -- can you point to

*Direct of Agent Brunson 3/10/10*                                    154

1    where --

2    A.   Yes.  Right under the slide, serial numbers, and if

3    you look at it in depth, you can see indentations that were

4    made by someone which allowed them to actually drill out

5    the serial number on this particular firearm.

6    Q.   Do you have an opinion as to the place and date of

7    manufacture of this weapon?

8    A.   Yes, ma'am.  This particular firearm is a Ruger .9

9    millimeter firearm.  It was manufactured after 1986 in

10   Prescott, Arizona.  And one way I can determine that is by

11   the model number.  This is, as I indicated earlier, it is a

12   P89.  The 89 represents the year it was actually

13   manufactured.

14   Q.   Given that the weapon was manufactured outside the

15   State of Michigan and found in the trunk of Mrs. Walker's

16   car in Redford, did this weapon cross the state line?

17   A.   In order for this weapon to have made it into

18   Michigan, it had to have crossed state lines.

19   Q.   Thank you.

20          MS. ROBICHAUD:  Your Honor, I would like to

21   request permission to pass this weapon to the jury.

22          THE COURT:  Yes, you may do so.  Is that safe?

23   That can't hurt anybody, can it?

24          THE WITNESS:  Yes, sir.  It is safe.  This is

25   what we call a draw strap, which allows it to be

*Cross of Agent Brunson 3/10/10*                                  155

1   nonfunctional.

2           THE COURT:  All right.  If you want to let the

3   jurors handle that, that's okay.  Take a look at it.

4           MS. ROBICHAUD:  I have no further questions, Your

5   Honor.  I pass the witness.

6           THE COURT:  Thank you.  When the jurors are

7   finished with that, just let one of the government

8   individuals know, and they'll retrieve it for you.

9           We are ready for you, Ms. Kostovski.  Sure, thank

10  you very much.

11                     **CROSS-EXAMINATION**

12  BY MS. KOSTOVSKI:

13  Q.   Good afternoon, Agent Brunson.

14  A.   Good afternoon, ma'am.

15  Q.   Now, how long have you been with ATF?

16  A.   Since 1989.

17  Q.   Have you always been involved in determining the

18  interstate nexus of weapons?

19  A.   Since 2001.

20  Q.   Since 2001?

21  A.   Yes, ma'am.

22  Q.   Just so that we are all clear, if you can maybe

23  explain to the jurors what do you mean by interstate nexus?

24  A.   Basically it involves the movements of goods from one

25  state to another.

*Cross of Agent Brunson 3/10/10*                                    156

1    Q.   Okay.  So, in this particular case, you were asked to

2    determine whether this weapon, Exhibit 14, was manufactured

3    outside the State of Michigan; is that correct?

4    A.   Yes, ma'am.

5    Q.   Okay.  And based on your research, you determined that

6    it was?

7    A.   It was, yes.

8    Q.   Okay.  And what was -- how did you make that

9    determination that it was made outside the State of

10   Michigan?

11   A.   Well, a lot has to do with the certain markings on the

12   firearm itself that are required by law.  If you look at

13   that particular firearm, it is stamped, I believe,

14   Southport, Connecticut, which is the actual headquarters of

15   Sturm, Ruger.

16          A lot has to do with my previous experience as

17   far as handling firearms similar to that Ruger P89 and I

18   know just by dealing with those firearms previously, that

19   that particular firearm, the Ruger P89, was manufactured in

20   Prescott, Arizona.

21   Q.   Okay.  That's based on, you said, the markings?

22   A.   Yes, ma'am.

23   Q.   Now, you also testified that you believe the serial

24   number was drilled, drilled out?

25   A.   Yes, the serial number has been removed.

1    Q.  But how do you know it was drilled out?  In other

2    words, what makes you believe that it was drilling as

3    opposed to something else that was used to scratch out the

4    serial number?

5    A.  By the indentations on the firearm itself.  If you

6    look at it, it appears that someone actually drilled it or

7    hollowed it out using some type of a device, whether it

8    could have been a file or a drill bit, or something to that

9    nature.

10   Q.  Could have been a screwdriver?

11   A.  Could have been a screwdriver, a pick, yes.

12   Q.  All right.  Now, do you have any idea who did that?

13   A.  No, ma'am.

14   Q.  So you have no evidence of who might have scratched

15   out or drilled out the serial number, correct?

16   A.  No.  My sole responsibility is provide information as

17   to the interstate nexus of that firearm.  As far how it got

18   drilled out, who drilled it out, when they drilled it out,

19   I have no idea.

20         MS. KOSTOVSKI:  No other questions.

21         THE COURT:  Thank you very much.  Anything else

22   from the government?

23         No.  Very good.  Agent Brunson, you are finished.

24         THE WITNESS:  Thank you, Your Honor.

25         THE COURT:  And we want to thank you for your

1    time here today.  Have a good afternoon.

2              THE COURT:  What's next, Mr. Gabel?

3              MR. GABEL:  The next witness for the government

4    is Special Agent George Powell from the United States

5    Secret Service.

6                  **SPECIAL AGENT GEORGE POWELL**

7              (The Witness is Sworn)

8              THE COURT:  Have a seat, sir, and you have heard

9    all of my instructions.

10                      **DIRECT EXAMINATION**

11   BY MR. GABEL:

12   Q.  When you are comfortable, could you please tell the

13   jury your name?

14   A.  George Powell.

15   Q.  And where do you work?

16   A.  I'm currently employed with the United States Secret

17   Service as a Special Agent.

18   Q.  How long have you been in law enforcement, total?

19   A.  18 years.

20   Q.  Could you break down the positions that you have had

21   in law enforcement?

22   A.  I served as a Detroit police officer and in the last

23   seven years, I've been a special agent with the United

24   States Secret Service, as I previously stated, during which

25   time, I worked special investigations, which included

1    narcotic investigations, vice investigations, organized

2    crime investigations as well.  And now more specifically,

3    I'm working, in addition to the protection that we provide

4    to the President of the United States, Vice President, I

5    also deal with anything that impacts the financial

6    infrastructure of the country, which is now indicative if

7    it's counterfeit.

8    Q.  You investigate cases that would threaten the

9    integrity of the financial system in the United States,

10   that does include counterfeiting offenses?

11   A.  Yes.

12   Q.  What type of training have you had regarding genuine

13   currency versus counterfeit currency, if you could explain

14   that to the jury, please?

15   A.  I spent 16 weeks in the Federal Law Enforcement

16   Training Center in Glynco, Georgia, where extensive

17   training was given on the genuineness of U.S. currency.

18   After which I spent another 16 weeks in the United States

19   Rowley Training Center, which is basically a Secret Service

20   compound or training facility, in which I received

21   additional training in genuine currency.

22        What we specialize on is learning and being able

23   to identify the genuine aspects of U.S. currency and,

24   therefore, we use that to basically look at anything, any

25   other images or bills presented to kind of offset that and

1    say this isn't real or to dispel that being a genuine bill.

2    Q.   So, in essence, in becoming knowledgeable about

3    genuine real U.S. currency, you're able then to determine

4    what does not meet the qualifications of real currency?

5    A.   Yes.

6    Q.   Over the course of your career with the Secret

7    Service, could you estimate how many counterfeit bills you

8    have examined?

9    A.   Hundreds and hundreds of bills.

10   Q.   I would like to turn your attention now to May 4th of

11   2009.  As an agent who investigates counterfeiting

12   offenses, were you contacted by Redford Township Police to

13   inform you that they had made an arrest?

14   A.   Yes, I was.

15   Q.   What did they tell you they had come across?

16   A.   Well, essentially I was contacted by the detective on

17   the case and he explained to me that there had been a

18   traffic stop in their city and someone was arrested that

19   had a large sum of counterfeit currency, a large amount of

20   U.S. currency as well, and three pistols as well in their

21   possession, along with other items.

22   Q.   Who is the individual who was arrested?

23   A.   It is Michele Johnson as what we know her now, but at

24   the time we thought her name to be Nancy Walker.

25   Q.   Could you please point to her and describe what she is

 1   wearing?

 2   A.  She's sitting next to defense counsel wearing a gray,

 3   charcoal suit.

 4   Q.  I'm sorry, what was the name you initially believed

 5   her to be?

 6   A.  We determined at that time Nancy Walker was her name.

 7   Q.  Okay.  Now, in meeting with Redford Township Police,

 8   did they turn over the evidence that they had uncovered

 9   from Ms. Johnson?

10   A.  Yes, they did.

11   Q.  Why did they turn the evidence over to the Secret

12   Service?  Why didn't they just handle the case; do you

13   know?

14   A.  Well, due to the amount of counterfeit that was seized

15   in this investigation, and due to the quality of the bills

16   that were seized, they turned that over to us for further

17   investigation.

18          MR. GABEL:  I want to place --

19          MS. KOSTOVSKI:  Wait, wait, just briefly.

20          (Discussion off the record)

21   BY MR. GABEL:

22   Q.  Could you describe the evidence that was turned over

23   to you from Redford Police?

24   A.  Essentially, it was three pistols, 32,000 -- what

25   later counted to be $32,750 in counterfeit currency.  There

*Direct of SA Powell 3/10/10*                                    162

1    was $13,794 genuine currency, an assortment of

2    miscellaneous items, to include driver's license or copy

3    photo identification of driver's license, and the bags in

4    which they were actually obtained in, and things of that

5    nature.

6    Q.  Now, did they turn over a purse to you that had

7    contained some of the firearms?

8    A.  Yes, they did.

9    Q.  Was it your understanding that they had thoroughly

10   searched through the contents of the purse by the time they

11   had turned it over to you?

12   A.  To my knowledge, it was.

13   Q.  Was there a number of items in the purse?  Was it

14   fairly --

15   A.  It was fairly packed with a lot of, like I said,

16   different miscellaneous items, papers, different notes,

17   scrappings of notebook pads, and things of that nature.

18   Q.  And the evidence that they turned over to you, the

19   guns, the counterfeit money, the genuine U.S. currency, are

20   those included amongst the exhibits that have already been

21   admitted in this case?

22   A.  Yes, they are.

23   Q.  I would first like to discuss the gun with the

24   obliterated serial number, Government's Exhibit 14.  That

25   is one of the firearms that they turned over to you when

*Direct of SA Powell 3/10/10*                                      163

1    you arrived at Redford Township?

2    A.  Yes, it is.

3    Q.  And did you see the officers handling this firearm

4    when you were at their station?

5    A.  Yes.

6    Q.  Could you describe what you saw?

7    A.  Essentially, this particular weapon here was not made

8    safe at the time and the clip was removed from it, and

9    several items -- several officers were trying to actually

10   make it safe.  So they were trying to get the slide back to

11   get it in a locked position like it is now and originally,

12   they couldn't get that to be done.  So they called someone

13   from the station that was one of their firearms guys that

14   actually came up.  And then they tried to manipulate it.

15   And essentially he was, he was able to get the magazine

16   removed from the weapon, as well as get it into this locked

17   position, which you see it currently.

18   Q.  As they were attempting to make it safe, were they

19   barehanded?

20   A.  Yes.

21   Q.  And how many people had touched the gun while trying

22   to make it safe?

23   A.  Well, in my presence, at least two.

24   Q.  When you received that firearm, did you submit it for

25   fingerprint analysis?

1    A.   Yes, I did.

2    Q.   And did you additionally submit a card with the

3    fingerprints of defendant Nancy Walker, I'm sorry, Michele

4    Johnson?

5    A.   Yes.  And as you said correctly, the card did have

6    Nancy Walker on it, because that was the name that we

7    originally had her arrested as but it's a/k/a, also known

8    as Michele Johnson, so yes.

9    Q.   Was it your understanding that the fingerprint card

10   wasn't of good enough quality to make a comparison to the

11   partial print that was found on the gun?

12   A.   The -- exactly.  Both print impressions that was

13   obtained, the initial ones from the arrest by Redford PD,

14   which was later pulled from what they call a Life Scan,

15   which is a computer system there they -- at the State

16   Police, they are able to, as mentioned earlier, a database

17   so that they could see the prints were not a good set.  So

18   I was asked to get a second set.  So I got          another

19   -- she's been housed, defendant's been housed at Wayne

20   County Sheriff's Department.  So we asked for another set

21   of prints to be done and done the traditional way, which is

22   by ink.

23   Q.   So the Wayne County Sheriff's Department would have

24   been the ones who fingerprinted her?

25   A.   Yes.

1    Q.   So to the extent the lab didn't receive the

2    fingerprints that they needed, it wasn't because you failed

3    to print her, that was just what had been provided to you?

4    A.   That's correct.

5    Q.   Now, upon receiving the purses and bags in this case,

6    did you have an opportunity to go through that material to

7    see what else Ms. Walker had in her possession aside from

8    just the guns and the counterfeit money in the trunk?

9    A.   Yes, I did.

10   Q.   I first hand you Government's Exhibit 21.  Have you

11   seen Government's Exhibit 21 before?

12   A.   Yes, I have.

13   Q.   On what occasion?

14   A.   This is one of the items recovered from the purse

15   during the inventory of it.

16   Q.   Is that purse that you're discussing, Government's

17   Exhibit 3?

18   A.   It is.

19        MR. GABEL:  Your Honor, the government moves for

20   the admission of Government's Exhibit 21.

21        THE COURT:  Objection?

22        MS. KOSTOVSKI:  No objection, just so we identify

23   what it is for the record.

24        MR. GABEL:  Go ahead and publish it to the jury

25   on the screen now.

1          THE COURT:  If it's going to be in, we are going

2    to do that.  So you're stipulating to its admissibility?

3          MS. KOSTOVSKI:  Yes.

4          THE COURT:  21 is in and you may show it to the

5    jury and have the agent identify it now, Mr. Gabel.

6          (Government's Exhibit 21 received)

7    BY MR. GABEL:

8    Q.  Could you identified Government's Exhibit 21 for the

9    jury, please?

10   A.  21 is an actual photocopy of what appears to be a

11   Sunshine State Florida license that has the defendant's

12   picture placed on it with the name of Michele Andretta

13   Johnson.

14   Q.  Do you understand that this is not a genuine ID but

15   rather a fake or altered ID?

16   A.  This appears to be a fake or altered, altered in the

17   respect of the photo.  The photo that is on this particular

18   license is not evenly cropped in a square or rectangular

19   motion.  It's cropped from the top portions of it as though

20   it was cut and paste, or the background or the illumination

21   of the background that was -- as the picture was taken, or

22   portrait was taken -- was tried to be removed from the

23   photo so it wouldn't be shown.

24   Q.  I'm handing you what has been marked as Government's

25   Exhibit 22.  I understand there is no objection and

1    therefore move for admission at this time.

2              MS. KOSTOVSKI:  That's correct, Judge.

3              THE COURT:  Okay.  That's 22?

4              MR. GABEL:  Yes.  If we can please place it on

5    the screen at this time.

6              THE COURT:  22 is received.  Thank you.

7              (Government's Exhibit 22 received)

8    BY MR. GABEL:

9    Q.   Have you seen Government's Exhibit 22 before today?

10   A.   Yes.

11   Q.   Where did you first encounter it?

12   A.   This is another license photocopy that was retrieved

13   from the defendant's purse during the inventory search and

14   most notably on this photo is that it's very similar in

15   nature to the photos that we just seen for Michele Andretta

16   Johnson, with the exception of if we pay attention to the

17   top portion of the portrait, the voided areas of white in

18   this particular picture was not illuminated so now you can

19   see certain portions of the area in, essentially, a

20   different angle of the picture, if you will, being shot but

21   yet in the still the same portrait.

22   Q.   Let's put both up just so we can see that clearly.

23             Now, what were you describing about the photo?

24   A.   In the photocopy, 21, in 21 -- can I approach this

25   little bit.

 1            MR. GABEL:  May the witness step down --

 2            THE COURT:  Absolutely.

 3            MR. GABEL:  -- and use the screen, Your Honor?

 4            THE COURT:  Go ahead, Agent.

 5    A.   In the photocopy of 21, this area of shading is not

 6    there.  Essentially, what I'm stating here is that the

 7    portrait is actually manipulated.  When you're cutting and

 8    pasting from a computer, you try to shrink in or shrink the

 9    background away from you.  In normal photo IDs that we'll

10    see from the state, you're going to a backdrop of some sort

11    that is going to be actually visual in the actual portrait,

12    which is very similar to also what you'll commonly see on

13    your Michigan driver's license.

14    BY MR. GABEL:

15    Q.   I'm placing before you a demonstrative exhibit, and if

16    you need to step down, please feel free.  Am I correct that

17    you created this exhibit?

18    A.   I did.

19    Q.   And could you please tell the jury what this reflects?

20    A.   These are the additional licenses that was recovered

21    from the defendant in regards to this investigation and,

22    essentially, this depiction is the names that were

23    associated with the defendant, along with what we finally

24    found, discovered her real name to be, which is Michele

25    Johnson.  As you see, these are IDs from the State of

1    Florida, as well as from the State of Michigan, with

2    various types of portraits placed on, looks to be cut and

3    paste on valid or copied versions of Florida licenses, as

4    well as Michigan driver's license.

5    Q.   Now, in searching her purse did you also recover

6    anything that gave you an indication of where the car had

7    come from, where it had been purchased?

8    A.   Yes.

9    Q.   And was that the bill of sale that we saw Mr. Willie

10   Reeve testify about?

11   A.   Yes, it was.

12   Q.   Now, after receiving the purse, did you do a more

13   extensive search than was done initially at Redford Police

14   Department?

15   A.   Yes.

16   Q.   And could you please describe what you found that is

17   relevant to this case once you conducted the search of the

18   purse?

19   A.   Continuing through the search of the purse, there was

20   additional counterfeit money and currency found inside of

21   her purse, as well as, as just mentioned here, these photo

22   identifications that were found on the initial stop at

23   Redford Police Department, the only license or photocopy

24   license they had for Dianne Wilcosh.

25   Q.   So in addition to the counterfeit money that was found

1    in the trunk of the car that she was driving, additional

2    counterfeit money was found in the purse?

3    A.   Yes.

4             (Discussion off the record)

5    BY MR. GABEL:

6    Q.   I'm handing you what is in total been marked as

7    Government's Exhibit 16, with one particular portion of it

8    labeled Government's Exhibit 16A.  You have seen

9    Government's Exhibit 16 and Subexhibit 16A prior to today?

10   A.   I have 16A.  I don't see 16B.

11   Q.   There is only 16, all of it.  16A is just one of them.

12   A.   I'm sorry.

13   Q.   Have you seen those prior to today?

14   A.   Yes.

15   Q.   On what occasion?

16   A.   During the inventory search going through the purse

17   and actually now logging the property into our property

18   evidence locker, started noticing in going through her

19   purse, like I stated earlier, a lot of miscellaneous items

20   inside of the purse in, like, a little pouch, there were

21   these additional billings inside of there.

22   Q.   Could you describe what Exhibit 16 and Subexhibit 16A

23   are for the jury?

24   A.   What we are looking for here are uncut sheets of

25   counterfeit currency, which in a counterfeiting operation

1   this would be one of the stages in order to manipulate or

2   make the counterfeit itself.

3           Genuine currency is made with three plates, three

4   plates that are -- what we call offset printing.  And those

5   three plates initially are the front of the bill, which is

6   considered the front plate.  Later we will see there is a

7   back plate, which is essentially the back side of the bill,

8   which is what we call the back plate.  And then the

9   Treasury seal, which is the little green items to the left

10  of the portrait, would be what we call a saber-tooth type

11  emblem around it.

12          This particular bill here has been copied onto

13  some type of, maybe, linen quality or cotton or some type

14  of regular resume-type paper and this is one stage of it

15  here.

16  Q.  Were you --

17          THE COURT:  Wait a minute, let's manage those

18  exhibits.  I don't think you've offered those yet --

19          MR. GABEL:  I haven't.  We do move to admit it at

20  this time.

21          MS. KOSTOVSKI:  No objection.

22          THE COURT:  Okay.  16 and 16A are received.

23          (Government's Exhibits 16 & 16A received)

24  BY MR. GABEL:

25  Q.  We will go into this in a little bit more detail

1   later, but you were ultimately able to determine this was

2   indeed counterfeit money?

3   A.   Yes.

4   Q.   Did it look like it was in the process of being made?

5   A.   Yes.

6   Q.   Now, could you pull out 16A, the one that has the

7   sticker on it?

8   A.   This is 16A here.

9   Q.   Yes.  What, in particular, do you notice in that bill

10  with respect to the security features?

11  A.   I just want confirm, but this bill again, first stage,

12  front plate, it has running through it a security thread

13  but the security thread is actually -- it's kind of hard to

14  see from here, but the security thread looks to have been

15  pasted.  In the second stage, if another sheet of this

16  paper was placed over on the back plate of it, or the back

17  part of the bill was on there, this would actually look as

18  though the security thread is actually imbedded in the bill

19  and, thus, if you were checking for those immediate

20  features which is visually and readily known to the public,

21  it would appear that it's here.

22  Q.   Can I take that from you?

23         MR. GABEL:  Judge, I would like to pass this to

24  the jury and let them observe it.

25         THE COURT:  Okay.

1           THE WITNESS:  I think it's to the left of that

2   particular portrait in that particular photo.

3   BY MR. GABEL:

4   Q.  Let me collect the additional money just so we don't

5   lose track of it.

6           The paper that was used to Government's 16 and

7   16A, do you have an understanding of why paper like that

8   would be used if you're attempting to create counterfeit

9   money?

10  A.  Well, most commonly types of paper that you will see

11  in counterfeit currency that's being passed is either some

12  type of resume paper or something of a thicker bond.  In

13  other words, the paper text will feel thicker.  Most folks,

14  or individuals, suspects, to make counterfeit thinks it

15  needs to have that texture.

16          What they are trying to duplicate or solve or

17  resolve a problem is when you go to the merchants, you

18  normally see them strike a pen across a bill to check to

19  see if that bill is actually legitimate or not.  What that

20  pen is actually picking up is starch.  So pretty much any

21  paper that is made -- paper is made out of some type of

22  fiber or some type of starch in it.  So depending upon the

23  type, if it's a good resume paper, you may get what we call

24  a false indication.  So that in and of itself isn't really

25  an absolute way to determine if that particular bill is

1    counterfeit or not.  So that's why we not only try to

2    educate the general public on certain security features to

3    look for, there is other things that we also entail and

4    look if we're in question of a particular bill.

5    Q.  So the use of the pen that we see cashiers do when you

6    use a large bill at a store, that pen is -- in essence, can

7    be fooled by a high-quality resume paper?

8    A.  It is fooled in the sense that it's picking up only

9    one thing, starch.  That's all it's looking for in a

10   particular bill.  And if that particular type of paper that

11   is being used and can be purchased from Staples, or

12   anywhere else, just a basic heavy bond-type resume paper or

13   resume form-type paper, it may entail, have enough starch

14   content and you will get a negative reading from the pen.

15   Q.  I'm handing you what has been marked as Government's

16   Exhibit 17.  I ask you if you have seen Government's

17   Exhibit 17 prior to today?

18   A.  Yes.

19   Q.  On what occasion?

20   A.  During the inventory of the purse, again, this

21   particular envelope, along with this currency, was found

22   inside of it.

23   Q.  Inside?

24   A.  I'm sorry, inside of the purse that --

25   Q.  This purse again?

1   A.   Yes.

2   Q.   The defendant's purse?

3   A.   That the defendant was carrying.

4   Q.   Now, included amongst this money did you find

5   handwritten notations?

6   A.   I did.

7   Q.   And could you describe for the jury what those

8   handwritten notations said?

9   A.   On some of the -- some of the notes that was placed on

10   the bills, you would see such things as night, or day, just

11   various little amounts and indications in the bills.  Some

12   of the bills were prewrapped, things of that nature.

13   Q.   Was there a notation that said "for stores"?

14   A.   Yes.

15   Q.   Was there a notation that said "for nighttime"?

16   A.   Yes.

17   Q.   What did you understand that to be conveying?

18   A.   Generally, the whole purpose of making counterfeit is

19   to essentially pass it, so to pass --

20        MS. KOSTOVSKI:  Your Honor, at this point I'm

21   going to object because where is the foundation that Agent

22   Powell would know what those notes mean since he's not the

23   creator.  He's speculating.

24        THE COURT:  I would agree with that.

25        MR. GABEL:  Your Honor, I believe I can establish

1   a foundation.

2            THE COURT:  Good.  Go right ahead.

3   BY MR. GABEL:

4   Q.  In your experience as a Secret Service agent have you

5   become familiar with the times of day or the types of

6   businesses that counterfeiters, or people who are passing

7   counterfeit money, the times of day and the stores they

8   like to hit?

9   A.  What I will say is I have become very experienced in

10   the methodologies used by those that pass counterfeit.

11   And, see, the methodologies that's commonly used is that we

12   call -- what we call runouts.  Essentially, we get hundreds

13   of reports, whether it's coming in from police departments,

14   banks or business establishments, where counterfeit notes

15   have usually been passed in some type of business.

16   Sometimes these businesses can be party stores, they can be

17   department stores and sometimes they can be restaurants.

18   They can be after -- different type of bars or

19   establishments, such as that.

20            Commonly what you find, or what you see, is most

21   of the lower quality or different type of notes that are

22   kind of passed in, say, a bar under low light, low reading

23   conditions, are essentially more easily and readily passed

24   to the general public, as opposed to something that

25   may -- that particular note being passed in the day might

1    automatically get someone, a cashier's or teller's

2    attention, to maybe start drawing towards those particular

3    features that we talked about.

4    Q.  So, in light of that experience, what did you

5    understand the notes for nighttime and for stores to be

6    conveying?

7    A.  In my opinion, it was that those particular notes that

8    would say night, or particular bills that they wanted to

9    pass during the night, what type of establishment and where

10   is unknown, but the other ones that would say for stores,

11   may indicate that these may be passed more at a convenience

12   store, it could be a party store.  I'm not sure what type

13   of store but it does have an indication for the particular

14   person or counterfeiter that is trying to pass it so that

15   when they're reaching and trying to actually manipulate

16   counterfeit money with genuine money, they will know which

17   type they want to use and to effect which type of crime or

18   what time of day.

19   Q.  Again, we will get into this in more detail later,

20   probably tomorrow, but were you able to identify this money

21   at Government's Exhibit 17 as indeed counterfeit money?

22   A.  Yes.

23          MR. GABEL:  Within Government's Exhibit 17, Your

24   Honor, we are marking an individual bill 17A that we'll

25   discuss later, including its serial number.  I don't

1   believe there is any objection to that.

2          THE COURT:  17 and 17A, any objection?

3          MS. KOSTOVSKI:  No objection.

4          THE COURT:  They are both received at this time.

5   Go ahead, Mr. Gabel.

6          (Government's Exhibit 17 & 17A received)

7   BY MR. GABEL:

8   Q.  Do you see Government's Exhibit 17A that's been

9   individually marked?

10  A.  I do.

11  Q.  Could you please read the serial number to the jury?

12  A.  The serial numbers indicated on this particular bill,

13  is A, as in apple, B, as in boy, 28539702 E, as in echo.

14  Q.  Thank you, Agent Powell.

15         MR. GABEL:  Your Honor, I would like to pass

16  along this envelope of currency, counterfeit currency, to

17  the jury for their inspection.

18         THE COURT:  Okay.  You are getting the exhibits

19  back?

20         MR. GABEL:  The gun we do have.

21         THE COURT:  That's important now.

22  BY MR. GABEL:

23  Q.  Now, in your investigation did there come a time where

24  you compared the bills found in the trunk of the car that

25  Ms. Johnson owned and was driving with the bills that you

1    later found in the purse?

2    A.   Yes.

3    Q.   And could you describe what your findings were when

4    you compared those bills?

5    A.   Well, essentially both bills, there was numerous

6    bills, 50s and 100s.  And in the bills that was in the

7    envelope, and the serial number that I just read, it was

8    similar bills found in the trunk.  And what immediately

9    drew my attention to the bills that was recovered from the

10   trunk is that, in fact, the serial numbers which were the

11   same.

12   Q.   Okay.  So serial numbers on some of the bills in the

13   purse matched the serial numbers in the trunk?

14   A.   Yes.

15   Q.   Now, could I pull up both Government's Exhibit 15A and

16   17A, it's on a demonstrative.

17           Thank you, Ms. Gentry.

18           We're placing on the screen Government's Exhibit

19   15A, which has previously been admitted as having been

20   found in Ms. Johnson's purse, and Government's Exhibit 17A,

21   which later -- or I'm sorry, earlier recovered from her

22   trunk.  Could you please describe the similarities you see

23   between the bill from the purse and the bill from the

24   trunk?

25   A.   Well, immediately the first thing that you would

1    actually see would be serial numbers.  Again, pointing,

2    serial numbers are identified by numeric and alphabetical

3    notations.  Immediately looking at these bills, that's the

4    first thing that grabs your attentions.

5           Then there's other indicators on here, such as

6    this B3 and the B3 that's here.

7           It looks like C4, C4 on this particular bill, as

8    well as C4.  Again, these are indicators that tell us

9    particular things, such as B3 tells us what bank this was

10   particularly made at, and the serial numbers, again, they

11   go into a little bit more about how the printing process

12   was done.

13   Q.  Now, it's not that uncommon to have two bills that say

14   B3 because banks create more than one bill, right?

15   A.  Correct.

16   Q.  But what about the serial numbers, is it possible for

17   genuine U.S. currency to have the same serial number?

18   A.  No.

19   Q.  And could you describe why that is?

20   A.  Because each particular bill, as I stated earlier, is

21   made on three plates, the three plates.  Those three plates

22   are then placed on a templet, if you will, which has 32

23   individual sheets.  So what happens when money is printed,

24   there is 32 sheets of money that's printed in any given

25   block and those -- that particular number is numerically

1    ordered and it's done so in a sequential algorithm in a way

2    that no two numbers on a bill should ever match.

3    Q.  So is the serial number on a bill essentially like a

4    numerical identifier that is unique to each bill?

5    A.  It's essentially that bill's fingerprint and that

6    particular fingerprint stays that with particular bill.

7    The only way to reproduce it is for someone to just copy

8    it.

9          MR. GABEL:  Your Honor, we have to just unplug a

10   cord real quick and connect it to the agent's computer.  Do

11   we want to break or --

12         THE COURT:  How much do you have left with this

13   witness?

14         MR. GABEL:  I think there's going to be a fairly

15   significant amount, as well as cross-examination.

16         THE COURT:  For your part you have got more than

17   five or ten minutes?

18         MR. GABEL:  Yes.

19         THE COURT:  Okay.  I think this is a good point

20   to end the day.  All right?  You may step down, Agent

21   Powell.

22         THE WITNESS:  Thank you, sir.

23         THE COURT:  Thank you.

24         Ladies and gentlemen, we are moving along nicely.

25   We obviously are on the, oh, gosh, sixth or seventh witness

1   of the government's case.  I anticipate we will go to the

2   end of the government's proofs tomorrow and either tomorrow

3   or Friday, more likely Friday, we will be ready for the

4   argument and then instruction.

5           Now, one thing that is important for me to tell

6   you is that when the case is yours, which is to say when

7   you go to the jury room and start deliberating, you're here

8   all day.  Okay.  So, Friday at the minimum, I would plan to

9   be here from 8:30 until 4:00 or 4:30, or at least until you

10  reach a verdict.

11          Tomorrow I think it's likely that we will finish

12  the proofs and then have to take up some legal matters so

13  we will be -- actually, we'll be on a little different

14  schedule.  We will be here at 9:15 tomorrow morning.  I

15  have a matter early in the morning so we will start with

16  the jury at about 9:15, and then we will plan to go to

17  about 1:30 or so.  All right.  And then I would expect the

18  case will be in your hands on Friday and you should plan to

19  be here to deliberate all day that day.  Then we will see

20  where we are.

21          In the meantime, I know we were a little choppy

22  today with your time, and I regret that.  I'm grateful for

23  your attention and your presence.  Please don't talk about

24  the case with anybody, family members, yourselves or

25  anybody else.  Be safe, relax and have a pleasant evening

 1    and a safe drive home.  All right.  All rise for the jury.

 2              (Jury out at 4:15 p.m.)

 3              MR. GABEL:  Judge, before the jury is excused, I

 4    think there's a pretty strong likelihood we'll be done

 5    tomorrow.  Powell is going to be our last witness.

 6              THE COURT:  Really?

 7              MR. GABEL:  I know that the defense has some time

 8    on cross-examination.  But after that, we will be ready to

 9    launch into closing.

10              THE COURT:  You may all be it seated.

11              MR. GABEL:  I don't think the defense has any

12    witnesses at this point.

13              THE COURT:  Well, candidly, we have to put your

14    jury instructions together.  We have to meet to talk about

15    them and you have got to argue the case and I have got to

16    instruct the jury.  I don't really know how much all that

17    is going to take.  So I appreciate you saying that,

18    Mr. Gabel, and I am getting in a little bit late tomorrow.

19    So let's just see what happens.  Okay.  And if we are

20    instructed and closed at 12:30, I'll keep them as long as

21    possible.  But if we don't have jury instructions read to

22    them by 1:00, then we'll let them go and have them come

23    back on Friday morning.  So, whatever, we will get it

24    worked out.  Okay?

25              MR. GABEL:  Okay.  Do you plan on reading the

*Direct of SA Powell 3/10/10*                              184

1    jury instructions before closings or after?

2              THE COURT:  After.  You speak, then I speak and

3    then they go to deliberate.

4              MR. GABEL:  Great.  Thanks.

5              THE COURT:  Any other questions, comments,

6    issues?

7              MS. KOSTOVSKI:  When are we meeting with you to

8    go over jury instructions?

9              THE COURT:  Tomorrow.

10             MS. KOSTOVSKI:  Is it after --

11             THE COURT:  On our morning break.  We will close

12   the government's case, receive the defendant's case, if

13   any, receive any rebuttal case, if any, review the

14   instructions off the record.  Put your objections to the

15   charge on the record and then go to closing argument.

16             MS. KOSTOVSKI:  Okay.

17             THE COURT:  Sound good?

18             MS. KOSTOVSKI:  Yeah.

19             THE COURT:  Okay.  Anything else?

20             MR. GABEL:  Nothing else for the government, Your

21   Honor.

22             THE COURT:  Thanks for all your hard work and,

23   again, if you don't mind being here, set up and ready to go

24   by 9:15 tomorrow morning, we'd be grateful.  Okay.  Have a

25   good evening.

```
1            MS. MCNEILL:  All rise.  Court is in recess.

2            (Proceedings adjourned at 2:15 p.m.)

3

4

5

6                         *       *       *

7

8                  CERTIFICATE OF REPORTER

9            As an official court reporter for the United

10   States District Court, appointed pursuant to provisions

11   of Title 28, United States Code, Section 753, I do hereby

12   certify that the foregoing is a correct transcript of

13   the proceedings in the above-entitled cause on the date

14   hereinbefore set forth.

15

16

17                  ____s/ Karen Klerekoper____

18                  KAREN KLEREKOPER, CSR, RPR

19                  Official Court Reporter

20

21

22

23

24

25
```