1

2                          UNITED STATES DISTRICT COURT
                           EASTERN DISTRICT OF MICHIGAN
3                               SOUTHERN DIVISION

4      **UNITED STATES OF AMERICA,**

5                      Government,              **Case No. 09-cr-20264**
          **-v-**
6
       **MICHELE JOHNSON, also known as**
7      *Angela Jackson*, **also know as**
       *Dianne Anne Johnson*, **also know as**
8      *Nancy Lori Walker*,

9                      Defendant.
       _____/
10
                              **JURY TRIAL**
11                            Volume III
                 BEFORE THE HONORABLE **STEPHEN J. MURPHY, III**
12                    United States District Judge
                 Theodore Levin United States Courthouse
13                    231 West Lafayette Boulevard
                           Detroit, Michigan
14                    **Thursday, March 11, 2010**

15     **APPEARANCES:**

16     FOR THE              **Mr. Louis Gabel**
       GOVERNMENT:          **Ms. Sarah Robichaud**
17                          U.S. Attorney's Office
                            211 West Fort Street
18                          Detroit, MI  48226
                            (313)226-9756
19     FOR THE DEFENDANT:   **Ms. Suzanna Kostovski**
                            Law Offices of Suzanna Kostovski
20                          220 Bagley
                            Suite 1015
21                          Detroit, MI  48226
                            (313)965-6050
22
            Also Present:  Ms. Alissa Greer, Courtroom Deputy
23                         Ms. Susan McNeill, Law Clerk
                           Special Agent George Powell
24
                    **To Obtain a Certified Transcript Contact:**
25              Karen Klerekoper, CSR, RPR - (313)961-1119

1                           TABLE OF CONTENTS

2        _____

3
         Witness for the Government:                        PAGE
4

5                      **SPECIAL AGENT GEORGE POWELL**
         Direct Examination (Con't) by Mr. Gabel............... 15
6        Cross-Examination by Ms. Kostovski.................... 34
         Voir Dire Examination by Mr. Gabel.................... 57
7        Voir Dire Examination by Ms. Kostovski................ 61
         Voir Dire Examination by the Court.................... 65
8

9        Closing Argument by Mr. Gabel......................... 82
         Closing Argument by Ms. Kostovski.................... 100
10       Rebuttal Argument by Mr. Gabel....................... 110

11       Jury Instruction by the Court........................ 115

12

13
            **IDENTIFICATION/RECEIVED:**                       PAGE
14
         Government's Exhibit 3 re-received (purse/fanny pack)..  4
15       Government's Exhibit 11 (flash drives)................ 19
         Government's 18 & 18A (counterfeit from purse)........ 26
16

17

18

19

20

21

22

23

24
            **CERTIFICATE OF COURT REPORTER**.........................140
25

1   Detroit, Michigan

2   March 11, 2010

3   At 9:24 a.m.

4                    *     *     *

5          (Call to Order of the Court)

6          MS. GREER:  The Court calls case 09-20264, United

7   States of America versus Michele Johnson.

8          THE COURT:  Okay.  We are resuming our jury trial

9   and I'm chomping at the bit to go.  I appreciate everybody

10  being on time and I regret -- you may all be seated.  I

11  regret being a little bit late this morning.

12         What is going on, Mr. Gabel?  They say you have

13  two things.

14         MR. GABEL:  Two issues.  First, we are adding two

15  exhibits to our exhibit list, one of which the defense has

16  no objection to.  It's a postal bag.  That will be the new

17  Exhibit 23, as opposed to 23 that was initially on our

18  list.

19         THE COURT:  Hold on, let me get my pen here.  My

20  little red pen is missing.  Thank you, Alissa.

21         Government's 23 is going to be what?

22         MR. GABEL:  This postal bag.  I understand there

23  is no objection, so I will move for its admission.

24         MS. KOSTOVSKI:  No objection, of course.  I

25  believe he's going to put the exhibit in through Agent

1    Powell as soon as we establish chain of custody, and other

2    foundation, I'm sure there will be no objection.

3             THE COURT:  All right.  Subject to establishing a

4    minimal foundation to satisfy the defendant's concerns, we

5    will receive 23.

6             (Government's Exhibit 23 re-received)

7             THE COURT:  Go ahead, what is next?

8             MR. GABEL:  One additional exhibit, Exhibit 24,

9    which, in the Government's estimation, is a tally sheet for

10   counterfeit currency being passed.  This was found in the

11   defendant's purse.  I understand the defense objects but I

12   don't think they go -- her objections go to the

13   admissibility.  They go more towards weight.

14            THE COURT:  Pass it to Ms. Greer, if you would,

15   please, Mr. Gabel, and let me take a quick look at it.

16            MR. GABEL:  I believe the defense's position is

17   we don't know whose handwriting it is.  We don't really

18   know what's being reflected in there, but I think that

19   comes up in drug tally sheets oftentimes and that goes more

20   towards weight.  Ms. Kostovski can argue this is ambiguous

21   but it certainly is relevant.

22            THE COURT:  Who pulled this out of Ms. Johnson's

23   purse?

24            MR. GABEL:  It was pulled from her purse, yes.

25            THE COURT:  Who pulled it out?

1          MR. GABEL:  Agent Powell did.

2          THE COURT:  Here you go, Ms. Greer.  If he can

3    authenticate it and lay a foundation, I will let you admit

4    it over objection and you can argue the matter to the jury

5    but I'd be careful with that because it is true that there

6    is nothing beyond handwritten numbers on there and we don't

7    know whose handwriting or what it means, so I will let you

8    make your objection and -- go ahead, do you want to say

9    something?

10         MS KOSTOVSKI:  Yes, Your Honor.  First of all, I

11   have never seen that until now.  I actually met with Agent

12   Powell and Mr. Gabel on Monday to review the exhibits, the

13   physical exhibits as well as the paper exhibits.  This was

14   never presented to me at Monday morning's meeting so I

15   don't know where this came from.  I have never seen this

16   before.

17         THE COURT:  I think the better course would

18   probably be to not offer that, Mr. Gabel, in the grand

19   scheme of things but, again, if you're able to establish a

20   foundation, I will consider admitting it.  I take it that

21   your issue goes beyond admissibility.  It goes to a Rule 16

22   violation, or something.  What's --

23         MS. KOSTOVSKI:  That's correct.  There's a

24   standing order here to present all of that.  If it was not

25   presented to any other attorney prior to me and I've never

1    seen it and, again, Judge, they had the opportunity to give

2    it to me on Monday and say to me, you know, here is

3    something, maybe you haven't seen it.

4          MR. GABEL:  Judge, I guess I can shortcut this.

5    We will not admit it, that's fine, out of an abundance of

6    caution.  It was mixed in with a number of papers that were

7    in her purse.  A closer inspection uncovered it but to

8    short-circuit all of this and avoid any potential issue

9    going forward, we will just put it back with all the

10   other --

11         THE COURT:  All right.  I think that's a very

12   laudable decision.

13         MS. KOSTOVSKI:  Thank you, Mr. Gabel.

14         THE COURT:  Thank you, both.  Good job.

15         Now, let's talk jury instructions.  Maybe we're

16   more optimistic than I gave you all credit for last night.

17   Susan, our law clerk, advises that she has put together a

18   joint packet of instructions and counsel have been highly,

19   highly professional about this.  My understanding is that

20   the joint book of instructions that she gave to you this

21   morning, which I have a copy of in front of me, have been

22   worked out and agreed upon between the two of you.  There

23   is an instruction dealing with counterfeiting that you have

24   augmented by stipulation and we're essentially ready to go

25   with these.  Correct?

1          MS. KOSTOVSKI:  That's correct.

2          MR. GABEL:  Yes.

3          THE COURT:  All right.  Well, then I'm going to

4    have Susan type up a final pack and what you have in front

5    of you is what we're going to give to the jury.  Okay?

6          MR. GABEL:  Thank you.

7          THE COURT:  Anything else?

8          Sorry I jumped on you about the redirect

9    yesterday, Ms. Robichaud.

10          MS. ROBICHAUD:  No problem.

11          THE COURT:  You ran into a buzz saw with the

12    defense attorney.  She lodged an objection and --

13          MS. KOSTOVSKI:  Thank you, Judge.

14          THE COURT:  That's how we learn.  Right.

15          MR. GABEL:  Trial by fire.

16          THE COURT:  That's how we learn.

17          So we're ready for the jury.  We're going to

18    finish with Agent Powell.  We're going to hear from the

19    defense and then we're going to be ready for instructions

20    and closing arguments today.  Correct?

21          MS. KOSTOVSKI:  Right.

22          THE COURT:  Excellent.  All right.  Good.  I want

23    to thank the U.S. Marshals for being on time and I have

24    got -- since it is likely to be our last day together, I

25    had Julie brew some of my expensive French roast from

1    California, so help yourself to that and we're ready to go.

2            (Jury in at 9:32 a.m.)

3            THE COURT:  Welcome back, everybody.  How are you

4    today?  You may all be seated, 15 minutes over schedule and

5    we had a short delay not due to the parties or the lawyers

6    or anybody else.  We had a couple legal issues to talk

7    about so we're going to get going.  I have very good news.

8    The lawyers have been remarkably professional in using the

9    time when we were not in session to resolve legal issues

10   and I think, quite candidly, we should be able to give you

11   your instructions and closing arguments today.  So it's my

12   expectation we will wrap up the case today and we'll have

13   today and tomorrow for deliberations.  But we will talk

14   about that in a little bit.

15           The case has been efficiently tried and that's to

16   the credit of the lawyers and we have worked hard to

17   minimize your time here in court and on delays.  So we are

18   very grateful for the way this case has gone and for your

19   attention.  All right.

20           With that, I will turn back to Mr. Gabel -- go

21   ahead, sir.

22           MR. GABEL:  Your Honor, after you just mentioned

23   that we haven't had delays, I hate to cause a brief delay.

24   There is one more legal issue that we --

25           THE COURT:  Come on up.  I know the jury wants to

1    get their daily dose of white noise here.

2            (At sidebar on the record)

3            THE COURT:  Okay.

4            MR. GABEL:  The issue is the admission of the

5    defendant, I have to establish a foundation for Powell

6    because you have conditionally ruled that it's admissible.

7    Now, in laying the foundation for Powell regarding the

8    Miranda in the natural sequence of things, he would mention

9    that she invoked, and then we have got an issue because

10   there is a potential mistrial if she mentions -- if I

11   elicit testimony that she invoked her rights and refused to

12   speak.

13           So what I suggested doing was going with Powell

14   in a different chronology, saying were you at the station

15   and alerted that she wanted to speak with you?  Yes.

16           What happened?

17           I went down, I said what's up.  She blurted out

18   everything and told me.

19           At that point -- so he will testify to that.  And

20   then I'll say, prior to that, had you told her about her

21   Miranda rights?  And he will just say yes and it won't

22   bring up the issue that she invoked them because I'm

23   worried about the potential of us commenting on the fact

24   that she invoked her rights.  That's the way I can see it

25   done.

*Jury Trial 3/11/10*                                                      10

1           MS. KOSTOVSKI:  Because she did invoke and then

2     he stopped and then came back again.

3           MR. GABEL:  If she opens the door, I don't

4     think --

5           MS. KOSTOVSKI:  I don't know.

6           MR. GABEL:  -- it's on us.

7           THE COURT:  Let me ask you a question.  Your

8     position is that upstairs on the first floor your client

9     invoked her right to remain silent.  Right?

10          MS. KOSTOVSKI:  And her right to counsel.

11          THE COURT:  And her right to counsel.  Now, I

12    take it that from what I have heard, both in your factual

13    presentation, Ms. Kostovski, and from the government, that

14    what happened next was that Powell ceased questioning and

15    sent her back downstairs.  Right?

16          MS. KOSTOVSKI:  That's what he says in his

17    report.  He has never been questioned.  Remember, we never

18    had a separate hearing on this just based on what was

19    stated in his report.  And I also said to you yesterday

20    that I never received the waiver form, signed or unsigned.

21    I've never seen it until it was mentioned yesterday but,

22    again, it was not presented.

23          THE COURT:  Because it was not signed.

24          MR. GABEL:  Yeah, it is not signed.

25          THE COURT:  All right.  It seems to me we all

1    agree to the fact that she was given her rights, she

2    invoked them.  They ceased questioning and went downstairs.

3    We also know that there's never been a prior hearing on

4    this because no motion was filed and that complicates

5    things.  So to be fair, I've read the cases, and there is a

6    new one, *Maryland versus Shatzer*, that was decided February

7    24, 2010 in the Supreme Court, that essentially says the

8    testimony of Ms. -- or the statement of Ms. Johnson

9    downstairs is deemed to be involuntary if the police raised

10   any issue or put any pressure on her to drop her invocation

11   of her rights.  So I think where we start this is with

12   Powell going downstairs.

13           MR. GABEL:  Speak just a --

14           THE COURT:  I will be quieter.  I think where we

15   start this is with Powell going downstairs and testifying

16   about what happened and if he --

17           MR. GABEL:  Going downstairs at her request.

18           MS. KOSTOVSKI:  After the first time --

19           THE COURT:  After the first time.

20           MS. KOSTOVSKI:  -- mentioned the first time at

21   all.

22           THE COURT:  Listen, after the first time she goes

23   downstairs, his testimony starts when he is alerted about

24   her being downstairs and we hear what happened there.  If

25   she, without provocation, says to him, I want to talk to

1    you, and spills her guts, I think that is compliant with

2    the case law as a waiver that can be admitted.  If, in any

3    way, he or a Redford police officer, suggested or coerced

4    this statement, it's inadmissible.

5         Now, if it's admissible, then I think in fairness

6    to the defendant, you have the right to go into what

7    happened previously, but I would start with what happened

8    downstairs --

9         MR. GABEL:  Now, can I --

10        THE COURT:  -- to establish whether or not the

11   initiation was hers or if it was an involuntarily statement

12   coerced by the police, which I would rule out.  Okay?

13        MS. KOSTOVSKI:  Shouldn't we take some testimony

14   from Ms. Johnson on that?  All we have, Judge, is Agent

15   Powell's recitation in his report.  We have no other -- no

16   other witnesses.  They had Kimberly Considine, I believe

17   that was probably a reason they her on the witness list,

18   and Detective Schiller.

19        MR. GABEL:  Ms. Considine, she was here yesterday

20   ready to testify until the conditional ruling was made that

21   if Powell testified consistent with the proffer, that it

22   would be admitted.

23        THE COURT:  I am in a jury trial with citizens.

24   The defendant has been massively uncooperative here.  I

25   don't know how we stop the trial to have her testify, and I

1    don't even know if she would testify at this point without

2    having filed a motion.  I guess I would be willing to hear

3    from the officer about what happened in his view on the

4    first floor and --

5          MR. GABEL:  She was here yesterday, and her

6    schedule -- in case we had to have this come up, but once

7    the ruling was made, she -- her schedule has been --

8          THE COURT:  How important is this stuff?

9          MR. GABEL:  I believe defense counsel is going to

10   make the point that this counterfeit money wasn't good

11   enough to deceive anyone and I think the admission that it

12   was actually being passed and she was getting real money in

13   exchange is important to counteract that defense.

14         THE COURT:  I'll tell you what, this is out of

15   control here, your evidence of guilt here, in my opinion,

16   is overwhelming.  I don't even see this as a close case,

17   however, the evidence is clearly relevant.  It's clearly,

18   based on what I have heard from both sides, prima facie

19   admissible but I don't want to get in trouble on a case

20   like this over an issue of this magnitude and sensitivity.

21         What I would say, in all candor, given the

22   unusual posture, the late entry into the case of

23   Ms. Kostovski and the complete absence -- and I want you to

24   know I think I could be very hard core about this and admit

25   all this stuff, but I'm trying to be fair.  You're welcome.

1          I would say, just omit this from the agent's

2     presentation on direct, let Ms. Kostovski cross-examine him

3     and if we need to get this in on redirect, we can do it and

4     I will hear from both of you.

5          MR. GABEL:  With all due respect, I have already

6     told the jury in my opening that they are going to hear

7     this, based on my confidence that it was going to be

8     admissible.  Now, if --

9          THE COURT:  That's not going to hurt you.  She

10    objected to that.

11         MR. GABEL:  If we are going to have a

12    hearing -- I know but it looks like --

13         MS. KOSTOVSKI:  Well, no --

14         MR. GABEL:  If we're going to have a hearing on

15    credibility, we're going to have Agent Powell up there

16    testifying consistent with his report.  And then, in my

17    opinion, a totally incredible defendant saying what he says

18    is wrong.  It's going to be a credibility determination.

19    I'm happy to have that.  I think it will take 15 minutes

20    over the course of a break to have Powell just testify

21    briefly about those circumstances.  She wants to take the

22    stand, that's fine.  The cross-examination shouldn't be

23    long.  We can do it at a break and then we can just go on

24    with it.  I think it is important --

25         THE COURT:  Finish off Powell.  Let Ms. Kostovski

1    cross-examine.  We'll take a break and revisit the issue

2    and we can hear from him, hear from her and present the

3    testimony on redirect if you still feel it's necessary.

4    All right?

5             MR. GABEL:  Okay.

6             THE COURT:  Let's do that.

7             MR. GABEL:  Thank you.

8             MS. KOSTOVSKI:  Thank you, Judge.

9             (End of discussion at sidebar)

10            THE COURT:  The lawyers got things worked out.

11   We are going to finish up Agent Powell's testimony and then

12   we are going to take a short break after that.  Okay?

13            Ready, Mr. Gabel?

14            MR. GABEL:  We are.

15            THE COURT:  Agent Powell, you were on direct exam

16   yesterday.  You are still under oath and please resume the

17   witness chair.

18            THE WITNESS:  Thank you, sir.

19            THE COURT:  Thank you.

20                **DIRECT EXAMINATION (Con't)**

21   BY MR. GABEL:

22   Q.  Good morning, Agent Powell.

23   A.  Good morning.

24   Q.  You testified that you collected the evidence that was

25   found in the defendant's car and in her purse.  You

1    collected that from the Redford Township Police Department;

2    is that correct?

3    A.   Yes, I did.

4    Q.   And that includes Government's Exhibit 5?

5    A.   Yes, sir.

6    Q.   Take a look at that and hold it up for the jury.   I

7    would like to ask you about this gun.   Could you

8    explain -- is this a typical handgun that would be

9    confiscated from someone involved in criminal activity?

10   A.   Typical?   I can't say it's typical but, I mean,

11   pistols, handguns, weapons that are used for either

12   protection, or some sort, it's not unusual.

13   Q.   What is connected to the front of that firearm?

14   A.   It's a suppressor.

15   Q.   A suppressor.   What does it suppress?

16   A.   Essentially, the suppressor, it takes the gas that

17   comes out, the flash that comes from the bullet expelling

18   from the barrel, this device actually eliminates the actual

19   lighting or the flash you would normally see when you're

20   firing a weapon.   So a suppressor reduces that to where you

21   can't see it and what happens when that is going on, it

22   will, what we call, target reduction.   So we're trying to

23   identify where those shots are coming from, it's very hard

24   to see if a suppressor is on there, especially in light or

25   low visibility because you can't see where the round is

1   actually being fired from.

2   Q.   When guns are confiscated from individuals, is it

3   typical they have a flash suppressor attached to the front?

4   A.   No.

5   Q.   After receiving this purse, Government's Exhibit 3

6   from Redford Township, did you conduct a further search of

7   this purse?

8   A.   I did.

9   Q.   And could you describe, was the purse full, was it

10  relatively empty?  Could you describe in general what the

11  contents were?

12  A.   The purse was loaded with miscellaneous papers,

13  plastic bags, envelopes and papers inside of papers, just

14  an assortment of different items, among other things.  Also

15  within there was a smaller type, like, little -- we used to

16  call them lady's pocketbook or little change purses, things

17  of that nature as well.

18  Q.   I'm handing you what has been marked Government's

19  Exhibit 11.  Go ahead, finish that.  Well, actually, just

20  wait until we establish the foundation --

21  A.   Okay.

22  Q.   -- if you could.  Have you seen what has been marked

23  as Government's Exhibit 11 prior to today?

24  A.   Yes.

25  Q.   Where did you first come across Government's Exhibit

1    11?

2    A.   These were found in the bottom of the defendant's

3    purse, the brown, tan-looking purse.

4    Q.   Government's Exhibit 3?

5    A.   Yes.  Is that her brown --

6    Q.   Yes.

7    A.   Yes.

8    Q.   Did you obtain a search warrant to review the

9    contents -- actually, tell the jury what Government's

10   Exhibit 11 is.

11   A.   What they are, are two, what they call flash drives or

12   thumb drives and, essentially, they are little portable

13   file cabinets, for lack of words.  They are able to hold

14   data or files or information on these little devices and it

15   makes that information portable so that you take it from

16   place to place and use various computers to hook up to it.

17   Q.   So would it be fair to characterize them as glorified

18   computer disks?

19   A.   Yes.

20   Q.   And did you obtain a search warrant to review the

21   contents of those flash drives?

22   A.   I did.

23   Q.   And could you describe the process that was undertaken

24   to review the contents of those flash drives?

25        THE COURT:  Can I interrupt briefly?  Is this in,

1    Number 11?

2             MR. GABEL:  We would move for its admission now.

3             THE COURT:  Objection?

4             MS. KOSTOVSKI:  No objection.

5             THE COURT:  Okay.  Government's Exhibit 11 is

6    received.  Go ahead, Agent, I'm sorry to interrupt you.

7             (Government's Exhibit 11 received)

8             THE WITNESS:  No problem.

9             I'm sorry, could you --

10   BY MR. GABEL:

11   Q.  Could you please describe the process that was used to

12   review or retrieve the content off of those flash drives?

13   A.  We use what we called a forensics analysis when we're

14   taking particular data off of a device that has been

15   obtained.  And the easiest way to kind of understand that

16   is it's like taking a photo of all the information that's

17   on the particular devices and capturing that information in

18   its present state so that it's not disturbed.

19   Q.  Did you something call a Write Blocker?

20   A.  Yes.

21   Q.  Could you explain to the jury what a Write Blocker is

22   and why you would have used it?

23   A.  Again, the Write Blocker is, again, a forensics tool

24   that actually allows us to be able to capture that

25   information without disturbing its present state.  So,

1   what, essentially, I'm saying is the way that we are able

2   to put that information on a disk and display it later as

3   evidence or in court, is exactly the way it looked as on

4   that particular disk when the actual whomever would have

5   had it and have loaded that information on it.

6   Q.   Once you took an image of what was on the flash drive

7   using the Write Blocker, did you then save the contents of

8   what was on the flash drive on that computer that you have

9   on the stand with you?

10  A.   Yes.

11  Q.   And could you just describe for the jury generally

12  what you found on the flash drive?

13  A.   Basically, on both of these flash drives, we found an

14  assortment of bills, different types of -- like when we

15  spoke about it yesterday, the plates, the front plate, the

16  front of the bill, the back of the bill, the Treasury seal,

17  fabric, images of fabric or paper fabric that was used.

18  There was numerous bills that were cut and paste.  In other

19  words, when I say cut and paste, you may have seen a

20  portrait of, say, a $50 bill with Grant's face on it.  Then

21  you would see where that serial number we spoke about

22  yesterday, that may have been cut out and moved and placed

23  somewhere else on another bill, just basically the

24  manufacturing of a note.

25  Q.   Could you please show the jury some of the contents on

1   the screen that you recovered from those flash drives, and

2   could you describe for the jury what they're seeing and

3   where this was found on the flash drive?

4   A.   This was found in one of the photos in the drive.

5   There are several other files, if you will, inside of the

6   files.  This particular file inside of there was named

7   "pictures."  And what you are looking at here on this first

8   one is actually named, as you can see, 2009, it says

9   "fabric."  So what we looked at when we see this is that

10  there was an image taken of fabric that had a particular

11  textured look to it.  And then, as we moved over, here you

12  have the bill, which is the back plate of the bill, that

13  was actually cut and paste, placed over top of the fabric.

14  And just as you continue to go on, you are seeing how the

15  bill is actually being processed or manufactured in an

16  electronic version.  And once it's completely done, it's

17  just -- let's just take, for example, this one here.  Once

18  it's completely done, you have an image similar to this.

19  And what happens after it's all been completed, it's just

20  like any other Word document or anything else.  You simply

21  just begin to print it out on a high-laser printer and you

22  will have what looks to be a genuine note.

23  Q.   And along with this counterfeit money, I'm sorry, the

24  images of counterfeit money that we see in this folder,

25  were there other folders that had similar images?

1    A.   Yes.

2    Q.   I would like to focus on some particular images that

3    you were focusing on in your investigation, some involving

4    the security features on bills.  Were you able to

5    scrutinize individual images to determine if they would be

6    useful to use in counterfeiting?

7    A.   I did.

8    Q.   And could you -- let's go through those here.  The

9    first one that's on the screen, that was an image that was

10   on one of those flash drives?

11   A.   Yes, it was.

12   Q.   And could you describe for the jury what this is and

13   how it's relevant to this case?

14   A.   Essentially, what you're looking at here is the

15   microprinting of the security strip, which we all see when

16   we go to the store and someone holds up the bill or a bill

17   in the air and they are looking for that strip.  What's

18   placed in currency is the numerical symbols and then United

19   States, U.S.A.

20        So in this case you're seeing U.S.A. 50, and

21   that's indicative for the security thread that would go on

22   a $50 bill.  This was imaged and obviously taken off of a

23   site, placed into, again, the electronic hard drive.  And

24   all you do is you cut and paste, move that -- move a strip

25   over to one of the bills, as I showed earlier and, again,

1    you're creating that note along with other security

2    features.

3    Q.  Is this multiple strips that you would have to cut out

4    each individual one individually to insert into a bill?

5    A.  There is one strip per bill.

6    Q.  And this shows more than one strip; is that right?

7    A.  This just shows -- right.  What you're looking at here

8    is just basically -- it went to a site and probably

9    downloaded the particular, like a know-your-money, or some

10   type of site, and now you just sit and simply highlight,

11   cut and paste.

12   Q.  I would like to hand you Government's Exhibit 16A,

13   please, and if you would look at the back side of that,

14   could you tell the jury what you see on the back side?

15   A.  Okay.  What we have on the back side of this

16   particular uncut sheet is one of those -- one of a strip

17   similar to what you see here on the screen.  So it's been

18   cut and paste.  It's been printed, and relatively evenly,

19   it's been evenly cut and laced on the back of this

20   particular note here.

21        MR. GABEL:  I will ask for permission to pass

22   this to the jury while we continue the testimony?

23        THE COURT:  Yes, sir, Mr. Gabel.  Go right ahead.

24   BY MR. GABEL:

25   Q.  Let's look at a couple other images.  Let's just focus

1    on a couple more.  Could you describe what this image is

2    and how it's relevant to counterfeiting?

3    A.   What you're seeing here is the Treasury seal, again,

4    another plate that's used in the creation of a note.  One

5    thing to pay close attention to on a Treasury seal, when

6    you're making a copy such as this, those fine points that

7    you see in green around the note that looks like little

8    points, we call them saber-tooths.  The more keen and

9    defined those are, those are ways that we are able to

10   detect whether a note is counterfeit or not.  So when

11   you're working with an image that is obviously made with a

12   very profound type of -- a very profound picture to kind of

13   work with, it gives you a better picture, like when you

14   actually cut and paste and put it on a particular bill.

15   Unlike what we see where someone tries to take a note,

16   stick it on a color printer and just copy the front, copy

17   the back and print it out.  That's going to look very

18   smudged.  The edges won't look very crisp and clean.

19   Q.   If you are using something like this image, you will

20   have a more precise definition?

21   A.   It helps to sharpen it up.  I mean, the better

22   pixels -- when I say pixels, pixels is what makes up that

23   little coloring.  The better the original is, the better

24   the copy will be.  So kind of looking at it that way.

25   Q.   Could we take a look at another image?

```
 1              Could you describe what you see in this image
 2     that's relevant to counterfeiting?
 3     A.  Here, you just simply are taking one of the edges off
 4     of the bill.  Again, on the back of the portrait you will
 5     have some microprinting where the $100 symbol, numeric
 6     symbol is.  Once again, if you're taking a photo of a good
 7     copy, it just helps enhance the copy that you make from
 8     that.  Again, just making very defined pictures of the back
 9     of the portrait.  And it's little things that's relevant
10     here.
11              Just to give you an example, here, in the clock,
12     that's something that you won't really pay attention to on
13     the back of a bill, but the clock in the hands that are,
14     looks to be set at about 1:30, you wouldn't normally be
15     able to see that on just a photocopy because it would
16     looked smudged.  So, there again, these are just things
17     that people -- if you're working with a good copy, it's
18     just going to make that copy again look good.  I'm
19     repeating it but I'm just trying to kind of drive home a
20     point of why this is all important things to us.  Just the
21     same thing, same thing.
22     Q.  Okay.  You can go ahead and close that down.  I'm
23     handing you what's previously been marked as Government's
24     Exhibit 18.  I'm handing you what has been previously
25     marked as Government's Exhibit 18 and included within
```

*Direct of SA Powell 3/11/10*                                    26

1    Exhibit 18 is Exhibit 18A.  Have you seen Government's

2    Exhibit 18 prior to today?

3    A.  I have.

4    Q.  Could you describe where you first encountered it?

5    A.  This was -- this was also taken from the defendant's

6    purse inside of another smaller little change purse, so to

7    speak, like a little wallet.

8          MR. GABEL:  Your Honor, the government moves for

9    the admission of Government's Exhibit 18.

10          THE COURT:  Any objection?

11          MS. KOSTOVSKI:  No objection.

12          THE COURT:  Does that include 18A?

13          MR. GABEL:  It does.

14          THE COURT:  All right.  18 and 18A are received.

15   Please go ahead.

16          (Government's Exhibits 18 & 18A received)

17   BY MR. GABEL:

18   Q.  I'm also handing you now what has been marked as

19   Government's Exhibit 23.  Have you seen that item prior to

20   today?

21   A.  Yes.

22   Q.  When did you first see that item?

23   A.  At the Redford Township Police Department.

24   Q.  Is it your understanding that that item came from the

25   defendant's trunk?

1    A.   Yes.

2    Q.   And do you know what was contained within that item

3    when it was first uncovered in her trunk?

4    A.   This, from what I was told, the counterfeit currency

5    was in here and when I actually arrived there, there was

6    some counterfeit money inside of this particular envelope.

7    Q.   Was there just one envelope or was there another

8    envelope that you saw when you went to Redford Township

9    Police Department?

10   A.   I saw two.

11   Q.   What happened to the second envelope?

12   A.   It was just ripped up to open up, so we just took the

13   one, I used the one, carried the evidence bag, that's all.

14   Q.   Was the other envelope discarded?

15   A.   Yes.

16   Q.   Now, you mentioned that you were able to determine

17   that the money found in the trunk and the purse was

18   counterfeit and I would like to show you a demonstrative,

19   sort of drive home that point.

20          MR. GABEL:  Your Honor, may Agent Powell come

21   down from the stand in the well --

22          THE COURT:  You bet.

23          MR. GABEL:  I understand there is no objection to

24   these demonstrative exhibits.

25          THE COURT:  Visual aids that the jury is not

*Direct of SA Powell 3/11/10*                                    28

1    going to get at the end of the case?

2            MR. GABEL:  These will not be given to the jury

3    at the end of the case.  They will not be admitted into

4    evidence, however, the bills that are blown up have been

5    admitted into evidence, so they will get the bills.

6            THE COURT:  You are okay with that procedure, I

7    take it, Ms. Kostovski?

8            MS. KOSTOVSKI:  Yes, Your Honor.  I have no

9    objection.

10           THE COURT:  Thank you.  Come on down, Agent.  You

11   can stand next to the -- ladies and gentlemen, this is

12   known as demonstrative -- I hesitate to call it evidence.

13   This is a demonstrative presentation by the government

14   based on evidence that's in the case using Agent Powell's

15   testimony to help clarify and clear up and guide you

16   through what that evidence is.

17           Go ahead, Mr. Gabel.

18           MR. GABEL:  Thank you.

19   BY MR. GABEL:

20   Q.  Agent Powell, is it your understanding that the top

21   bill on this demonstrative aid was a genuine $50 bill

22   recovered from the defendant's purse?

23   A.  Yes.

24   Q.  And is it your understanding that the lower image is

25   an image of a counterfeit bill also recovered from the

1    defendant's purse?

2    A.   Yes.

3    Q.   Exhibits 9A and 18A, for the record.

4         Could you please describe how in comparing the

5    genuine to the counterfeit you were able to determine that

6    this was, in fact, counterfeit money and not genuine U.S.

7    currency?

8    A.   Okay.  Basically, what I did is just took a copy of a

9    genuine note, and some of the main things I'm pointing to

10   is what I spoke about earlier, where the first red arrow is

11   placed where it says "seal."  We're able to see the

12   saber-tooths are very crisp, very fine.  You can actually

13   see the little dots that's inside of the Homeland Security

14   and balance scales of justice inside of the seal.

15        I also put an arrow for color shifting ink.

16   These are all identifiers of security features that you

17   will commonly hear or that is available for the general

18   public.

19        What color-shifting ink does, essentially, you

20   are able to take a bill, 20, 50, 100, just move it back and

21   forth and you will actually see the ink change colors.

22   Sometimes it goes from maybe a slight yellow-ish, gold-ish

23   color to a more darker black color of some sort.  But the

24   bottom line, it changes colors.  And that you will not be

25   able to duplicate when you print it, even if you use a

1   high-quality printer.  You cannot reduplicate that

2   color-shifting ink because this is a separate ink process

3   once the bill is actually made up.

4          I also made an another arrow toward the security

5   thread and again just to explain the security thread, it's

6   microprinted.  To the eye you would actually need a

7   particular microfying (sic) glass.  You can see it when you

8   hold it up.  But it's very fine printing.  It's very

9   defined.  It's very clear when you're looking at it.

10  Again, in a counterfeit note that's just simply printed, as

11  I spoke earlier, just placed on a scanner and just made a

12  copy of, that would not come out.  It won't be clear.  When

13  you place that strip in, or cut and paste like we spoke

14  about, you will see a defined security thread.

15         The last thing --

16  Q.  Just to interrupt, the security thread, on that point,

17  did you examine the counterfeit found in the person's trunk

18  and could -- when you held it up to the light, could you

19  see at least an attempt to re-create the security strip?

20  A.  You can see the attempt inside of it.

21  Q.  How could you tell that that wasn't a real security

22  strip, is there a way?

23  A.  Well, again, what you're -- again, you're looking for

24  a defined -- again, it's not going to be as defined in a

25  counterfeit note as a genuine note because, there again,

1    it's a copy of a copy, or it's a copy from -- in this case

2    it's a copy from an original bill but it's still a copy.

3           Just the other last point was just the

4    microprinting, and this is found, generally, somewhere on

5    different notes but just for purposes of this case, I'm

6    depicting the 50s.  In this corner it's on both sides.  It

7    says -- microprinting is, in the corner here is the -- it's

8    actually written 50, the word F-I-F-T-Y.  And you can see

9    that with a magnifying glass on a genuine bill.  On the

10   counterfeit note you won't be able see that, or a fake

11   note, you won't be able to see that.

12   Q.  All right.  You can go ahead -- is there anything you

13   would like to discuss on the back of the bill?

14   A.  It's -- no.  Just this other one here is basically

15   going back over the microprinting, and that's pretty much

16   the bottom line.  These are just regular security features,

17   but this, again, microprinting, that's all.

18   Q.  Thank you.  You can go ahead and have a seat again.  I

19   will put these in the bag.

20          Given your experience investigating counterfeit

21   money, would you consider this above-average counterfeit

22   money, poor counterfeit currency, counterfeit currency that

23   might not dupe someone?  How does this measure up, in your

24   experience?

25   A.  Generally, because of the security features that you

1    won't see that we look for, the work and the quality and

2    the time that was placed into this, I would have to say

3    it's above average from the normal bill that's, again,

4    being placed on a color copier, printed, copied both sides

5    and just printed out.

6    Q.  So, in your opinion, would this have been time

7    consuming to make, the counterfeit money that was found in

8    her person trunk?

9    A.  Very, very time consuming.

10   Q.  And the security features, like the security strip and

11   the watermark, is it true that you found those in the

12   counterfeit bills found in her purse and trunk?

13   A.  You can see those security features and this is,

14   again, by using the high-quality printer, you're basically

15   making a copy of that.  So it's not that it's actually

16   embedded in there like the original progress, but it's a

17   copy, you are looking at that photocopy.

18   Q.  What would be the reason for trying to re-create those

19   security features?

20   A.  Well, this is what, again, as I stated, what the

21   general public is aware and of the common features to look

22   for most readily, these are the things that if you go to

23   the store, you are going to see someone holding that bill

24   up to the light, looking for a watermark and a security

25   feature and if you see that, and more than likely, you are

1    going to accept that bill and think it's genuine.

2    Q.   Now, have you had an opportunity to check the serial

3    numbers on some of the bills that were recovered from

4    Ms. Johnson's purse or trunk to see if they have turned up

5    at merchants?

6    A.   Yes, I did.

7    Q.   And what were your findings?

8    A.   Well, in checking on one bill that we seen --

9    Q.   I believe it's Government's Exhibit 15A?

10   A.   I need to see it.  Yes.  In checking this -- this

11   seemed to be a common bill, a common number that was a

12   reappearing theme as far as the serial number.  This bill

13   had been passed at least 27 times in a short period of

14   time.

15   Q.   When you say this bill, I'm sorry, I want to be clear

16   for the jury, does that mean a bill with that serial

17   number?

18   A.   I'm sorry.  Exactly.  What we do is we create a

19   database.  Each time that there is a pass of a bill and

20   that merchant either turns it into the bank and the bank

21   subsequently turns it into us, that note goes into a

22   database.  And what happens is the way we track these

23   numbers or track these bills is by the serial numbers.  So

24   just running this number on this particular bill, we found

25   that it was passed 27 times in a short period of time

1    during last year.

2    Q.   And of those 27 times, was it ever caught as the

3    person was passing it or did the people later discover it

4    and then report it to the Secret Service?

5    A.   These are later reported and this is, like I say,

6    something that we get after the fact, after it's either

7    been given to the bank, the bank finds it, it's kicked back

8    out or maybe later as the teller -- as the cashier is maybe

9    counting down the drawer, and it's being verified and maybe

10   their supervisor, or someone may catch it and it's there,

11   pull it on and sent to the bank and the bank sends it to

12   us.

13   Q.   So bills with those serial numbers had successfully

14   duped people on occasion?

15   A.   Yes.

16           MR. GABEL:  I have no further questions.  I pass

17   the witness for cross-examination.

18           THE COURT:  Thank you very much, Mr. Gabel.

19           Ms. Kostovski, it's your turn, now.

20           MS. KOSTOVSKI:  Thank you.

21                    **CROSS-EXAMINATION**

22   BY MS. KOSTOVSKI:

23   Q.   Good morning.

24   A.   Good morning, ma'am.

25           THE COURT:  Both sides realize that there may be

1   some open issues and redirect with this witness.  I just

2   wanted to note that.

3            Go ahead, Ms. Kostovski.

4            MS. KOSTOVSKI:  Thank you, Judge.

5   BY MS. KOSTOVSKI:

6   Q.  Now, Agent Powell you spent a lot of time yesterday,

7   and mainly today, discussing the manufacturing process of

8   counterfeit.  Correct?

9   A.  Yes, ma'am.

10  Q.  All right.  I just want to clarify with you for the

11  jury, that this is not a manufacturing case, correct?

12  A.  Correct.

13  Q.  This is a possession of counterfeit money case,

14  correct?

15  A.  That's the charge.

16  Q.  That's the charge.  Now, you also testified yesterday

17  that I believe there was an envelope, which was Exhibit 17.

18           MS. KOSTOVSKI:  May I approach?

19           THE COURT:  Yes, absolutely.

20  BY MS. KOSTOVSKI:

21  Q.  I'm handing you Exhibit 17.  You testified that there

22  was notations in there that said "for stores, for

23  nighttime" --

24  A.  Yes, ma'am.

25  Q.  -- do you remember that?

1   A.   Yes.

2   Q.   Was there anything -- if you can take a look, let's

3   start with the "for stores" notation, and that's just a

4   loose note; is that right or --

5   A.   Yes.

6   Q.   -- was that attached to something in that envelope?

7   A.   No.  It's just a loose note.

8   Q.   It was just in there.  So you don't know if it

9   referenced a particular stack of bills; is that right?

10  A.   If it was referenced -- this was actually taken off of

11  bills, so each bill in here is marked and they are marked

12  with numbers and what this is for is for our accounting

13  process.  These are things that we did.  So this was taken

14  off.  So tell you exactly which set of notes it was, no, I

15  couldn't say that.  If it was just these two sets, this

16  went to that.  But it came from these bills inside this

17  pack.

18  Q.   So just so the jury can see, and we only took just a

19  few representatives samples, correct?

20  A.   Yes.

21  Q.   And these are Post-Its?

22  A.   Yes.

23  Q.   That you put on?

24  A.   Yes.

25  Q.   As you were counting?

*Cross of SA Powell 3/11/10*                                      37

1   A.   Yes.

2   Q.   Is that what these numbers reference.

3            So you really can't tell this jury which of these

4   were for stores or for nighttime; is that right?

5   A.   No, because they are all 50.  So it really doesn't

6   matter to me to be able to say this went with that or that

7   one.  They're all the same denomination of bills, the same

8   quality.

9   Q.   The answer to my question is, you cannot tell?

10  A.   No, not like that, no.

11  Q.   All right.  So the follow-up, I think you already

12  answered, and that is, is there any difference in the ones

13  that were marked "for stores" or "for nighttime?"

14  A.   Not really.  I mean, just basically serial numbers are

15  a little different on some of them.  Some of the serial

16  numbers are different on some of the notes.

17  Q.   But you can't tell which ones are which?

18  A.   No.

19  Q.   Now, you also had a demonstrative exhibit yesterday, I

20  believe.  It had to do with driver's licenses --

21  A.   Yes.

22  Q.   -- do you remember that?

23  A.   Yes.

24           MS. KOSTOVSKI:  Judge, I'm just going to stand

25  this up in front.

1              THE COURT:  Yes.

2    BY MS. KOSTOVSKI:

3    Q.   You remember?

4    A.   Yes.

5    Q.   And I think, if we're correct, there is four copies?

6    A.   Yes.  I'll step down.

7    Q.   Is that right?

8    A.   Yes, ma'am.

9    Q.   And I think your testimony was you believe that all

10   four photos or images are of the same person?

11   A.   Yes.

12   Q.   Okay.  Did you ever investigate Angela Jackson,

13   Dianne Elizabeth Wilcosh, Velma Moore, Michele Andretta

14   Johnson?

15   A.   Absolutely.

16   Q.   What did you discover?

17   A.   Well, Angela Christine Jackson, in running that name,

18   there is no record on computer.  So by running the driver's

19   license and identifier slip, couldn't find anyone on

20   computer.

21            The Dianne Wilcosh, as stated earlier, came back

22   to a young lady out in Grand Blanc, Michigan, which is

23   obviously not the defendant.  Velma Moore came back to a

24   young lady in a photo that was actually recovered of her

25   real Florida ID, a photo, a picture of her real Florida ID

1   for a real Velma Moore was actually discovered.

2   Q.   And Michele Andretta Johnson, did you investigate

3   that?

4   A.   The Michele Andretta Johnson came back no record on

5   computer but I did find that there was a temporary license

6   so it shows me that -- and we didn't charge for the

7   document fraud but there was information that showed me

8   that they had the right amount of information to take to

9   the Secretary of State there and get that particular ID.

10  Q.   Okay.

11  A.   In and of itself, one other thing just to add to that.

12  Q.   There is no other question.

13  A.   I'm sorry.  I thought you wanted to know about the

14  other.

15  Q.   No other question.

16  A.   All right.

17  Q.   Thank you.  Now, I think there was some testimony

18  yesterday where you testified that when you went to Redford

19  police and you were examining the Ruger .9 millimeter

20  weapon, you saw the Redford officers barehanded trying to

21  safety secure the weapon.  Do you remember that?

22  A.   Correct.

23  Q.   Okay.  Is that normal for law enforcement to use bare

24  hands on evidence that they just recently seized?

25  A.   I would say in this case, it appeared to be very

1    normal.

2    Q.   In this case?

3    A.   In this case, in my experience.  Let me explain a

4    little bit why I say that.  There appeared to be not only

5    constructive possession of the evidence, there was actually

6    physical personal possession of the evidence that was

7    obtained from the officers.  And what I mean by that, is

8    this evidence was actually taken off of the defendant that

9    they were charging.  So with that happening, the officers

10   felt at that point, without a doubt, this is what this

11   particular had, because it was taken off their possession

12   in their physical control.

13          Secondly, what is more important is the safety of

14   that firearm being stored.  It has to be unloaded.  It has

15   to be unchambered in order to be made safe, so I would say

16   yes.

17   Q.   Let me just understand here.  You're saying that law

18   enforcement already convicted Ms. Johnson?

19   A.   No.  I'm saying that --

20   Q.   That is just exactly what you said, Agent Powell.

21          MR. GABEL:  Your Honor, she is misstating the

22   testimony.

23          MS. KOSTOVSKI:  No, I'm not misstating --

24          THE COURT:  The jury will use its recollection of

25   what the witness said.  If you want to ask a question and

1    cross-examine him, that's fine, but let's try to avoid

2    arguing, please.

3    BY MS. KOSTOVSKI:

4    Q.   So, Agent Powell, when you seize evidence in any case,

5    not just this case, is it your policy, or the Secret

6    Service policy, to bare handle it?

7    A.   We don't carry a policy to say how we are going to

8    handle a particular evidence.  Every piece of evidence in

9    every case is based on this fact.  In case in point, if I

10   arrive at a scene and there is spent shells and a weapon on

11   the ground and no suspect in sight, that weapon is

12   obviously not only going to be secured and preserved for

13   prints, because we have to try to help identify that

14   person.

15        If I am physically chasing or pursuing an

16   individual and I actually grab on to that person and I'm

17   able to arrest them and place them into a secure position,

18   and I remove a weapon from their body, I'm going to

19   physically handle that weapon at that particular time, not

20   only for the safety but to get it away from them and I'm

21   going to articulate those facts in my report as such.

22   Q.   In this case you didn't have -- or at least as far as

23   you knew, Redford police didn't have that type of exigent

24   circumstance where they needed to handle the weapon without

25   possibly contaminating the evidence; is that right?

*Cross of SA Powell 3/11/10*                                     42

1    A.   I'm sorry, ma'am, I can't -- I can't testify to the

2    state of mind of what Redford was doing at the time.   But

3    based on the information when I arrived at the scene and

4    was told how it was obtained and the circumstances

5    surrounding it, I didn't feel that they did anything

6    improper, though.

7    Q.   Well, you just testified, not five minutes ago, that

8    they made a determination that Ms. Johnson was in

9    constructive possession.   I mean, you used legal

10   terminology here, isn't that right, sir?

11   A.   Yes, ma'am.

12   Q.   Now, the other issue with respect to the weapon, you

13   heard the testimony of Tracy McIntosh from the State

14   Police, right?

15   A.   I heard most of it.   I know I stepped out at one

16   point, but go ahead.

17   Q.   All right.   She testified based on questions from

18   Mr. Gabel that if other people touched the weapon before

19   it's submitted for latent fingerprint analysis, that might

20   contaminate it and not give the examiner enough information

21   to really lift a print.   Do you remember that testimony?

22   A.   Yes.

23   Q.   And I think you also testified yesterday that you were

24   requested for a second set of prints from Ms. Johnson; is

25   that correct?

1    A.   Yes.

2    Q.   And you testified that you presented to Ms. McIntosh

3    the second set of prints that were given to you by the

4    Wayne County Sheriff's Department?

5    A.   Yes.

6    Q.   All right.  Did you yourself take any prints from

7    Ms. Johnson?

8    A.   No.  I asked for the Wayne County Sheriff's Department

9    to do it.

10   Q.   Did you take Ms. Johnson into custody after you took

11   custody of this case?

12   A.   No.

13   Q.   Who took custody?

14   A.   Redford PD took custody of her and then she was

15   transferred.

16   Q.   And then she became in whose custody?

17   A.   The case as adopted by the government.  When I say the

18   government, it was adopted federally.  So opposed to trying

19   her on state charges, we charged her federally.  So when

20   the indictment in this particular case or the warrant was

21   issued, then she became in custody of the government and,

22   therefore, the U.S. Marshals take custody of her and are

23   responsible for her transportation to and from.

24   Q.   Right.  Now, you could have fingerprinted her

25   yourself; is that correct?

```
 1    A.   I wouldn't have fingerprinted her because she was
 2    already processed.
 3    Q.   But my question is you could have; is that right?
 4    A.   I could but I don't know if there was a purpose to
 5    that -- I'm sorry, can you explain what's your question in
 6    regards to --
 7    Q.   You don't understand my question?  I think it's very
 8    simple.  You could have fingerprinted her once she came
 9    into federal custody, you meaning the Secret Service?
10    A.   No.  And I will tell you why.  Because if I
11    fingerprint her a second time, we use the same live scan
12    system that is hooked up to the State of Michigan.  All it
13    would have printed out would have been a duplicate print.
14    It would show she was already in the system.  Taking
15    another set of -- let me explain again what live scan is.
16    Live scan printing means that your hand is placed on a
17    digital computer, for lack of words, and it's an image of
18    the hand taken, as opposed to the old way in which we used
19    to roll them with ink.  So that's a little bit differently.
20    So, that's the way she was originally printed and then when
21    a request was made for an additional print, I asked for it.
22    They told me I need an ink print.  I asked for a rolled
23    print with ink.
24    Q.   But you could have done that at the Secret Service,
25    isn't that right, sir?  That's just my question.
```

1    A.   No.

2    Q.   You couldn't do that, Secret Service is not equipped

3    to do fingerprints; is that your testimony?

4    A.   We have the electronic version, the live scan

5    printing, and she was in the custody where she was, that

6    was simply to have them do it.

7    Q.   But she was in federal custody?

8    A.   Yes, yes.

9    Q.   All right.  Now, this morning two flash drives were

10   admitted, Government's Exhibit 11?

11   A.   Yes.

12   Q.   And we had a slide show presentation here; is that

13   right?

14   A.   Yes.

15   Q.   All right.  Now, when did you discover the flash

16   drives, Agent Powell?

17   A.   During the inventory of some of her property in

18   prepping for the trial inside of her bag within our

19   custody.

20   Q.   So you took custody, or jurisdiction if you will, of

21   this case on May 5th?

22   A.   Yes.

23   Q.   All right.  And you obtained a search warrant.  Do you

24   remember what date it was?

25   A.   It was sometime thereafter.  It was during the trial

1    prep.  I know sometime during last year.  I'm not sure the

2    actual date.

3    Q.  Would October 19th of 2009 ring a bell?

4    A.  If it's on the search warrant, absolutely.

5    Q.  May I show you?

6    A.  Absolutely.  What I have before me is a search warrant

7    obtained for the flash drive dated October 19th, 2009 at

8    4:30 p.m.

9    Q.  So that is the date that you actually had the flash

10   drives examined?

11   A.  Yes.

12   Q.  Why did it take five months to do that?

13   A.  Because to do the prep trial for this particular case,

14   we started inventorying things that would being utilized

15   and used for evidence in the case.  So, again, the purse

16   being filled with so many items as I continued to go

17   through, we noticed that down in the bottom there were two

18   flash drives for it.  And based on the circumstances and

19   the quality of money in this case, and my past experience

20   and investigation of how the information in evidence is

21   stored on a particular electronic device, I asked for a

22   search warrant to review that particular flash drive to see

23   what was on it.

24   Q.  In your investigative report on this case, you didn't

25   mention any flash drives, did you?

1    A.   No.  At that time, the first original report --

2    explain our report system.  Initially we make a report --

3    Q.   Agent Powell, just, these are real simple yes and no

4    questions.  The question is, you did not reference any

5    flash drives in your report?

6    A.   On the original report on 5 of '09, there was no

7    reference because it wasn't discovered at that time.

8    Q.   All right.  Now, you also testified that in preparing

9    the information from the flash drive for the slide show

10   presentation, you used, I believe, what is called Write

11   Blocker?

12   A.   Yes.

13   Q.   Is that some type of software program?

14   A.   Yes.

15   Q.   And is it possible, sir, when you -- for someone to

16   manipulate the data off of any flash drive, CD, or any type

17   of computer disk when they are re-creating it for something

18   else?

19   A.   Not using the Write Blocker.  The whole purpose of the

20   Write Blocker is to capture that information in its present

21   state and not leave an electronic footprint of the entry of

22   it.  So what happens is each time you log on to your

23   computer, or you stick in a flash drive or disk, even if

24   you're accessing the same information, the computer

25   recognizes access; and that electronic footprint is

1    somewhere in the hard drive of it.  When you use a Write

2    Blocker, a Write Blocker eliminates that from happening.

3    It captures the information, almost like a shadow.  It

4    shadows the information and captures it and allows you to

5    be able to place that information on another disk or hard

6    drive without disturbing the physical evidence.  That's the

7    purpose of it.

8    Q.  Well, my question is, is it possible to manipulate the

9    information when you're trying to capture or copy it by

10   using Write Blocker?

11   A.  The software is designed to protect that information.

12   Now if you're asking about calibrations, and things, the

13   software is designed to stop that.  Maybe by human error,

14   but this software is designed and we never have -- to my

15   knowledge there has been no such problems with the Write

16   Blocker, but I can't speak to the technology that was made

17   for that particular use.

18   Q.  So the answer to my question is it is possible or it

19   is not possible?

20   A.  In my opinion, no.

21   Q.  Okay.  Now, you also testified that the -- again, this

22   is not a manufacturing case but you testified that the

23   process of re-creating these false bills was pretty time

24   consuming; is that correct?

25   A.  Correct.

1    Q.   All right.  You also demonstrated to the jury using

2    the flash drives, the progression, if you will, of the

3    process; is that correct?

4    A.   Yes.

5    Q.   Now, how is it that you can say that this is pretty

6    time consuming when, even under your analysis, you could

7    just take the images and we're now using computers and you

8    could move that stuff around pretty quickly and create

9    something almost instantaneously, isn't that correct, sir?

10   A.   What is the question?  You asked a couple things.

11   Q.   Well, my question is, you said that it appears that

12   this was a time-consuming process.

13   A.   It is.

14   Q.   That's your testimony.

15   A.   Yes.

16   Q.   And my question is, given all the imagery and things

17   that are on there, isn't it just as easy to do this pretty

18   quickly because there is a computer that is being used?

19   A.   I would say no.

20   Q.   Why is that?

21   A.   Because what you are looking at is the finished

22   product of the research in order to do this particular

23   processing.  You're looking at images that have been

24   captured, whether they have been researched on the internet

25   or whether they were scanned in from another device or

1    another media, thumb drive, placed in this particular file,

2    and then each one beginning to be placed and manipulated in

3    the creation, as I have explained, of the bill.  And this

4    is only the actual, if you will, the book.

5            Now, in order to actually do the test, you would

6    have to have software such as Publisher, or some sort, to

7    actually now create that bill and then print it.  That is

8    very time consuming.

9            Also, as I explained and showed earlier, the

10   security thread strips.  Those were cut out.  That is not

11   just cut by scissors because they are very even, they are

12   very precise.  Each one of these notes, if you look at it,

13   they are very -- they are cut evenly as possible and they

14   are cut as precise as possible.

15           Again, this is all time consuming.  I don't think

16   anyone can just sit there and just run through very

17   quickly.  You need certain tools in order to make -- to do

18   that.

19   Q.  I think you testified that this --

20   A.  Which one?

21   Q.  15A?  That bills with this serial number, is that what

22   you said?

23   A.  Yes, ma'am.

24   Q.  Was passed around 27 times?

25   A.  Yes, ma'am.

1    Q.   But not this particular bill obviously?

2    A.   The identifier -- that bill meaning that serial number

3    which we spoke about yesterday, the fingerprint -- the bill

4    fingerprint, if you will -- a duplication of some other

5    bill just like this bill was passed and later found by

6    rather bank or merchant, and then turned over to us.

7    Q.   Were you able to trace where it was passed these 27

8    times?

9    A.   Some of them we were.

10   Q.   And where were they?

11   A.   There were bills passed at AutoZone, there were bills

12   passed at Kroger and several other locations throughout

13   Detroit, Redford, Southfield and I would have to look at

14   the actual sheet to see the rest of them but throughout the

15   metro Detroit area.

16   Q.   And do you have a time frame as to when a bill with a

17   serial number, or bills -- was it one or was it more than

18   one?

19   A.   It's multiple.  It's multiple passes so what you look

20   at is each time that note is passed, it's taken in, it's

21   given to us, so it's multiple passes.

22   Q.   Can you give me a time frame, was it after May of 2009

23   through today or was it before?

24   A.   No.  It was actually before May of 2009.

25   Q.   All of the 27?

1   A.   No.  Before and after, which is actually kind of

2   conducive to show that once the bill was in circulation and

3   passed, it may have been continued to be passed.

4   Q.   Do you have any information on who was passing these

5   bills?

6   A.   No.

7   Q.   Now, you have had an opportunity to examine the bills

8   in this case, correct?

9   A.   Yes.

10   Q.   The false bills?

11   A.   Yes, ma'am.

12   Q.   And I think you testified that these are pretty good

13   quality; is that correct?

14   A.   Yes, ma'am.

15   Q.   You also heard the testimony yesterday of Officer

16   Bailey -- or Officer Jones, I'm sorry, correct?

17   A.   Again, parts, because I did excuse myself several

18   times.

19   Q.   Officer Jones, I think, testified that when he first

20   saw these he knew immediately that they were false bills

21   because he said the ink was running, do you remember that?

22   A.   I don't recall his exam but go on.  I don't recall it

23   per se, but --

24   Q.   Do you think, sir, that after looking at these, that

25   people would be deceived by these bills?

1    A.   Absolutely.

2    Q.   Why is that?

3    A.   Not only because of, again, the quality and how the

4    bill was made but because the bill has actually been passed

5    and passed again, and for it to be passed, meaning that it

6    was actually used, merchants have taken losses in regards

7    to bills like this being passed.

8    Q.   You're saying -- let's be real careful here.  You're

9    saying bills with a serial number have been passed.  You

10   can't testify that any of these bills would pass?

11   A.   Those bills are the bills that were seized in the

12   evidence of this case, $32,750 worth of bills.  Obviously

13   with that large amount of counterfeit, and also looking at

14   data that was in our database showing that that bill has

15   been passed, even prior to the arrest, it's easy to infer

16   that obviously that bill has been made prior to when we

17   finally caught the person that was actually having

18   possession of notes that were very similar bearing these

19   serial numbers and these identifiers, which in this case

20   happen to be the defendant.

21   Q.   Do you have the bills that were passed around 27

22   times?

23   A.   The bills that were passed, the 27 time bills, each

24   one of those bills were turned into us.  Those are stored

25   and logged within the Secret Service.

1    Q.   Do you have those bills?

2    A.   I have the data.  I can show the data that's here for

3    them.  We wouldn't bring those bills because they are not

4    evidentiary evidence for this particular case.

5    Q.   So you can't say that those bills are similar to these

6    bills; is that correct?

7    A.   Absolutely.  I can say that those bills, again, the

8    ones that were passed were the bills, $50 bills in

9    denominations, bearing this serial number placed into our

10   tracking system, which I do, if you would like to see, I

11   have the actual data to show you that.

12   Q.   But you don't have the bills?

13   A.   I don't have the physical bills in court because they

14   are not evidence with this case.  Those are for other cases

15   against those merchants.

16        MS. KOSTOVSKI:  I have no other questions.

17        THE COURT:  Okay.  Thank you very much.

18        Ladies and gentlemen, it's 10:30.  I think this

19   would be a very good time for a short break.  We have been

20   at it for 1 hour and 15 minutes.  We have a legal issue and

21   we are approaching the end of the case and the end of the

22   morning, so why don't we take our morning break right now.

23   Okay?

24        As I have consistently admonished you, please

25   don't talk about the case among yourselves.  You should

1    have time if you want to go out and get a little fresh air

2    and relax, get a little food, drink, hopefully we can be

3    back here by 11:00.

4            Please rise for the jury.

5            (Jury out 10:40 a.m.)

6            THE COURT:  Let's all be seated.

7            What do you want to do about the interview at the

8    police station, Mr. Gabel?

9            MR. GABEL:  Your Honor, I would like to elicit

10   testimony from Agent Powell regarding the confession.  I

11   don't think it's going to take very long.  I'm happy to do

12   a brief voir dire of him and I can -- Ms. Kostovski could

13   cross him.  My voir dire of him will be five minutes.  I

14   don't care how long she crosses him but I think we can kind

15   of settle the issue of what happened and move forward from

16   this and make a complete record to air the issue out even

17   though it is untimely at this point.

18           THE COURT:  All right.  You still object to my

19   proposed procedure and the testimony, Ms. Kostovski?

20           MS. KOSTOVSKI:  Well, I would like to make a

21   record of what happened that day.

22           THE COURT:  All right.  We will get the Agent

23   back on the stand.

24           Hold on a minute, Agent Powell.  You're charging

25   her with possession of counterfeit money with intent to

1    pass.  There is $32,000.  We don't have evidence on the

2    record that what was passed is unlikely to be accepted.

3    The defense theory is plain and I have a sense of what

4    Ms. Kostovski is going to argue.  But, again, there is no

5    evidence for it, which doesn't prohibit her from arguing

6    it.

7              The fact of the matter is, the agent said he

8    seized the currency, he seized the flash drive, he

9    correlated what is on the flash drive with what is in the

10   evidence and all the elements, in my humble judgment, have

11   been established for the offense but you want him to

12   testify over an objection regarding the Fifth Amendment

13   that she voluntarily told him that she was going to give

14   this money to a drug dealer, is that my understanding?

15             MR. GABEL:  I do, and I appreciate the Court's

16   discussion of the evidence and the discussion of the

17   strength of our case at this point.  But I did mention this

18   in my opening statement, and I don't want to have something

19   that I told them they would see during the course of trial

20   not presented to them.  In addition, I think Ms. Kostovski

21   is going to argue that this couldn't have fooled someone

22   and I think she's already given us preview of the evidence

23   she thinks she has on that, particularly Officer Jones

24   saying, no way, I would have noticed right away, I wouldn't

25   have been fooled.  I see that coming out in her closing,

1    it's pretty obvious she's going that way.  So I would like

2    to get the evidence in she admitted she was passing --

3             THE COURT:  Come on up, Agent Powell.  You are

4    still under oath.

5             Mr. Gabel, you can handle the witness.  But let

6    me just advise you, Agent Powell, since you haven't been

7    privy to our discussions at the bench, that we are going to

8    want to hear about the circumstances of the initial

9    interview on the second floor of the Redford police

10   station, followed by the call you got from the woman

11   officer.  What's her name, Mr. Gabel?

12            MR. GABEL:  Officer, I never pronounce it

13   correctly, Considine.

14            THE COURT:  Considine, and your subsequent second

15   encounter with Ms. Johnson and then how that ended.  Okay?

16            THE WITNESS:  Yes, sir.

17            THE COURT:  Let's take five or ten minutes and

18   then Ms. Kostovski will have a chance.

19            Go ahead, Mr. Gabel.

20                    **VOIR DIRE EXAMINATION**

21            (Outside presence of jury)

22   BY MR. GABEL:

23   Q.   Just briefly, could you describe when you first

24   encountered the defendant at the Redford Township Police

25   Department?

1    A.   I arrived -- upon arriving at the Redford Police

2    Department, I went up to the detective bureau, where I met

3    Detective Schiller, who was going to be the officer in

4    charge of the case for Redford PD.

5              Officer -- Detective Schiller instructed me that

6    the person that had been arrested was downstairs in lockup.

7    They brought him up to a room, interview room, on the

8    second floor, at which point the defendant came into the

9    room.  She was advised of her rights, asked to speak to

10   her --

11   Q.   Did you advise her of her rights using a Miranda form?

12   A.   I did.

13   Q.   Did she not sign that Miranda form?

14   A.   She did not.

15   Q.   After advising her of her Miranda, what was her

16   reaction?

17   A.   She didn't want to talk, and that was it and we

18   stopped.

19   Q.   At that point did she stay on the second floor?  Where

20   did she go?

21   A.   She was taken back down by one of the officers, if I'm

22   not mistaken.  It was Officer Bailey who was there in the

23   interview room with me.  She was taken back down to the

24   lockup area.  I stayed upstairs with Detective Schiller.

25   Q.   What happened next?

1    A.   As I'm there with Detective Schiller, he receives a

2    call and says, hey, the defendant wants to talk now.

3    Q.   Who did he receive the call from?

4    A.   He indicated to me it was someone from down in lockup.

5    When we got downstairs to the lockup area, we were met by

6    Officer Considine, and she told us that a female, that's

7    all she described her, female wanted to talk to you guys.

8    She then led us over to her cell.  She opened the cell at

9    that point.

10   Q.   You went to the cell to speak with her?

11   A.   We breached the door, yes.

12   Q.   How long a lapse between the time she invoked her

13   rights under Miranda and said she didn't want to speak and

14   the time that Detective Schiller received the call that you

15   guys were wanted back downstairs?

16   A.   Speculating now, maybe, 10, 15 minutes maybe.

17   Q.   Okay.  So you go back down to her cell.  Could you

18   describe as best as you can recall what you said to her,

19   what she said to you?

20   A.   I asked her what did she want, blunt like that, what

21   do you want?  She began to say, that, hey, that's not mine.

22   That belongs to somebody named "D."  I'm just, you know,

23   picking it up for people.  I give to guys.  They go out,

24   move it.  When I used the word move it, they pass the bill,

25   whatever.  Give it back.  She collects the real money and

1    she's supposed to meet this person named "D."

2            MR. GABEL:  I have no further questions.

3            THE COURT:  Well, no, what happened after that,

4    she said --

5    BY MR. GABEL:

6    Q.   What happened -- I'm sorry, what happened after that?

7    Was that the end of the discussion with her?  What was it?

8    A.   No.  Then I said, well, who's "D," what's "D?"  And

9    she couldn't describe or say anything, and that's it.

10           I said, okay, you need to get an attorney, get

11   someone and we can make -- if there is some kind of deal,

12   or something that can be attained from it, we will go from

13   there.  Because what she had said to me really didn't seem

14   to make any sense to me at that --

15   Q.   So were you hoping if an attorney could get involved,

16   there could be some possible discussions about cooperating

17   and she could provide more details about "D"?

18   A.   Yes.

19   Q.   At that point, questions cut off and you went back

20   upstairs?

21   A.   Yes.

22           MR. GABEL:  Okay.  No further questions from the

23   government, unless the Judge has any other questions.

24           THE COURT:  All right.  Go ahead, Ms. Kostovski.

25                   **VOIR DIRE EXAMINATION**

```
 1                    (Outside presence of jury)

 2       BY MS. KOSTOVSKI:

 3       Q.   Thank you.  Agent Powell, you said that you went to

 4       the Redford Township Police Department, you met with

 5       Detective -- or Officer Bailey and Detective Schiller; is

 6       that correct?

 7       A.   Yes.

 8       Q.   And why did you go to speak to Ms. Johnson initially

 9       the first time?

10       A.   To try to find out what -- would she want to give a

11       statement in regards to the counterfeit.

12       Q.   Okay.  So you initiated the first conversation?

13       A.   Absolutely, yes.

14       Q.   All right.  And you said you gave her Miranda warnings

15       off of a card or a sheet?

16       A.   Right, yes, ma'am.

17       Q.   And she refused to sign that?

18       A.   Yes, ma'am.

19       Q.   Did she also invoke her right to counsel at that

20       point?

21       A.   She asked for an attorney.

22       Q.   And you stopped -- you didn't say anything else to

23       her --

24       A.   No.

25       Q.   -- after that, correct?
```

1    A.   No, not with regards to that.

2    Q.   She was then taken back downstairs?

3    A.   Yes.

4    Q.   To a cell area?

5    A.   Yes.

6    Q.   All right.  Then you were still upstairs?

7    A.   Yes.

8    Q.   And then you were leaving?

9    A.   I was still upstairs gathering the evidence to --

10   putting all together to take back to our office.

11   Q.   And you said, maybe 10, 15 minutes passed --

12   A.   To the best of my knowledge, yes.

13   Q.   Could it have been shorter?

14   A.   I'm going to stay with the 10 to 15 because I don't

15   like to speculate.  That's the best of my --

16   Q.   All right.  When you received word that she now wanted

17   to speak to you, where were you at that point?  Were you

18   still on the second floor?

19   A.   In Detective Schiller's office, yes.

20   Q.   All right.  So you had not started to leave; is that

21   correct?

22   A.   You mean, physically leaving the building?

23   Q.   Right.

24   A.   Gathering the rest of the evidence, that's it.  I

25   mean, in the immediate soon to be leaving, but no, I wasn't

1   out the door and someone came and grabbed me, no.

2   Q.   Okay.  So then you went back with Detective Schiller

3   to her cell area; is that correct?

4   A.   Yes.

5   Q.   They didn't bring her back upstairs, you physically

6   went downstairs?

7   A.   Physically walked downstairs, yes.

8   Q.   And was she inside the cell?

9   A.   Yes.

10  Q.   Okay.  And you and Detective Schiller were outside the

11  cell?

12  A.   Right in the breach of the doorway.

13  Q.   Was the cell door open or closed?

14  A.   Officer Considine opened door.

15  Q.   Where was Ms. Johnson?  Was she sitting or near

16  the -- near you?

17  A.   She was on a bench, the cellblock bench cot.  She was

18  kind of laying there a little bit and she kind of sit up.

19  Q.   Did you ask a question of her?  Did you say to her, I

20  understand now you want to talk to me?  Or how did this

21  start?

22  A.   I walked in and said, what did you want?  What do you

23  want?  Because she didn't want to talk and she's pretty

24  adamant about it upstairs.  So I didn't think that she

25  really was going to talk about anything down there.

1    Q.   But you went back down there and then you asked her

2    what do you want?

3    A.   Yes.

4    Q.   Did you give her any new Miranda warnings?

5    A.   No.

6    Q.   Why not?

7    A.   She reinitiated.  I didn't think I needed to re-

8    advise her of her rights.

9    Q.   All right.  And what did she say to you?

10   A.   Essentially what I just stated, that the money wasn't

11   hers.  She was moving -- she had it.  It belonged to some

12   guy named "D."  She gave it to -- her job was to sort of

13   give it to individuals that would pass it, exchange the

14   counterfeit for genuine.  She would collect the genuine and

15   ultimately give it back to "D."

16   Q.   All right.  So her statement, was that like a

17   narrative or was it a question and answer?

18   A.   That was more of a narrative.

19   Q.   So she just blurted this information out to you, is

20   that your testimony?

21   A.   Yes, that's -- yes.

22   Q.   And you said, you need to get an attorney and you

23   stopped the conversation?

24   A.   No.  As I said previously, I said, who's "D," where is

25   this "D," I mean, what's "D?"  And she just said, it's some

1    guy from the street.  Didn't give a name, full name, didn't

2    know where they lived or no way of contacting them.

3           So at that point I didn't hear anything of what

4    she said that would have given us any investigative leads

5    per se to work on.  So, like I told her, to me it was just

6    a farce.  I just said, get an attorney.  If you come up

7    with something, we'll talk about it later.

8    Q.  So you didn't believe her statement?

9    A.  No.

10          MS. KOSTOVSKI:  No other questions.

11          THE COURT:  All right.  Thank you.

12          Is it true that when Officer Bailey took the

13   defendant back downstairs and Officer Considine called you

14   between that period of time, you didn't see or talk to the

15   defendant?

16          THE WITNESS:  Yes, sir.  No, I didn't talk to

17   them.

18          THE COURT:  Is it true as well that you have no

19   information from Officer Considine, Officer Bailey, or any

20   other officer or individual at Redford that you don't have

21   any information about what happened while they had custody

22   of her and you remained upstairs?

23          THE WITNESS:  No.

24          THE COURT:  And they didn't tell you that they

25   said anything to her or she said anything to them?

1              THE WITNESS:  No.

2              THE COURT:  You just got the call and headed down

3    and then the evidence is what you testified it was?

4              THE WITNESS:  Yes.  Detective Schiller got the

5    call and he told me and we went down.

6              THE COURT:  Very good.

7              Anything else, Mr. Gabel?

8              MR. GABEL:  No, Your Honor.

9              THE COURT:  Okay.  You may step down and thank

10   you very much, Agent Powell.

11             THE WITNESS:  Thank you.

12             *Maryland versus Shatzer*, 2010 Westlaw 624042, was

13   decided February 24, 2010.  E*dwards* creates a

14   presumption -- excuse me, *Maryland versus Shatzer* says that

15   *Edwards versus Arizona*, which I cited on the record

16   yesterday, creates a presumption that once a suspect

17   invokes his Miranda right to counsel, any waiver of that

18   right in response to police attempts to custodial

19   interrogation are involuntary.  The rule set forth by

20   *Maryland versus Shatzer* in light of *Edwards* sets forth two

21   distinct inquiries and relies on *Edwards Construction* by

22   *Smith versus Illinois*, 469 U.S. 91, a 1984 case in saying

23   that, number one, the Court must determine whether the

24   accused actually invoked his right to counsel.  Secondly,

25   and I will quote here, "If the accused invoked his right to

1    counsel, courts may admit his responses to further

2    questioning only if on finding that he, A, initiated

3    further discussions with the police; and B, knowingly and

4    intelligently waived the right he had invoked, closed

5    quote.  That's *Smith versus Illinois* at page 95 of the

6    opinion, or of the U.S. Report citing *Edwards* 451, U.S. at

7    485, page 486, note 9.  "Discussions that come at the

8    behest of the police after the right to counsel has been

9    invoked are presumed coercive."  *Van Hook versus Anderson,*

10   488 F3d 411, 417, Sixth Circuit, 2007, which also cites

11   *Edwards*, the *Edwards* opinion of the Supreme Court.

12   *Maryland versus Shatzer* is the latest Supreme Court opinion

13   on this issue.  "To establish a valid waiver to the right

14   to an attorney, the government must show that the waiver

15   was knowing and intelligent and voluntary."

16        In an *Edwards* situation, says the Supreme Court,

17   "There is an additional second layer of prophylaxis

18   regarding requiring that a valid waiver of the right to

19   have counsel present during custodial interrogation, once

20   invoked may only be waived when further questioning is

21   initiated by the defendant."

22        Applying this authority, I am not going to admit

23   the statement of Ms. Johnson.  She may have very well and,

24   in fact, I think Agent Powell's testimony is that she

25   initiated the subsequent discussion.  There is no evidence

1    on the record that she waived her right to counsel

2    knowingly and intelligently and voluntarily.  We don't know

3    what happened with Considine and Bailey.  "Initiation means

4    that the accused has demonstrated a desire to discuss the

5    subject matter of the criminal investigation."  *Oregon*

6    *versus Bradshaw,* 462 U.S. 1039, that's a plurality opinion

7    and not the opinion of any particular justice.

8           While the facts here suggest strongly and, in

9    fact, I can say beyond a shadow of a doubt that Ms. Johnson

10   initiated a discussion, I would conclude that the

11   government has established the first part of the test but

12   whether the waiver is knowing, intelligent and voluntary is

13   a question to be determined from the totality of the

14   circumstances and that is, of course, set forth by *North*

15   *Carolina versus Butler*, 441 U.S. 369.

16          While the fact that the defendant initiated the

17   discussion is relevant, obviously that's a determination

18   that the Court in *Oregon versus Bradford* 462, 1039, 1046,

19   another plurality opinion established in 1983, the burden

20   is on the government to establish by a preponderance of the

21   evidence that the waiver was knowing, intelligent and

22   voluntary here and I do not find a preponderance of that

23   evidence.

24          Now, Mr. Gabel, take a deep breath because I know

25   the ruling of the Court is not the ruling that you sought

 1     but I think I'm on solid ground here.  You undoubtedly are

 2     going to tell me that if you were to get Considine and

 3     Bailey in here to establish facts, I would be proven to be

 4     wrong, and you may or may not -- in fact, you probably are

 5     right about that.  The fact of the matter is we are on the

 6     third day of the trial and, Ms. Kostovski, I have to take

 7     you to task here.  I do not think that the defense has

 8     comported itself in an appropriate manner.  I do not think

 9     this issue is raised in a timely or proper fashion.  I

10     think that if you wanted to object to this, the government

11     should have had the opportunity to brief it, to address the

12     Court and to bring in those two officers.  But because of

13     my decision on the way I want to run this courtroom and

14     this trial, they are not going to be able to.

15              I am only doing this because I think that the

16     evidence, while relevant and potentially admissible, is

17     cumulative and not likely to further result in any truthful

18     fact finding by the jury.  And that's the ruling of the

19     Court.  If you want to speak to it, Mr. Gabel, go ahead.

20              MR. GABEL:  That's the ruling, then we will go

21     forward with that ruling in place.

22              THE COURT:  All right.  Ms. Kostovski?

23              MS. KOSTOVSKI:  Thank you, Judge.  And I

24     understand the Court's comments with respect to the

25     timeliness of my raising the issue but I will say this,

 1    Judge.  I was surprised today at the agent's testimony

 2    about this latest revelation about a $50 bill being passed

 3    around 27 times with the same serial numbers.  That is

 4    truly news to me today.

 5              THE COURT:  Okay.

 6              MS. KOSTOVSKI:  This was not presented before and

 7    never brought up.

 8              THE COURT:  Okay.  Well.

 9              MS. KOSTOVSKI:  If we are going to talk about

10    surprises in the case --

11              THE COURT:  Okay.

12              MS. KOSTOVSKI:  -- and production of evidence.

13              THE COURT:  All right.  I think we have been more

14    than fair here.  Okay.  I think -- I think a lot of judges

15    would have let in what I just excluded but that may be up

16    for people in Cincinnati to review, not me.  With that,

17    let's take a ten-minute break and then we will --

18              MR. GABEL:  Your Honor, we are done with our

19    witnesses so we will be resting when the jury comes back

20    in.  There will be no redirect.

21              THE COURT:  I know but we may need to talk about

22    Rule 29 and any other issue, so let's do that in ten

23    minutes.  Okay?

24              MS. GREER:  All rise.

25              (Recess taken from 11:01 a.m. to 11:15 a.m.)

```
 1            MS. GREER:  All rise.  You may all be seated.

 2            Is everybody ready to go?  So we are finished

 3   with the agent's testimony, Mr. Gabel?

 4            MR. GABEL:  We are and the government has no

 5   additional witnesses.

 6            THE COURT:  What's you pleasure here,

 7   Ms. Kostovski?  Are you going to present a case or --

 8            MS. KOSTOVSKI:  I am not, Your Honor, but I do

 9   want the record to reflect -- Ms. Johnson, if you could

10   stand, please -- that I have advised Ms. Johnson of her

11   right to testify, is that correct?

12            THE DEFENDANT:  Yes.

13            MS. KOSTOVSKI:  And she has indicated to me that

14   she is declining her right to testify; is that correct?

15            THE DEFENDANT:  Okay.

16            MS. KOSTOVSKI:  Yes?

17            THE DEFENDANT:  Yes.

18            THE COURT:  Okay.  Good.  The record --

19            MS. KOSTOVSKI:  So I have no witnesses, Judge.

20            THE COURT:  The record is clear that the

21   government has called its last witness and will rest when

22   the jury returns to the courtroom.  The defense attorney

23   has elicited from her client that she has the right to

24   testify in this case and Ms. Johnson has indicated that she

25   understands and declines her right to testify, and with
```

1    that, Ms. Kostovski, I take it you're going to offer no

2    witnesses, no defense testimony, and your client is going

3    to assert her right to remain silent in this case, correct?

4              MS. KOSTOVSKI:  Correct.

5              THE COURT:  Very good.  Thank you for that.

6              Do you want to make a Rule 29 motion, or anything

7    else at this at this time.

8              MS. KOSTOVSKI:  I was contemplating doing that,

9    Judge, but I -- and this is -- I mean no disrespect to

10   your, Your Honor.  I think you've indicated that the

11   government has put on proofs to satisfy the elements and

12   that this is really going to go to the jury.

13             THE COURT:  Yeah.

14             MS. KOSTOVSKI:  To me it would be an exercise in

15   futility at this point to make that argument, unless -- I

16   mean, I'm sort of caught between a rock and a hard place.

17             THE COURT:  Okay.

18             MS. KOSTOVSKI:  Let me just say this.

19             THE COURT:  Go ahead.

20             MS. KOSTOVSKI:  I will make a motion for a Rule

21   29.

22             THE COURT:  Good.  I could be missing something.

23   I do not take any sign of disrespect.  If you disagree with

24   my view of the evidence, maybe there is an argument that

25   I'm not aware of.  You make your motion and I'm open minded

1   right now and I'll rule on it.  Go right ahead.

2        MS. KOSTOVSKI:  Well, as the Court knows, the

3   indictment charges two offenses here, possession of

4   counterfeit money and possession of a firearm with

5   obliterated serial number.

6        Now, the counterfeit is an interesting

7   definition.  I mean, the term has been used loosely around

8   here during the last three days but there is a specific

9   definition and we have incorporated that as part of the

10  jury instructions from *United States versus Weddington* and,

11  basically, the government has to show that the false bill

12  passed is counterfeit.  The defendant intended to use the

13  false bill to defraud, and the defendant actually possessed

14  the false bill.

15       I don't believe that the government has met its

16  burden on really all of the elements on Count One and I

17  don't believe -- certainly, there was no testimony from any

18  witness that Ms. Johnson had any actual possession of any

19  of these bills, number one.

20       Basically, the government is going to ask the

21  jury to infer that she was in constructive possession

22  because they were in a purse that they maintain is hers,

23  the laundry bag in the trunk of the car but I think they

24  really fall short even on that because there was testimony

25  that she had just bought the vehicle.  There was another

1    passenger in the car and most of his testimony, I think,

2    was self-serving here.

3           Furthermore -- and I think this has to go really

4    to the quality of the counterfeit here and the government

5    has to show that she intended to defraud and the analysis

6    there is to take a look at what the *Weddington* Court says,

7    the similitude of the money, how similar in quality and

8    likeness and imagery is it to genuine currency.

9           There has been testimony here that people would

10   not be fooled.  Then there has been testimony that people

11   would be fooled.  And, again, Judge, with respect to the

12   second charge, the possession of the firearm with the

13   obliterated serial number, there is four elements there.

14   Our dispute is that we don't believe the government has

15   presented sufficient evidence on elements one and three,

16   knowing possession.  Again, no testimony that anyone ever

17   saw her with any weapons, anyone ever saw her with this

18   particular weapon.  No fingerprint match came back to her

19   that was on the gun.

20          Secondly, I think with respect to element three,

21   I don't see how they have put on any proof that she had

22   knowledge that the serial number had been altered or

23   removed.  They presented no testimony of any kind from

24   anybody, including the agents, that she had any

25   knowledge -- in fact, the testimony was they don't know who

1      altered or obliterated the serial number.

2             THE COURT:  All right.  Is that your argument?

3             MS. KOSTOVSKI:  That's my argument.

4             THE COURT:  Thank you.

5             Do you want to respond, Mr. Gabel?

6             MR. GABEL:  I don't have much of a response.

7      Counterfeit money, clearly counterfeit, but it clearly is

8      good enough that it could deceive an individual.  If the

9      Court wants to see any of it, I'm happy to pass it up.

10            With respect to the firearm, the theory is

11     constructive possession for the firearm that was in her

12     trunk.  The fact that she fled, the fact she used fake

13     aliases, the fact that she had other firearms in her

14     possession all goes toward her knowledge of what was in her

15     trunk.  It was next to the counterfeit money that matched

16     the counterfeit money in her purse.  So all of that should

17     be left to the jury to decide if she did constructively

18     possess that firearm.

19            We don't have to prove how it was drilled out,

20     who drilled it out, that is not an element, even though

21     defense counsel has raised that in her argument.  Again,

22     basically looking at the gun, you can see the indents in

23     it.  She was a street-savvy individual.  She had other guns

24     in her possession.  She was a careful and meticulous

25     individual with respect to her counterfeiting and her fake

1    IDs and the idea that she didn't know that there was an

2    obliteration on the serial number just simply isn't

3    credible, at the very least it's something that the jury

4    should pass on.

5             That's it for the government, Your Honor.

6             THE COURT:  Thank you.  I want to say that my

7    comments earlier with regard to the evidence, I stand by

8    those, I am -- what I was speaking to in particular was the

9    fact that I thought the evidence on Count Two was

10   overwhelming but I certainly have an open mind and I

11   certainly realize and would not be surprised if the jury

12   were to return a not guilty verdict here, especially after

13   the vigorous defense put forth by Ms. Kostovski.

14            On the other hand, I'm going to deny the motion

15   for the following reasons:  On Count One, I think that

16   possession, constructive and even actual, as well as

17   knowledge, have been demonstrated circumstantially, maybe

18   not absolutely but certainly in a fashion that would get

19   the case to the jury.

20            The intent issue has been established in my mind

21   by the volume of the money, the fact that some of it has

22   made it into the stream of commerce and the fact that the

23   agent's testimony as a person with knowledge

24   under -- really under 702 would present the money as

25   counterfeit currency that would be intended to cheat

1    someone or be real.

2         Now, I realize there's an argument for that

3    point, but the issue of similitude that Ms. Kostovski

4    raises has been determined by the Sixth Circuit to be one

5    for the jury, so I think we go forward to that.  With

6    regard to elements one and three of Count Two.  I think

7    Mr. Gabel's analysis is correct and I won't repeat it here.

8    But in my mind, there is and always has been a large amount

9    of evidence to prove both -- excuse me, to prove

10   sufficiently for the jury to deliberate on the matter, that

11   the defendant knowingly possessed the firearm and that she

12   would have knowledge, circumstantially, of the alteration

13   of the serial number.  So I will deny the motion without

14   prejudice to renewing it if there is a conviction here.

15        Anything else from either side?

16        MR. GABEL:  Nothing else from the government,

17   Your Honor.

18        MS. KOSTOVSKI:  Nothing from the defense.

19        MR. GABEL:  One thing I would just like to raise.

20   I'm planning on passing some of the counterfeit out to the

21   jury during my closing.  I don't know if there is an

22   objection, if there's any problem with that.  But I just

23   wanted to make sure I'm not drawing an objection during my

24   closing.

25        MS. KOSTOVSKI:  No objection.

1          THE COURT:  All right.  Good.

2          MR. GABEL:  Thank you.

3          THE COURT:  I should have told you, but, you

4    know, if you want to object to anything in the closing

5    argument, if it's substantive, we can address that at the

6    sidebar, but my vast preference is for legal objections,

7    you preserve those after the argument and when the jury is

8    gone so that both counsel can get through their arguments

9    in as smooth a fashion as possible.  Okay?

10         We have the jury instructions.  We have the 14

11   jurors' names in the hat.  Correct, Alissa?

12         MR. GABEL:  Your Honor, will I get a rebuttal?

13         THE COURT:  On closing argument?

14         MR. GABEL:  Yes.

15         THE COURT:  Reserved, yeah.  How much time do you

16   want, I mean, 20 minutes?

17         MR. GABEL:  Probably 30 minutes.

18         THE COURT:  30 minutes per side, you are allowed

19   30 minutes per side.

20         How much do you want for rebuttal?  Five, ten.

21         MR. GABEL:  Five minutes.

22         THE COURT:  Good.  We will go 25 and 5 and

23   Ms. Kostovski has 30.

24         Okay.  That will get them to lunch by 12:30,

25   12:45.

*Jury Trial 3/11/10*                                                    79

1           Anything else from either side?

2           MS. KOSTOVSKI:  Nothing from the defense.

3           THE COURT:  You have your jury instructions.  We

4    are going to rest, close the proofs, draw the names, and

5    closing argument and instruct the jury.  Okay.  That's

6    where we going.  Ready?  Bring them on in, Alissa.

7           (Jury in at 11:33 a.m.)

8           THE COURT:  You may all be seated.

9           Mr. Gabel, Mr. Powell has stepped down.  We have

10   had a long break and we had some legal discussion with

11   counsel.  I think we're right on track.

12          What is next for you?

13          MR. GABEL:  Special Agent Powell was the

14   government's final witness.  The United States rests its

15   case.

16          THE COURT:  Thank you very much.

17          Ladies and gentlemen, Mr. Gabel indicates that

18   the government has rested its case, which means that they

19   are finished with their case in chief and they have no more

20   witnesses or evidence at this time, okay, which means it's

21   time for me to turn to Ms. Kostovski.

22          What is your pleasure at this point,

23   Ms. Kostovski?

24          MS. KOSTOVSKI:  Your Honor, the defense also

25   rests.  We do not intend to call any witnesses.

*U.S.A. v Johnson 09-cr-20264*

1            THE COURT:  Okay.  The fact is now, ladies and

2     gentlemen, that the defense has rested its case as well,

3     which indicates that they intend to place their defense and

4     rely upon the cross-examination of -- by Ms. Kostovski of

5     the government's witnesses and they have no witnesses to

6     present of their own, and I will instruct you further at

7     the end of the case on that.  So that means, obviously,

8     there is no rebuttal case and the proofs are over with now.

9     Okay.  So we have arrived at the part of the trial where

10    the evidence is in.  Counsel have an opportunity to argue

11    their case to you, and then I will instruct you and you

12    will deliberate today.

13            Before we do anything, it's time to dismiss our

14    alternates.  Okay.  Alissa -- we have put all your names in

15    a hat -- you want to mix that up.  This is Alissa's party

16    hat.

17            MS. GREER:  This is not my party hat.

18            THE COURT:  You have become very fond of Alissa.

19    Let me mix these up a little bit.  We will draw two names.

20            Mr. Joslin, you are going to be one of our

21    alternates and Mr. Bruttell, you are going to be one of our

22    alternates as well.  We selected your names randomly and if

23    counsel want to look at those, you are entitled to.

24            Let me tell our alternates, I'm going to dismiss

25    you before closing arguments so you can get on with your

1    day.  Don't talk about the case at all until we notify you

2    that there is a verdict, which we will do.

3           If, per chance, one of your fellows juror is hurt

4    or incapacitated and can't come back during deliberations,

5    we will call you back here but the fact of the matter is,

6    we go to deliberation with 12.  Right now there is 14.  So

7    you two fellows are going to be dismissed with our thanks

8    and if, in fact, there is a need, if we go down to 11 or 10

9    and we need to go back up to 12, we are going to call you

10   back.  So please just continue not to discuss the case

11   among yourselves, or anybody else, until we notify you that

12   there is a verdict.  But at this time, I will respectfully

13   and gratefully dismiss you from service and tell you that

14   your participation and attention has been notable and we

15   are very grateful to you.  Okay.

16          So with that, Ms. Greer, if you want to escort

17   Mr. Joslin and Mr. Bruttell out, that would be great.

18   Thank you both very much.

19          Ladies, come on down.  Ms. Palmeri and Ms.

20   Stieber and Ms. Fallon, we are going to bring you down

21   toward the Court.  And then we're going to take Mr. Clayton

22   and Ms. Thomas and put you up in the back row.  Okay.  No,

23   we are just going to put -- how many?  Just Ms. Thomas, you

24   stay in the back row now.  And Mr. Clayton, you stay where

25   you are at.  So we have six and six.  Right?  You may all

1    be seated.

2              With that, we are ready to go to closing

3    argument.  Correct?

4              MR. GABEL:  That's correct.

5              THE COURT:  Let me say one thing I forgot to do,

6    but we have been over this and I don't think it's a

7    surprise to anybody.  Government's Exhibit 1, 2, 3, 4, 5,

8    6, 7, 8, 9, 10, 9A and 10, 11, 12, 13, 14, 15, 15A, 15B,

9    16, 16A, 17, 17A, 18, 18A, 20, 21, 22, and 23, which are

10   the postal bag are all in evidence.  Correct?

11             MR. GABEL:  That is consistent with our records,

12   yes.

13             THE COURT:  And Defendant's Exhibit A, which is a

14   photocopy of the ticket is in as well.  Correct?

15             MS. KOSTOVSKI:  Correct.

16             THE COURT:  And that makes up the record of the

17   case.

18             MS. KOSTOVSKI:  Yes.

19             THE COURT:  I just wanted to make sure we all

20   were on the same page before you go to the jury.  All

21   right.  With that, we are ready to hear Mr. Gabel's

22   closing, argument.

23             Go ahead, sir.

24             MR. GABEL:  Thank you, Judge.

25                        **CLOSING ARGUMENT**

 1            MR. GABEL:  May it please the Court, counsel,

 2    Members of the Jury, I imagine that when we were all little

 3    we learned an important lesson.  It's a lesson that I teach

 4    my daughter, my little two and a half year old, it's the

 5    lesson that you shouldn't tell a lie.  Because when someone

 6    tells that first lie, they have to tell another lie to

 7    cover that lie up and another lie and another.  That's what

 8    we have in this case.  The defendant gave police bogus

 9    names, she used fake IDs and when that wasn't going to work

10    for her, she fled from police.  She did that because she

11    knew what was in her purse.  She knew what was in her

12    trunk.  She did not want law enforcement to discover the

13    evidence of her crimes.  The tens of thousands of dollars

14    worth of counterfeit U.S. currency, the guns, including the

15    gun that had its serial number drilled out.

16            Now, I expect defendant to ask you at closing

17    argument to believe a couple of different things.  One,

18    that this money just isn't good enough to dupe anyone and

19    another, she didn't possess that gun in the trunk.  She

20    didn't know it had the serial number scratched out.  I'm

21    going to review the evidence with you to see what is more

22    believable, what makes the most sense, because your guide

23    in this case should be your common sense.  When you go back

24    to the jury room, you do not expect your common sense at

25    door.  In fact, listen carefully to the instructions on the

1    law that the Judge will give you.  He is the master of the

2    law in this case.  You are the master of the facts.  You

3    determine what actually happened.  He tells you the legal

4    framework to analyze the facts and he will tell you, and

5    this is directly from the jury instructions that I expect

6    him to read to you, that you should use your common sense

7    in weighing the evidence.

8            But to use your common sense and properly

9    evaluate the facts, the facts in this case, it's helpful to

10   have a framework and I'm going to use the two counts that

11   the defendant is charged with, possession of counterfeit

12   U.S. currency and possession of a firearm with an

13   obliterated serial number.  Each of those crimes have

14   various elements that the government has to prove to you

15   for you to convict the defendant.

16           I'm going to start momentarily with the first

17   count, possession of counterfeit money.  And I'm going to

18   go element by element to show how we have proved each

19   element of this first count.  The first element, and the

20   Judge will instruct you on this, is that the defendant

21   possessed counterfeit money.  How do we know she possessed

22   counterfeit money?  You heard from Secret Service Agent

23   George Powell.  He told you how he searched the purse that

24   the defendant had and he found counterfeit money in that

25   purse, over $5,000 worth.  Some of it was in a billfold,

1    some of it was in an envelope.  She had actual possession

2    of that counterfeit money.  That was the purse that was

3    sitting at her feet when the officer first pulled her over,

4    sitting between the driver side door and her feet.  It was

5    the purse that she was clutching when she was pulled out of

6    the car.  It's also the purse that the mechanic, James

7    Rhodes, said he saw her carrying.  She had a purse around

8    her shoulder when he went to go fix her car for her.  She

9    had actual possession of that counterfeit money.

10           You also heard from Officer Brian Jones.  He is

11   the one who came in here on crutches, hobbled in and told

12   you how he had searched the trunk of the defendant's car.

13   Is was the defendant's car, we know that.  She had the

14   keys.  She was driving the car.  If there is any doubt

15   about that, we brought in Willie Reeves, the individual who

16   sold the car to her.  He sold it to her before she was

17   driving it around.  Never met her until she came to buy the

18   car.  And he said, before selling that car to her, like

19   anybody would do if they were selling a car, he cleared it

20   out, cleared out all of his personal items, made it look

21   nice so he could offer it for sale.  He sold it to her for

22   $800.  Now, in selling a car for $800 you are not going to

23   leave behind $13,750 worth of real currency when you're

24   selling the car for $800.  You are not going to leave

25   bundles of counterfeit currency, nearly $40,000 worth.  You

1   are not going to leave guns.  And he told you he didn't do

2   that.  He cleaned the car out

3          The contents of that car were placed there by the

4   defendant.  They were the defendant's items.  Again, the

5   Judge will instruct you, you can have actual possession of

6   something, like the purse that you are found clutching,

7   found in your possession.  You can also have constructive

8   possession, and listen carefully to the Judge's

9   instructions on that.  He will tell you that defendant has

10  constructive possession of something if she has the right

11  to exercise physical control over the item, she knew that

12  she had the right to exercise physical control over the

13  item and she intended to exercise physical control over

14  that item at some time.

15         For instance, car keys, I have my car keys to my

16  car.  I'm planning on going to my car this evening,

17  unlocking it and getting inside, driving home and I will

18  have access to all the contents in my car.  I, right now,

19  standing before you, have constructive possession of the

20  contents in my car.  I don't even have to be in my car.  I

21  know I have the right to get into my car and access the

22  contents so I have constructive possession.  Put those back

23  so I don't lose my keys with the evidence.

24         The same is true for the defendant.  She is

25  driving the car she owned, the car that she had control

1   over.  She was found inside the car with the counterfeit

2   money.  The evidence has shown that she had constructive

3   possession of the contents of that trunk.  And if there is

4   any question about whether she ever had access to the trunk

5   or knew what was in the trunk, that's answered for you when

6   you look at the bills.  We see a bill at the top.  It's

7   Exhibit 15A that was admitted into evidence, and you see

8   the serial number, AB28539702E.  We looked at Exhibit 17A,

9   the one that was found in her purse, the exact same serial

10  number, AB28539702E.  They came from the same batch of

11  counterfeit money.  For her to claim or hope that you

12  believe that she had this money in her purse but she had no

13  idea what was in the trunk, that simply doesn't make sense.

14  Again, use your common sense.

15        Moving beyond just the possession of the

16  counterfeit money, we have to prove to you the second

17  element and that is the defendant knew at the time the

18  money was counterfeit and this is an important element.  We

19  don't want to convict people of federal crimes if they are

20  walking with around with money in their possession that

21  they don't know is counterfeit.  If you get change back

22  from the store and a counterfeit 20 or 50 is included in

23  that, you are not going to be guilty of a federal crime but

24  it's obviously not what happened in this case.

25        The defendant could not have been under the

1    impression that this money, all this money, was real money.

2    There was nearly $40,000 of it in a duffel bag in her

3    trunk.  That's not how you would treat real money.  And if

4    there is any question on whether she would have known this

5    was counterfeit, you have seen this exhibit.  It's a

6    one-sided counterfeit bill in the process of being created.

7    The security strip has been pasted to the back side.  It's

8    clear she knew that this wasn't genuine currency.

9         Recall the flash drives that were found at the

10   bottom of her purse.  Agent Powell showed you what was

11   found on those flash drive.  There were bills in the

12   process of being made and manipulated.  There were some

13   examples of the security features, including the security

14   strip that could be used to place on counterfeit money.

15   It's clear she knew this was counterfeit, all the evidence

16   points in that direction.  There really can be no doubt

17   about that.

18        The third element that we must prove to you is

19   that the defendant possessed counterfeit money with the

20   intent to defraud, which essentially means she intended to

21   cheat someone by making the person think it was real money.

22        Now, it's not necessary for us to prove that she

23   actually did pass this money and actually did cheat anyone.

24   By having it in her possession and intending to pass it and

25   intending to fool someone, we prove the third element.

1   This feeds into the definition of counterfeit money.  For

2   counterfeit money to actually qualify as counterfeit money,

3   and not just, like, Monopoly money, money that is obviously

4   not attempting to be counterfeit money, it has to be

5   similar enough to real currency that it would be calculated

6   to deceive an honest person who is unsuspecting when they

7   are dealing with someone that they believe to be upright

8   and honest, and this element -- this element, I think the

9   proof is in the counterfeit money.  I'm going to pass some

10  out to you here.

11        The question is, is this similar enough to U.S.

12  currency that it was intended to deceive someone?  I know

13  we have talked about counterfeit currency quite a bit but

14  you haven't had a chance to get your hands on it.

15  It doesn't have to be an exact copy.  It's hard -- the U.S.

16  Treasury takes their -- they take extra security

17  precautions to make sure you can't make it identical.

18  That's so Secret Service can determine what are real bills

19  and what are fake bills.  But it has got to be close

20  enough.

21        Take a look at the bills, hold them up to the

22  light.  You will see re-creations of some of the security

23  strips.  If you hold them up to the light, you can see it

24  in there.  If you take a look at the bill, sometimes you

25  can see it on the front side, other times you can see it on

1    the back side.  You can see the faint printing when you

2    hold it to up the light of a watermark.  The counterfeit

3    currency clearly meets -- this currency that you have in

4    your hand clearly meets the definition of counterfeit

5    currency and it clearly was designed to fool people.

6          Agent Powell testified this took some time, this

7    took sophistication.  It's not someone placing it down on a

8    color copier and printing it out.  It's cut out to the

9    exact dimensions of real money.  The same color of ink is

10   used.  The paper that is used.  It's not simple white

11   office paper, it's a resume paper that's there to mimic the

12   feel of real money.  The fiber content of that paper is

13   used to deceive -- Agent Powell told you that's used

14   because when you use those pens in stores that we see

15   cashiers use, sometimes resume paper, like this paper, can

16   fool those pens.  Again, if there is any question on

17   whether or not this is good enough counterfeit money to

18   fool someone, you heard Agent Powell's testimony this

19   morning, he told you that the Secret Service has

20   investigated cases in which counterfeit bills did fool

21   cashiers, did fool business owners and the serial numbers

22   on those bills that fooled those people are the same serial

23   numbers on the bills found in the defendant's trunk and her

24   purse.

25          From the mom and pop businesses to gas stations,

1       fast-food chains, these are the people who are handed

2       worthless pieces of paper for their honest day's work for

3       the goods and services they have provided.  We even

4       saw -- you didn't see these because I didn't pass them

5       around but they are part of the evidence.  They are part of

6       Government's Exhibit 17.  The envelope that had counterfeit

7       money in her purse.  If you can make that out it says "for

8       nighttime."  There was another note, "for stores."  It's

9       clear what this money was intended for.  It was intended to

10      be passed to dupe stores, storeowners, cashiers, some who

11      work at nighttime.  So you might be a little less observant

12      if you are passing this money under the cover of darkness.

13           Recall when the defendant was pulled over and her

14      purse was searched, officers found $13,750 worth of genuine

15      U.S. currency.  So her scheme appeared to be successful.

16      That money, where do you think it came from?  She was

17      passing this money and getting genuine U.S. currency in

18      return.

19           I would like to move on to Count Two now.  That

20      involves the gun that was found in her trunk.  Count Two is

21      possession of a firearm with an obliterated serial number,

22      and I will go element by element for this offense.  The

23      first element is that the defendant knowingly possessed the

24      firearm described in the indictment.  And, you know, one of

25      the difficulties as a prosecutor, as we have elements where

1    we have to prove what the defendant knew and you can't ever

2    get into a defendant's head and tell you exactly what was

3    going on in their head.  We have to prove that with

4    circumstantial evidence with the entire facts of the case.

5    And the Judge will instruct you and I ask you to pay close

6    attention to this instruction as well.  He will instruct

7    you on how you can determine what is in a person's mental

8    state, some of the factors and evidence that you can

9    consider.  He will tell you, and I quote from the jury

10   instructions you will hear, a defendant's state of mind can

11   be proved -- can be proved indirectly from the surrounding

12   circumstances.  This includes things like what the

13   defendant said, what the defendant did, how the defendant

14   acted and any other facts or circumstances in evidence that

15   show what was in the defendant's mind.

16          Now, we already talked about constructive

17   possession and the fact that I have the keys to my car, I

18   have control of its contents and whatever is in its trunk.

19   She had constructive possession of what was in her trunk,

20   including that gun.  But think about what she did, what we

21   know about the defendant when you're determining whether

22   she knew what was in the trunk and knew about that gun.

23   She used multiple aliases.  She had numerous fake IDs,

24   including one she passed to the officer who pulled her

25   over.  And when that wasn't working, she fled from them.

1    Why?  Because she knew.  She knew what was in her trunk.

2    And think about it, did she have a motive to have these

3    guns on her, including that gun in the trunk?  She is

4    involved in criminal activity.  She is in the

5    counterfeiting game.  She is dealing with unsavory

6    characters, people you can't really trust, that gun was her

7    insurance policy.  All the guns were her insurance policy.

8    They were there to protect herself.  They were there to

9    protect the bundles of counterfeit money that she had.

10   They were there to protect the real currency that they got

11   in exchange for the counterfeit currency.  There were guns

12   in her purse that she had near her in case she is passing

13   that counterfeit money to individuals out on the street

14   from the passenger compartment.  But if she had to go into

15   that trunk and hand people bundles of money so they could

16   go out and pass it, she needed protection in that instance.

17   That's why she had the gun in the trunk, and the gun in the

18   trunk -- it's important to remember Officer Jones'

19   testimony.  He told you that the gun in the trunk was in

20   close proximity to the counterfeit money in the trunk.

21   They were, in fact, in the same large white laundry bag

22   that he dumped out and out came the -- where is the

23   mailbag -- the mailbag that had counterfeit money and out

24   came the duffel bag that had the gun in it.  They were next

25   to each other in this large white laundry bag.  For the

1   defendant to suggest that she knew nothing about that gun,

2   it simply doesn't make sense.  The counterfeit money that

3   was in that postal bag matched the counterfeit money in her

4   purse.  The gun was right next to that counterfeit money.

5   Also, we see that the defendant had no problem arming

6   herself.  We saw this gun.  This is not what you're going

7   to find in a typical traffic stop.  It has got a flash

8   suppressor attached to it.  We saw the Beretta that was in

9   her purse.  She had no problem arming herself but the gun

10  that was found in her purse (sic), the one that subjects

11  her to federal charges because the serial number has been

12  drilled out, she wants to claim that that's not hers.  When

13  you so readily arm yourself with firearms but the one that

14  can get you caught on federal charge is the one you say you

15  don't know anything about?  Ask yourself if that makes

16  sense, if that's a credible explanation.

17          The second element is that the serial number of

18  the firearm in question, and that's Government's Exhibit

19  14, the firearm found in her trunk, the serial number from

20  that gun had been removed, obliterated or altered and I

21  don't think there really is any dispute at all on this.

22  You heard from Agent Brunson.  He told you that all guns

23  have to have serial numbers on them and you cannot find a

24  serial number on this firearm.  What you find instead is an

25  indent where it's been drilled out.  So I really don't

1    expect the defense to spend much time on this because it's

2    truly undisputed.

3              Now, it's important, though, for you to know that

4    we don't have to prove to you who scratched out that serial

5    number.  We don't have to prove to you how it was done,

6    whether it was by a file or a screwdriver.  We simply have

7    to prove to you that it was.  It was obliterated and then

8    that gun was in her possession.

9              You will have an opportunity when you go back to

10   the jury room, if you would like, Government's Exhibit 14,

11   the gun can be sent back with you and you can see there is

12   no serial number.  It has been obliterated.  The gun pretty

13   much speaks for itself on that second element.

14             That brings us to our third element and that is

15   that the defendant knew that the serial number had been

16   removed, obliterated or altered, however, the government is

17   not required to prove that the defendant herself removed,

18   obliterated or altered the serial number.  That's what I

19   was just speaking about.  We don't have to prove that it

20   was removed.  We have to prove that she knew it was

21   removed.  And as I said earlier, no one can get into the

22   defendant's head and tell you definitively what she knew.

23   But we can tell you what she knew beyond a reasonable

24   doubt.  And how do we do that?  Well, look at the

25   defendant's actions.  Look at what she did when she was

1   pulled over by police.  Again, and I hate to reiterate but

2   a lot of this evidence is interwoven.  She used the

3   aliases.  She used fakes IDs and she fled from them,

4   because she knew about the counterfeit money, Count One,

5   she knew about the gun with the obliterated serial number.

6   She new about all this stuff that she had in her

7   possession.  We saw the extent to which she went so that

8   her true identity and her criminal activity wouldn't be

9   discovered.  All of these aliases, all of these fakes IDs.

10  And, in fact, again, when it comes to the law, the Judge

11  will instruct you about aliases and about fleeing from law

12  enforcement.  He will tell you that that type of conduct

13  may indicate that she thought she was guilty and was trying

14  to avoid punishment.  That will be in your jury

15  instructions.  Pay careful attention to that.

16          And the defendant wants you to believe that she

17  knew nothing about guns.  You would have to be an expert to

18  know that a serial number was on a gun and it was

19  obliterated off of it, but look at the gun.  You can

20  clearly see the indent and the idea that she knew nothing

21  about guns, that doesn't make sense.  Look what was found

22  in her purse.  She was street savvy.  She was no babe in

23  the woods.  She knew what she had.  And think about why

24  someone would want a gun with an obliterated serial number.

25  Without a serial number, that gun cannot be traced.  You

1    cannot determine who bought that gun, who that person may

2    have sold the gun to and where the gun ultimately ended up.

3    Precisely the type of gun that you would want if you're

4    engaged in criminal activity.  If you're engaged in

5    counterfeiting.  She had a motive to have guns, certainly,

6    but she had a motive to have that particular gun that

7    couldn't be traced back to her, couldn't be traced back to

8    whoever gave it to her or wherever she got it.

9         The idea that the defendant had this gun but

10   didn't know exactly what it was, does that make sense given

11   what we know about the defendant?  This is a defendant that

12   paid careful attention to detail.  She was meticulous.

13   Look at the counterfeit money that you have, the security

14   features.  They are there to replicate a real counterfeit

15   bill.  Look at the fake IDs she had, different names on

16   each one, different addresses, different birth dates.  She

17   paid attention to detail.  She was meticulous.  The idea

18   that she didn't know what that gun was all about simply

19   doesn't make sense in light of what we know about the

20   defendant.

21        The fourth and final element of Count Two is that

22   the firearm had at one time traveled in interstate

23   commerce, meaning it crossed state lines.  That's

24   essentially what brings us into Federal Court, along with

25   the obliterated serial number, that's what makes it a

1    federal crime.  There, again, doesn't appear to be any

2    dispute on the last element.  You heard from Agent Curtis

3    Brunson.  He has examined thousands of guns.  He knows guns

4    inside and out.  He told you Government's Exhibit 14 was

5    manufactured in Prescott, Arizona.  So to get into the

6    defendant's trunk, it had at one time crossed state lines.

7    We don't from prove that defendant had to cross state

8    lines.  We just have to prove at some time in that gun's

9    history, it crossed state lines.  Agent Brunson's testimony

10   is undisputed, undeniably credible.  There's really no

11   dispute on that fourth and final element.

12          Considering all the evidence you heard in this

13   case, including the testimony you heard from Officer Brian

14   Kennedy, and he is the most -- I would imagine most of you

15   would agree, he is one of the most patient law enforcement

16   officers that any of us would hope to encounter if we were

17   pulled over for a traffic violation.  He came in here and

18   his testimony was internally consistent and it was

19   consistent with all of the evidence that we have heard in

20   this case.  He had no reason to come in here and lie to

21   you, and he didn't.  It was credible.

22          You also heard from Officer Brian Jones.  He

23   hobbled in here on his crutches and he told you about

24   popping open the defendant's trunk.  He didn't have to

25   force it open.  He could get into just like the defendant

1    could get into it with her keys, or just pushing it open

2    from the inside of her car.  And he told you what he found

3    in that trunk and, again, his testimony internally

4    consistent, consistent with all of the evidence in this

5    case.

6           You heard from Willie Reeves about selling the

7    car.  I've already touched on that.  You heard from the

8    mechanic who was in the car when she was pulled over, James

9    Rhodes.  He was just there to fix the car and make ten

10   bucks.  He was annoyed to be involved in any of this.  It

11   was clear he didn't bring guns into her trunk, he didn't

12   bring guns into her purse, counterfeit money in the purse

13   or trunk.  He never saw the trunk open.  He also told you

14   that no one was in the car with the defendant when she came

15   to pick him up.  She drove him to that motel where he fixed

16   the car.  Didn't pick anyone up along the way, and she

17   didn't pick anyone up coming back.  She was the only person

18   driving that car.  She was the only one who owned that car.

19   It was sold to her and her alone.  It was exclusively her

20   car, the contents of that car were hers.

21          And finally you heard from Secret Service Agent

22   George Powell.  He told you how this counterfeit money took

23   some time to create.  It was created that way so it could

24   fool people, so it could dupe them.  The two counts in this

25   case have been proven to you beyond a reasonable doubt.

1    Defendant possessed and intended to pass, intended to pass,

2    I have to watch my Ps, intended to hand over tens of

3    thousands of dollars' worth of counterfeit U.S. currency.

4    Instead of paying people who deserved real money, she gave

5    them worthless pieces of paper.  And she did this so she

6    couldn't be caught.  She assumed different aliases and had

7    fake IDs and she did it while armed, armed with a gun that

8    couldn't be traced back to her.

9            I ask you to return a verdict letting the

10   defendant know that the scheme has finally run its course.

11   A verdict that is consistent with the testimony and the

12   evidence that you have seen in this case, that's a verdict

13   of guilty of both counts.  Thank you.

14           THE COURT:  Thank you, Mr. Gabel.

15           Ms. Kostovski, if you would like to address the

16   jury, now it's your turn.

17           MS. KOSTOVSKI:  Thank you, Judge.

18                       **CLOSING ARGUMENT**

19           MS. KOSTOVSKI:  Ladies and gentlemen, good

20   afternoon.  First and foremost I want to thank each and

21   every one of you on behalf of my client, Ms. Michele

22   Johnson, and myself for paying close attention to this case

23   and basically for coming to work every day with us here to

24   try to really figure out what happened.

25           This is going to be my last opportunity to speak

1     to all of you directly and to talk to you about what I

2     think the government has done or not done in this case.

3              First of all, I want to talk to you about what

4     this case is not about, which is very important.  This case

5     is not about false identifications or false documents.

6     This case is not about valid or invalid driver's licenses.

7     It's not about whether Ms. Johnson fled from police

8     officers, did not give them correct information.  It's not

9     about whether she was involved in the making of counterfeit

10    money.  You already had that testimony from the chief agent

11    in this case, Agent Powell, who said she is not charged

12    with making false or counterfeit money.

13             It's also not about whether she provided false or

14    misleading information.  It's not about whether she

15    cooperated with law enforcement or she did not cooperate.

16    It's not about whether these two guns, which have been

17    admitted, the Tec-9 and the Beretta, whether these were or

18    were not in the tan purse that was found in this case.

19    That's not what this case is about.

20             What this case is about are two counts, one,

21    whether she was in possession of counterfeit money -- the

22    Judge is going to define to you what the government has to

23    show you in this case, what constitutes possession of

24    counterfeit money.  That's number one.

25             Number two, she is also charged with possession

```
 1   of a gun with an obliterated serial number, which is
 2   Exhibit 14.  This is the Ruger.  That's what this case is
 3   about.  They spent a whole lot of time, ladies and
 4   gentlemen, talking to you about what this case is not about
 5   and not really a whole lot of time about what the case is
 6   about.  Why?  Because they didn't have the evidence here to
 7   show you and prove to you beyond a reasonable doubt what
 8   the case is about.  They had a whole lot of backdrop,
 9   window dressing to paint Ms. Johnson as a dishonest,
10   terrible person but the focus here is, was she in
11   possession of counterfeit money as that term in defined?
12   And the Judge will tell you the legal definition.  And was
13   she in possession of the Ruger handgun with an obliterated
14   serial number?  That's what the focus of this case is
15   about.
16              Now, I want to talk to you just briefly about
17   what the government had to prove to you and why we believe
18   the government failed miserably in this case.  First, that
19   the false bills were counterfeit.  Second, that she
20   intended to use these false bills to deceive people like
21   yourself, like myself, like members in this room; and
22   third, that she was in possession.
23              Let's look at the government's evidence now.
24   There was testimony from Officer Jones yesterday, this was
25   the officer that came in on the crutches, and Agent Powell,
```

1   that they believe that some of this money was counterfeit.

2   I would prefer to use the term false bills because there

3   might be some confusion in terms of the legal definition of

4   counterfeit money versus falls bills.  And there is a

5   specific definition, which Mr. Gabel showed you.  So there

6   is testimony that these bills were false.  We are not going

7   to dispute that.  But the government wants you to infer

8   that she was in possession of these false bills and that

9   she intended to deceive honest people, such as yourselves,

10  by trying to pass these bills in the general public.

11  Remember, they have to show you beyond a reasonable doubt

12  that all three elements of possession of counterfeit money

13  were met in this case.  And here is why we believe that

14  they were not.  First, there was no testimony that

15  Ms. Johnson was in actual possession of any of these false

16  bills.  You have to make inferences in this case.  That she

17  was in, basically, constructive possession either of the

18  bills that were found in the trunk or the bills that were

19  found in her purse.  No one testified that she saw her with

20  any false bills in this case.  That's not in dispute.

21  That's number one.

22          Number two, the construction -- the constructive

23  possession would have you infer that these items she knew

24  about were in the vehicle or in the purse.  Keep in mind

25  she had just bought the vehicle a couple days before from a

1    gentleman named Willie Reeves.  There was another person

2    that was with her at the time of the traffic stop,

3    Mr. Rhodes.  Could he have been involved in this?  It's

4    possible.  Would he tell you he was?  No.

5            His testimony was pretty much self-serving.  He

6    had no knowledge about anything that day, if you recall.

7    He couldn't remember much of anything but when he was asked

8    specific questions that would somehow implicate him in this

9    case, he knew right away the answer.  So take his testimony

10   for whatever you feel it's worth.  That is one of your

11   prerogatives in this case.

12           Secondly, and I think this is really the crux of

13   the failure of the Government's case, the counterfeit

14   bills.  You all had an opportunity to look at these and I

15   want to give you some more samples to look at.

16           (Pause in proceedings)

17           Now, I'm going to just have you look at some of

18   the additional false bills in this case.  If you want to

19   just pass these around.  I'm also going to hand you what is

20   the -- a genuine bill to look at.  You can take it out of

21   the pouch, pass it around.

22           There was testimony from their witness, Officer

23   Jones, who said he knew immediately that these were garbage

24   bills.  The ink was running.  They were pink.  They were

25   off color.  And if you take a look -- and you will have an

1   opportunity in the jury room, if you look at the height of

2   the fake bill with the actual bill, you can clearly see

3   that the height is much smaller, even the cutting is not

4   even.  The numbering and the coloring -- what the

5   government wants you to believe in this case is folks such

6   as yourself would be duped if you were handed that kind of

7   money.  Officer Jones is not a Secret Service agent.  He is

8   a regular citizen in the community.  He doesn't deal with

9   counterfeit on a daily basis.  So I wouldn't classify him

10  as an expert like Agent Powell but he certainly knew -- he

11  himself said I knew that this money was garbage when I

12  first saw it.  I knew it was false.  I wasn't going to be

13  fooled by it, and you shouldn't be fooled by it.  That

14  isn't -- one of the most important elements that I believe

15  the Government has failed to show you here.  They want you

16  to leave your common sense and logic at door and say, well,

17  we are going to be easily fooled by this.  This is such

18  good quality.  It's such good size and shape.  This is

19  garbage.  Anyone can see that.  Feel it, touch it, look at

20  it.  Compare it to the real 50 and you will see clearly you

21  would not be fooled.

22       Now, there was also a whole bunch of testimony

23  about the genuine currency that was taken in this case.

24  Again, no evidence to suggest, nothing other than innuendo

25  and just a continuing theme on the part of the government

1    to paint Ms. Johnson as a bad person, that that money was

2    obtained by unlawful means.  They gave you nothing to show

3    other than she had genuine currency.  That's all.

4            They didn't tell you the source.  They didn't

5    tell you -- that could have been money that she had saved

6    up during her lifetime.  They could have been money that

7    someone had given her.  That could have been money she

8    could have obtained from a bank.  They showed you nothing.

9    They want you to speculate on where it came from, because

10   it fits their theory of the case that she is out there

11   passing these bad bills and accumulating good money.

12   Again, no evidence, no evidence.  They haven't presented

13   anything to you.

14           What really surprised the defense today was Agent

15   Powell's testimony about a $50 bill.  Agent Powell told you

16   really for the first time today, Exhibit 15A, which had a

17   series of serial numbers that apparently were the same, was

18   the same number in which some bills had been circulated 27

19   times throughout the community.

20           Now, that's interesting because that was never an

21   issue that was brought up by the government in this case

22   until today, that there was somehow some matching

23   information, number one.

24           Number two, nothing was brought in that any of

25   this was remotely related to this particular case.  They

1    just threw that in.  They just threw that in to basically

2    make you believe that, of course, people have been fooled,

3    because 27 times these bills made it around.  But they

4    can't tie any of that to this case, and the agent told you

5    that.  Keep that in mind.  All that was an attempt to say

6    good, honest decent people were fooled.  They might have

7    been fooled but they weren't fooled as part of this case.

8    That's the critical difference that I want you to focus on

9    when you deliberate.

10          The other large focus in this case was this

11   envelope, Exhibit 17, "for stores, for nighttime."  They

12   made a display of these notations and they told you that

13   that was her intent to defraud.  Well, I don't think that

14   you need a bright light to figure out that this is garbage

15   money.  It's almost like Monopoly money, really, if the

16   coloring was maybe a little bit different.  It's almost

17   like Monopoly money.  But do you really need the -- the

18   cover of darkness to try to pass this?  If this was being

19   passed to stores, what stores operate at night under the

20   cover of darkness?  I don't know what they're talking

21   about.  Most stores at night are lit up very bright and

22   most people are very careful when they are taking money now

23   from anyone, for that matter.  Use your common sense.  Look

24   at this.

25          Now, as to the second charge, Mr. Gabel went over

1    and showed you the four elements that the government has to

2    establish in this case.  For purposes of my closing

3    argument, I will say that we are only disputing elements

4    one and three.  As for element two, which the serial number

5    had -- I mean the gun had an obliterated serial number, we

6    are not disputing that -- that's there -- and the fact that

7    the gun was manufactured outside the State of Michigan.  We

8    are not disputing that.

9         What we are disputing is element one, which

10   requires the government to prove to you that she knowingly

11   possessed the firearm and that she knew, she had actual

12   knowledge that that serial number was obliterated.  And

13   again, here is why we don't believe that the government met

14   its burden on these two elements.

15        First, no testimony that anyone saw her with any

16   weapon at -- before the traffic stop or at any time.  No

17   evidence was presented that they saw her in possession of

18   any weapons, number one.

19        Number two, the government's expert, Tracy

20   McIntosh, from the Michigan State Police, she came in here

21   and told you that twice they tried to do a fingerprint

22   match on the gun to Ms. Johnson.  They were able to lift

23   the latent print but both sets of prints that were sent by

24   the Secret Service agent to the State Police did not match.

25   And what's really interesting is, when I was questioning

1    Agent Powell about that, I found it highly incredulous that

2    he would say that he could not secure a good set of prints

3    to send to their expert for analysis.  And also keep in

4    mind that Agent Powell wants you to believe that not only

5    he couldn't secure a good set of prints, but Redford Police

6    were so busy trying to secure the safety of the weapon that

7    they were just putting their hands all over it and if there

8    was any prints, it was rubbed off.  That's two.

9           Three, he also said, and you heard him, that they

10   didn't need to use any gloves.  They knew she was guilty

11   immediately.  She was guilty.  Everything was found in the

12   purse.  Everything was in the car.  Everything was side by

13   side.  They didn't have to protect the evidence.  They

14   didn't have to worry about contamination.  They knew she

15   was guilty right off the bat.  That's important.

16          Now, the third element about her knowledge that

17   the serial number had been altered or removed again, their

18   witness, Officer Jones, told you that a gun's serial

19   number, such as the gun here, is not something that is

20   readily -- and I think he used the word discernible but

21   basically it's not something that obvious to a person who

22   has no experience with guns, someone like Ms. Johnson.

23   Keep in mind they presented no evidence to you that she is

24   trained in guns or that she has some special or expert

25   knowledge in guns.  This would require you to impose a

1    conclusion, if you will, that you get a gun and you have to

2    look at it to make sure there is a serial number.  I mean,

3    this is what they want you to find her guilty.  That's how

4    she had knowledge.  Because the serial number is gone, she

5    knew it was gone, therefore, she was in possession of it;

6    therefore, she's committed this crime.  That's what they

7    want you to do in this case.  I don't think they have shown

8    enough evidence to convict her on this particular offense.

9           And finally, I just want to thank you each and

10   every one of you once again for listening and paying close

11   attention to this case, and we hope that you come back with

12   a "not guilty" on Count One and Count Two.  Thank you so

13   much.

14          THE COURT:  Thank you, Ms. Kostovski.

15          Mr. Gabel, short rebuttal?

16          MR. GABEL:  Yes, brief, Your Honor.

17                     **REBUTTAL ARGUMENT**

18          MR. GABEL:  Something that I forgot to discuss

19   with you when I first got up is the reasonable doubt

20   standard.  Let me collect this money from you so we can

21   keep track of it.  Thank you.

22          The Judge will instruct you on reasonable doubt

23   and, again, I ask you to pay close attention.  It doesn't

24   mean we have to prove a case with absolute 100 percent

25   certainty.  It doesn't mean beyond any shadow of a doubt.

1    It's beyond doubts that are reasonable and there are no

2    reasonable doubts on either Count One or Count Two.

3            Now, the defense would like you to ignore

4    everything that the defendant had in her possession.  In

5    fact, it sounds like she would like you to ignore the fact

6    that she had actual possession of that purse and its

7    contents.  She told you that no one has proven that the

8    defendant had actual possession of any counterfeit money.

9    She was clutching that purse.  She had possession of that

10   purse all day.  It was right on her person.  She had actual

11   possession of the money that was in that purse, the money

12   that matched the money that was found in her trunk.  Of

13   course, she doesn't want you to consider the fact that she

14   used fake IDs and bogus names or had all of these firearms,

15   because that is the evidence that gives us a little window

16   into what was the defendant's mental state.  What did she

17   know she had in her possession and what did she know she

18   couldn't be caught with?  And that's why she fled.  That's

19   why she gave bogus names.

20           The defense has also said that the testimony of

21   Willie Reeves, who owned the car, and the testimony of the

22   mechanic, James Rhodes, was self-serving and this is

23   apparently an attempt to make you think this could have

24   been their counterfeit money or their guns.  Willie Reeves

25   told you he cleared that car out.  There was no questioning

1    of him, no testimony elicited from the defense that, no,

2    you left the stuff behind, no.  He was clear when I asked

3    him and when the defense asked him, I didn't leave any

4    guns, I didn't leave any counterfeit money in that car.

5    That just doesn't make sense.

6           James Rhodes came in here again on crutches,

7    another one of our witnesses on crutches, and it appears

8    the defense wants you to maybe think that that could have

9    been his stuff.  James Rhodes doesn't look like a man who

10   would carry around a purse.  He is a scrapper.  He was in

11   jeans and dirty clothes that day.  He had his tools.  He

12   doesn't have a purse, let alone a purse with guns and

13   counterfeit money.  He never went into the trunk.  Trying

14   to shift the blame to him simply doesn't make sense.

15          Defense has spent some time on the definition of

16   counterfeit and whether this was really good enough

17   counterfeit money, likening it to Monopoly money.  This

18   looks like no Monopoly money I have ever seen, and I have

19   seen those nice new Monopoly boards that they put out for

20   the 25th and 50th anniversary where there are the gold

21   pieces and there's nice money.  They never give you

22   something like this.  I'm sure if any of us opened up a

23   Parker Brothers Monopoly game and this was on the inside,

24   you would be thrilled at first.  You would think, oh, my

25   goodness, somebody put 100 bucks in there for me.  But that

1    doesn't happen because Monopoly money doesn't look like

2    this.  And here I will pass around a genuine $50 bill that

3    was recovered and one of these counterfeit bills.  And what

4    we are looking at, they don't have to be exactly identical.

5    They can't be exactly identical.  The U.S. Treasury

6    Department has so many security features that you can't

7    make them exactly identical but they have to be close

8    enough that they could work, they could fool someone if

9    they are not suspecting it.  If they think they're dealing

10   with someone who is honest.

11        Take a look at the real bill and the counterfeit

12   bill and you judge for yourselves, because you are the

13   finders of fact.  And you can take this back to the jury

14   room if you want to take more time and look at it, but it

15   really is something that I think jumps out at you right

16   away.  This is counterfeit money.  This was intended to

17   deceive people who received it.

18        Remember Agent Powell's testimony and the care

19   and the time that went into creating the counterfeit money

20   that was in her possession.  Remember the flash drives and

21   all those images of the security features.  Count One has

22   been proven to you beyond a reasonable doubt.

23        Now, Count Two, possession of the obliterated

24   serial number, again, defense attorney says no one can

25   prove that she actually possessed any firearms.  That's

1    what she said.  She had two guns in her purse, including

2    this gun, this gun.  She actually possessed both guns.  But

3    the defense wants to make this case all about just actual

4    possession and that gun in the trunk, she says we can't

5    prove she actually possessed it because it wasn't in her

6    hands.  She didn't come out guns blazing.  But, again,

7    listen to the Judge's instructions.  You can have actual

8    possession and constructive possession.

9           Remember, my car, I have constructive possession

10   of that car and its contents because I intend to go into it

11   tonight and be able to get to anything I want.  She

12   possessed that gun in her trunk.  She had constructive

13   possession of it.  And the idea that she didn't know about

14   the serial number, think about if you were to receive a

15   cell phone.  You buy one at the store, someone gives you a

16   cell phone and you a notice a number on it scratched out,

17   or the manufacturer's name scratched out and drilled out.

18   That's something you're going to take note of.  You are

19   going to notice that.  And consider, especially if you're

20   engaged in criminal activity and you want a gun that can't

21   be traced back to you, you have a motive for having a gun

22   that can't be traced back to you.  And how do you make sure

23   it can't be traced back to you?  You make sure it doesn't

24   have a serial number.

25           Count Two, and all of those elements under Count

1    Two, have been proven to you beyond a reasonable doubt.  We

2    ask you to return a verdict that's consistent with that

3    evidence, a verdict of guilty on both of those counts.  And

4    I thank you for your time and your careful attention during

5    the course of this trial.  Thanks.

6         THE COURT:  Okay, ladies and gentlemen, it's now

7    time for me to gave you instructions about the law that you

8    must follow in deciding this case.  I'm going to start by

9    explaining your duties and the general rules that apply in

10   every criminal case.  I'm going to explain the elements or

11   parts of the crime that the defendant has been accused of

12   committing.  I'm going to explain some rules that you must

13   use in evaluating particular testimony and evidence.  I'm

14   going to explain the rules that you must follow during your

15   deliberations in the jury room and the possible verdicts

16   that you may return.  I'm also going to tell you that after

17   this, we are going to take you to lunch and provide for

18   both your lunch and your transportation there, and then

19   have you back and at the end of the instructions I will

20   discuss the schedule with you as well.  After this, we will

21   take you to lunch and get everything taken care of.

22        Please listen carefully to everything that I have to

23   say.  You have two main duties as jurors.  The first is to

24   decide what the facts are from the evidence that you saw

25   and heard here in court.  Deciding what the facts are in

1    this case is your job and it's not mine and nothing that I

2    have said or done during this trial was meant to influence

3    your decision about the facts in any way.

4         Your second duty is to take the law that I give

5    to you, apply it to the facts and decide if the government

6    has proven the defendant's guilt beyond a reasonable doubt.

7    It's my job to instruct you about the law and you're bound

8    by the oath that you took at the beginning of the case to

9    follow the instructions that I give to you even if you

10   personally disagree with them.  Now, this includes all the

11   instructions that I gave to you before the proof in

12   evidence in the case, during the trial, as well as these

13   instructions that I'm reading to you.  All of the

14   instructions are important and you should consider them

15   together as a whole.

16        The lawyers have talked about the law quite a bit

17   during the trial but if anything they said is different

18   from what I say, you must follow what I told you.  What I

19   say about the law controls.  Perform your duties fairly.

20   Do not let any bias, sympathy or prejudice that you may

21   feel toward one side or the other influence your decision

22   in any way.

23        As you know the defendant had pleaded not guilty

24   to the crimes charged in the indictment.  The indictment is

25   not any evidence at all of guilt.  It's just the formal way

1    that the government tells the defendant what crime she is

2    accused of committing.  It does not even raise any

3    suspicion of guilt.  Instead the defendant starts the trial

4    with a clean slate and no evidence at all against here --

5    with no evidence at all against her, and the law presumes

6    that she is innocent.  This presumption of innocence stays

7    with her unless the government presents evidence here in

8    court that overcomes this presumption and convinces you

9    beyond a reasonable doubt that she is, in fact, guilty.

10   This means that the defendant has no obligation to present

11   any evidence at all or to prove to you in any way that she

12   is innocent.  It is up to the government to prove that she

13   is guilty and this burden stays on the government from

14   start to finish.  You must find that the defendant is not

15   guilty unless the government convinces you beyond a

16   reasonable doubt that she is guilty.

17        The government must prove every element of the

18   each crime charged beyond a reasonable doubt.  Proof beyond

19   a reasonable doubt does not mean proof beyond all possible

20   doubt.  Possible doubts or doubts based purely on

21   speculation are not reasonable doubts.  A reasonable doubt

22   is a doubt based on reason and common sense.  It may arise

23   from the evidence, the lack of the evidence or the nature

24   of the evidence.

25        Proof beyond a reasonable doubt means proof which

1    is so convincing that you would not hesitate to rely and

2    act on it in making the most important decisions in your

3    own lives.  If you were convinced that the government has

4    proved the defendant guilty beyond a reasonable doubt, say

5    so by returning a "guilty" verdict.  If you are not

6    convinced, say so by returning a "not guilty" verdict.

7          You must make your decisions based only the

8    evidence that you saw and heard here in court.  Do not let

9    rumors, suspicions, or anything else that you may have seen

10   or heard outside of court, influence your decision in any

11   way.

12         The evidence in this case includes only what the

13   witnesses have said while they were testifying under oath

14   and the exhibits that I allowed into evidence.  Nothing

15   else is evidence.  The lawyers' statements and arguments

16   are not evidence.  Their questions and objections are not

17   evidence.  My legal rulings are not evidence and my

18   comments and questions are not evidence.

19         During this trial I did not let you hear the

20   answers to some of the questions that the lawyers asked.

21   You must completely ignore these things.  Do not even think

22   about them.  Do not speculate about what a witness might

23   have said.  These things are not evidence and you are bound

24   by your oath not to let them influence your decision in any

25   way.  Make your decision based only on the evidence as I

1    have defined it here and nothing else.

2          The evidence in this case consists of the sworn

3    testimony of the witnesses, regardless of who may have

4    called them, and all exhibits received in evidence,

5    regardless of who may have produced them.  Any proposed

6    testimony or proposed exhibit to which an objection was

7    sustained by the Court and any testimony or exhibit ordered

8    stricken by the Court must be disregarded entirely.

9          Anything you may have seen or heard outside the

10   courtroom is not proper evidence and it also must be

11   entirely disregarded.  Questions, objections, statements

12   and arguments of counsel are not evidence in the case

13   unless made as an admission or stipulation of fact.  You

14   are to base your verdict only on the evidence received in

15   the case.  In your consideration of the evidence received,

16   however, you are not limited to the bald statements of the

17   witnesses or to the bald assertions in the exhibits; in

18   other words, you are not limited solely to what you see and

19   hear as the witnesses testify or as the exhibits are

20   admitted.  You are permitted to draw from the facts which

21   you find have been proven such reasonable inferences as you

22   feel are justified in the light of your experience and your

23   common sense.

24         You should use your common sense in weighing the

25   evidence.  Consider it in light of your everyday experience

1    with people and events and give it whatever weight you

2    believe it deserves.  If your experience tells you that

3    certain evidence reasonably leads to a conclusion, then you

4    are free to reach that conclusion.  If any reference by the

5    Court or by counsel to matters of testimony or exhibits

6    does not coincide with your own recollection of that

7    evidence, it is your recollection which should control

8    during your deliberation and not the statements of the

9    Court or of counsel.  You are the sole judges of the

10   evidence received in this case.

11            Now, some of you have heard the terms direct

12   evidence and circumstantial evidence.  Direct evidence is

13   simply evidence like the testimony of an eyewitness which,

14   if you believe it, directly proves a fact.  If a witness

15   testified that he saw it raining outside and you believe

16   that witness, that would simply be direct evidence that it

17   was raining.  Circumstantial evidence is a chain of

18   circumstances, simply put, that indirectly proves a fact.

19   If someone walked into a courtroom wearing a raincoat

20   covered with drops of water and carrying a wet umbrella,

21   then that would be circumstantial evidence from which you

22   could determine that it was raining.  It's your job to

23   decide how much weight to give the direct and

24   circumstantial evidence in the case.  The law makes no

25   distinction between the weight that you should give to

1    either one or say that any one is better evidence than the

2    other.  You should consider all the evidence, both direct

3    and circumstantial, and give it whatever weight you believe

4    it deserves.

5         Another part of your job as jurors is to decide

6    how credible or believable each witness was.  This is your

7    job and not mine.  It's up to you to decide if a witness's

8    testimony was believable and how much weight you think it

9    deserves.  You are free to believe everything that a

10   witness said or only part of it, or none at all.  But you

11   should act reasonably and carefully in making all of these

12   decisions.

13        Let me suggest some things for you to consider in

14   evaluating each witness's testimony.  Number one, ask

15   yourself if the witness was able to clearly see or hear the

16   events.  Sometimes even an honest witness may not have been

17   able to see or to hear what was happening and he or she may

18   make a mistake.  Ask yourself how good a witness's memory

19   seemed to be.  Did the witness seem able to accurately

20   remember what happened?

21        Thirdly, ask yourself if there was anything else

22   that may have interfered with the witness's ability to

23   perceive or to remember events.  Fourth, ask yourself how

24   did the witness act while testifying?  Did the witness

25   appear honest or did the witness appear to be lying?

1          Ask yourself if the witness had any relationship

2    to the government, to the defendant, or anything to gain or

3    to lose from the case that might influence the witness's

4    testimony.

5          Ask yourself if the witness had any bias,

6    prejudice or reason for testifying that might cause the

7    witness to lie or to slant the testimony in favor of one

8    side or the other.  Ask yourself if the witness testified

9    inconsistently while on the witness stand or if the witness

10   said or did something or failed to say or do something at

11   any other time that is inconsistent with what the witness

12   said while testifying.  If you believe that the witness was

13   inconsistent, ask yourself if this makes the witness's

14   testimony any less believable.  Sometimes it may, but other

15   times it may not.  Consider whether the inconsistency was

16   something important, was about something important or about

17   some unimportant detail.  Ask yourself if it seemed like an

18   innocent mistake or if it seemed deliberate.  And ask

19   yourself how believable the witness's testimony was in

20   light of all the other evidence.  Was the witness's

21   testimony supported or contradicted by other evidence that

22   you found believable?  If you found that a witness's

23   testimony was contradicted by other evidence, remember that

24   people sometimes forget things and that even two honest

25   people who witness the same event may not describe it

1    exactly the same way.  These are only some of the things

2    that you may consider in deciding how believable each

3    witness was.

4         You may also consider other things that you think

5    shed light upon a witness's believability.  Use your common

6    sense and your everyday experience in dealing with other

7    people, and then decide what testimony you believe and how

8    much weight you think it deserves.

9         There is one more general subject that I want to

10   talk to you about before I explain the elements of the

11   crimes charged.  The lawyers for both sides objected to

12   some of the things that were said or done during the trial.

13   Don't hold that against either side.  The lawyers have a

14   duty to object when they think something is not permitted

15   by the Rules of Evidence and those Rules are designed to

16   make sure that both sides receive a fair trial.

17        Do not interpret my rulings on their objections

18   as any indication of how I think the case should be

19   decided.  My rulings were based on the Rules of Evidence

20   and not about how I feel about the case.  Remember, your

21   decision must be based only on the evidence, the evidence

22   that you saw and heard here in court.

23        Now, that concludes my part of the instructions

24   explaining your duties and the general rules that apply in

25   every criminal case.  I'm going to explain the elements of

1    the crime that -- the crimes that defendant is accused of

2    committing.  But before I do that, I want to emphasize that

3    the defendant is only on trial for the particular crimes

4    charged in the indictment.  Your job is limited to deciding

5    whether or not the government has proven the crimes

6    charged.

7             Count One of the indictment then charges

8    defendant Michele Johnson with the crime of possession of

9    counterfeit money.  Count One reads as follows:  On or

10   about May 4, 2009 in the Eastern District of Michigan,

11   Southern Division, defendant Michele Johnson with intent to

12   defraud did possess falsely made, forged, counterfeited and

13   altered obligations of the United States, that is,

14   approximately $32,750 in counterfeit United States

15   currency, all in violation of federal law.

16            The federal law, Title 18 U.S. Code, section 472,

17   makes it a crime for anyone to possess United States money

18   with intent to defraud.  For you to find the defendant

19   guilty of this crime you must be convinced that the

20   government has proven each of the following beyond a

21   reasonable doubt.  First, that the defendant, in fact,

22   possessed counterfeit money.  Second, the defendant knew at

23   the time that the -- at the time that the money was

24   counterfeit; and third, that the defendant possessed the

25   counterfeit money with intent to defraud.  That is,

1   intending to cheat someone by making that person think that

2   the money was real.

3          It's not necessary, however, to prove that the

4   defendant intended to cheat a particular person or that the

5   United States or anyone else was, in fact, cheated so long

6   as it is established that the accused acted with intent to

7   cheat someone.

8          An item qualifies as counterfeit currency if it

9   bears such a likeness or resemblance to any of the genuine

10  obligations or securities issued under the authority of the

11  United States as is calculated to deceive an honest,

12  sensible and unsuspecting person of ordinary observation

13  and care when dealing with a person supposed to be upright

14  and honest.  To prove intent to defraud, the government may

15  present evidence that the defendant passed or attempted to

16  pass a false bill.

17         If the defendant is charged solely with

18  possession of a false bill, evidence of similitude, which

19  means similarity or likeness, is probative of intent to

20  defraud such that the more similar a false bill is to

21  genuine currency, the more likely the defendant intended to

22  use it fraudulently to procure goods and services.

23         Count Two of the indictment charges defendant,

24  Michele Johnson, with the crime of possession of a firearm

25  with an obliterated serial number.  Count Two of the

1    indictment reads as follows:  On or about May 4, 2009 in

2    the Eastern District of Michigan, Southern Division,

3    defendant Michele Johnson knowingly possessed and in

4    interstate commerce a firearm that is one .9 millimeter

5    Ruger semiautomatic handgun from which the manufacturer's

6    serial number had been obliterated and altered in violation

7    of Title 18 United States Code, Section 922.  Title 18 U.S.

8    Code, Section 922, makes it a crime for anyone to possess a

9    firearm which had the serial number removed or obliterated.

10   For you to find the defendant guilty of this charge, you

11   must find that the government has proved each of the

12   following four elements beyond a reasonable doubt.  First,

13   that the defendant knowingly possessed the firearm

14   described in the indictment.  This means that the defendant

15   possessed the firearm purposely and voluntarily and not by

16   accident or by mistake.  It also means that the defendant

17   knew that the object was a firearm.

18          Second, that the serial number of the firearm in

19   question had been removed, obliterated or altered.  Third,

20   that the defendant knew that the serial number had been

21   removed, obliterated or altered, however, the government is

22   not required to prove that the defendant herself removed,

23   obliterated or altered the serial number; and fourth, that

24   the firearm had at some time traveled in interstate

25   commerce.

1          Now, I want to explain something to you about

2     possession.  The government does not necessarily have to

3     prove that the defendant physically possessed the firearm

4     for you to find her guilty of this crime.  The law

5     recognizes two types of possession, actual possession and

6     constructive possession.  Either one of these, if proved by

7     the government, is enough to convict.  To establish actual

8     possession, the government must prove that the defendant

9     had direct physical control over the firearm and knew that

10    she had control of it.

11         To establish constructive possession, the

12    government must prove that the defendant had the right to

13    exercise physical control over the firearm and knew that

14    she had this right and that she intended to exercise

15    physical control over the firearm at some time, either

16    directly or through other persons.

17         For example, if you left something with a friend

18    intending to come back later and pick it up or intending to

19    send someone else to pick it up for you, you would have had

20    constructive possession of it while it was in the actual

21    possession of your friend.

22         But understand, just being present where

23    something is located does not equate with possession.  The

24    government must prove that the defendant had actual or

25    constructive possession of the firearm and knew that she

1    did for you to find her guilty of this crime.  This, of

2    course, is all for you to decide.

3           The length of time that an individual possesses a

4    thing is immaterial.  If you find beyond a reasonable doubt

5    that the defendant possessed the firearm for any length of

6    time, this is sufficient if all the other elements of crime

7    are proved beyond a reasonable doubt.  Then return a

8    verdict of guilty.

9           Next I want to explain something about proving a

10   defendant's state of mind.  Ordinarily, there is no way

11   that a defendant's state of mind can be proved directly

12   because no one can read another person's mind and tell what

13   that person is thinking.  But a defendant's state of mind

14   can be proved indirectly from the surrounding

15   circumstances.  This includes things like what a defendant

16   said, what the defendant did, how the defendant acted and

17   any other facts or circumstances in evidence that show what

18   was the defendant's state of mind.

19          You may also consider the natural and probable

20   results of any acts that the defendant did knowingly or did

21   not do and whether or not it is reasonable to conclude that

22   the defendant intended those results.  Again, this is, of

23   course, for all of you to decide.

24          Now, I want to say a word about the date and the

25   indictment.  The indictment charges that the crimes -- the

1    indictment charges that the crimes in Count One and Two

2    happened on or about May 4, 2009.  The government does not

3    have to prove that the crime happened on that exact date,

4    but the government certainly must prove that the crime

5    happened reasonably close to that date.

6            That concludes my part of the instructions

7    explaining the elements of the crimes charged in the

8    indictment.

9            Next, I'm going to explain some rules that you

10   must use in considering testimony and evidence.  You have

11   heard evidence --

12           MR. GABEL:  Your Honor, I don't think jury

13   instruction number 22 -- it's no longer relevant in this

14   case before --

15           THE COURT:  22 comes out?

16           MR. GABEL:  22 comes out.  Do you agree,

17   Ms. Kostovski?

18           MS. KOSTOVSKI:  Yes, yes.

19           THE COURT:  All right.  22 comes out.

20           MR. GABEL:  Thank you, Your Honor.

21           THE COURT:  Sorry about that.

22           Okay.  A defendant has an absolute right not to

23   testify or present evidence.  The fact that he did not

24   testify -- excuse me, the fact that she did not testify or

25   present any evidence cannot be considered by you in any

1    way.  Do not even discuss it in your deliberations.

2    Remember that it is up to the government to prove the

3    defendant guilty beyond a reasonable doubt.  It is not up

4    to the defendant to prove that she is innocent.  The law

5    does not require any party to call as witnesses all persons

6    who may have been present at any time or place involved in

7    the case or who may appear to have some knowledge of the

8    matters at issue in this trial, nor does the law require

9    any party to produce as exhibits all papers and things

10   mentioned in the evidence of the case.

11          One more point about witnesses, sometimes jurors

12   wonder if the numbers of witnesses who testified makes any

13   difference.  Do not make any decisions based on the number

14   of witnesses who testified.  What is more important is how

15   believable the witnesses were and how much weight you think

16   their testimony deserves.  Concentrate on that and not on

17   the numbers.

18          You have heard evidence that the defendant

19   attempted to flee from law enforcement officers when they

20   attempted to arrest her and provided aliases when they

21   requested her identity.  If you believe that the defendant

22   did the above, then you may consider this conduct, along

23   with all the other evidence in the case in determining

24   whether the government has proved beyond a reasonable doubt

25   that she committed the crimes that are charged.  This

1    conduct may indicate that she thought she was guilty and

2    was trying to avoid punishment.

3           On the other hand, sometimes an innocent person

4    may flee from law enforcement or provide aliases to avoid

5    being arrested for some innocent reason.  This is, of

6    course, for you to decide.

7           You have heard testimony that the defendant

8    committed crimes, acts, wrongs other than those charged in

9    the indictment.  If you find that the defendant did crimes,

10   acts, or wrongs, you can consider those pieces of evidence

11   only as they relate to the government's claim on the

12   defendant's intent and knowledge.  You must not consider it

13   for any other purpose.

14          Remember that the defendant is on trial here only

15   for possession of counterfeit currency and possession of a

16   firearm with an obliterated serial number, not for the

17   other acts.  Do not return a guilty verdict unless the

18   government proves the crime charged in the indictment

19   beyond a reasonable doubt.

20          You have heard the testimony of Special Agent

21   Curtis Brunson from the Bureau of Alcohol, Tobacco and

22   Firearms who testified as an opinion witness.  You do not

23   have to accept Special Agent Brunson's opinion.  In

24   deciding how much weight to give it, you should consider

25   the witness's qualifications and how he reached his

1    conclusions.  Also consider other factors discussed in

2    these instructions for you weighing the credibility of

3    witnesses.  Remember that you alone decide how much of a

4    witness's testimony to believe and how much weight it

5    deserves.

6            You have heard the testimony of Special Agent

7    George Powell of the United States Secret Service, who

8    testified to both facts and opinions.  Each of these types

9    of testimony should be given the proper weight.

10           As to testimony on the facts, consider the

11   factors discussed earlier in these instructions for

12   weighing credibility of witnesses.  As to the testimony on

13   opinions, you do not have to accept Special Agent Powell's

14   opinion.  In deciding how much weight to give it, you

15   should consider the witness's qualifications and how he

16   reached his conclusions, along with the other factors

17   discussed in these instructions for weighing the

18   credibility of witnesses.  Remember that you alone decide

19   how much of a witness's testimony to believe and how much

20   weight it deserves.

21           Now, that concludes my part of the instructions

22   explaining the rules for considering testimony and

23   evidence.  Let me finish up by explaining some things about

24   your deliberations in the jury room and your possible

25   verdicts.

1           The first thing you should do in the jury room

2    when you come back from lunch is to choose someone to be

3    your foreperson.  This person will help to guide your

4    discussions and speak for you here in open court.  Once you

5    start deliberating, do not talk to any member of my staff

6    or to me or to anyone else except each other about this

7    case.  If you have any questions or messages, you must

8    write them down on a piece of paper, sign them, and then

9    give them to a member of my staff.  The staff member will

10   give them to me and I will respond to you as soon as I

11   possibly can.  I may have to talk to the lawyers about what

12   you have asked and it may take me a little bit of time to

13   get back to you.  Any messages to me should normally be

14   sent through your foreperson.

15          One more thing about messages, do not ever write

16   down or tell anyone how you stand on your votes.  For

17   example, do not write down or tell anyone that you are

18   split six to six or eight to four, or whatever your vote

19   happens to be at that time.  That should remain secret

20   until you are finished with your deliberation.

21          Now, you must make your decision based only on

22   the evidence that you saw and heard here in court.  Do not

23   try to gather any information about the case on your own

24   while you are deliberating.  Do not conduct any experiments

25   inside or outside the courtroom.  Do not bring books,

1  dictionaries, or anything else with you to help you with

2  deliberations and do not conduct any independent research,

3  reading or investigation about the case and do not visit

4  any of the places that were mentioned during the trial.

5  Make your decision based only on the evidence that you saw

6  and heard here in court.

7       Your guilty whether it is -- your verdict,

8  whether it is guilty or not guilty, must be unanimous.  To

9  find the defendant guilty every one of you must agree that

10  the government has overcome the presumption of innocence

11  with evidence that proves her guilt beyond a reasonable

12  doubt.

13       To find the defendant not guilty, every one of

14  you must agree that the government has failed to convince

15  you beyond a reasonable doubt.  Either way, guilty or not

16  guilty, your verdict must be unanimous.

17       Now, all of the evidence is in.  The arguments

18  are concluded and I have instructed you, you are now free

19  to talk about the case in the jury room.  In fact, it's

20  your duty to talk with each other about the evidence and to

21  make every reasonable effort you can to reach unanimous

22  agreement.  Talk with each other, listen carefully and

23  respectfully to each others' views and keep an open mind as

24  you listen to what your fellow jurors have to say.  Try

25  your best to work out your differences.  Don't hesitate to

1    change your mind if you are convinced that other jurors are

2    right and that your original position was wrong.  But don't

3    ever change your mind just because other jurors see things

4    differently, or to get the case over with.  In the end your

5    vote must be exactly that, your vote.

6            It's important for each of you to -- for you to

7    reach a unanimous verdict and agreement but only if you can

8    do so honestly and in good conscience.  No one will be

9    allowed to hear your discussions in the jury room at all

10   and no record will be made of what you say, so you should

11   all feel free to speak your minds.

12           Listen carefully to what the other jurors have to

13   say and then decide for yourself if the government has

14   proved the defendant guilty beyond a reasonable doubt.  If

15   you decide that the government has proved the defendant

16   guilty, then it will be my job to decide any appropriate

17   punishment and what it should be.  Deciding what the

18   punishment should be is my job and not yours.  It would

19   violate your oath as jurors to even consider possible

20   punishment in deciding your verdict.  Your job is to look

21   at the evidence and decide if the government has proven the

22   defendant guilty beyond a reasonable doubt.

23           I have prepared a verdict form that should be

24   used to record your verdict.  It's very simple and

25   essentially it asks on Count One, "guilty" or

1    "not guilty" -- "not guilty" or "guilty".  Count Two, "not

2    guilty" or "guilty".  It has the case caption and a

3    signature block for the foreperson.

4          If you decide that the government has proved the

5    charge against the defendant beyond a reasonable doubt, say

6    so by having your foreperson mark the appropriate place on

7    the form.  If you decide the government has not proved the

8    charge against her beyond a reasonable doubt, say so by

9    having your foreperson mark the appropriate place on the

10   form as well.  Your foreperson should then sign the form,

11   put a date on it and return it to me.

12         I will conclude by repeating something I have

13   said and you have probably heard frequently, nothing that I

14   have said or done during this trial was meant to influence

15   your decision in any way.  You decide for yourselves if the

16   government has proven the defendant guilty beyond a

17   reasonable doubt.

18         Now, the case is yours.  The Marshals who are

19   here are going to take you for lunch.  You don't have to

20   worry about paying for that.  Be comfortable, eat, relax

21   and get fueled up for deliberations.  We are going to bring

22   you back here after lunch to begin deliberating on the

23   case.  We will go as long as practicable today and we will

24   have you here at 8:30 tomorrow morning.  You will receive a

25   written copy of what I just read to you for your reference.

1    You will receive all the exhibits in the case, but not the

2    guns.  We will provide those to you if requested.  You will

3    receive the verdict form and, I believe, that is all that

4    we send in with you.  You will have coffee, water,

5    restrooms and you will not be disturbed.

6          If you need anything, buzz Alissa, and she will

7    come down and listen to you.

8          At this point I ask the lawyers if either side

9    has any objection to the charge.  Mr. Gabel?

10         MR. GABEL:  The United States has no objections.

11         THE COURT:  Ms. Kostovski?

12         MS. KOSTOVSKI:  No objection by the defense.

13   Thank you.

14         THE COURT:  Thank you very much.

15         With that, we are going to swear in your

16   temporary bailiffs for the next period of time, which is

17   Susan and Alissa, and ask you to stand up.

18         (Temporary Bailiffs Sworn)

19         THE COURT:  Now, the jury and the bailiffs have

20   been sworn and we're ready to retire for the day.

21         Please don't talk about the case when you are

22   outside.  All right?  Go have lunch and enjoy yourselves.

23   From what I have been told, it's a beautiful day out.

24   Relax, and then come back.  I think you should be back

25   about 2:00.  Sit down and get to business and follow the

1    instructions that I gave you.  All right.

2          You need anything, buzz Alissa, and we are very

3    grateful -- hold on before you stand up.  We are very

4    grateful for your attention and participation.

5          Ms. Thomas had her hand up.  Is there something

6    you need?

7          JUROR THOMAS:  About the latest I can stay is

8    4:00.

9          THE COURT:  That will be fine.  You go start

10   deliberations at 2:00.  When you get into a time pressure,

11   buzz and let Alissa know.  Okay?  Ms. Thomas?

12         JUROR THOMAS:  Can I make a phone call?

13         THE COURT:  You can make a phone call.  I'm

14   sorry, Ms. Stevens.

15         JUROR STEVENS:  I also need to make a phone call.

16   I need to get my son to the doctor at 4:15 today.

17         THE COURT:  We will make the phone available to

18   you, absolutely.

19         I will note for the record I gave the impression

20   that we would end closing argument later today than we

21   actually did.  The lawyers were very efficient and we are

22   now deliberating at 1:00 so I think it's a good idea for

23   you to start but I understand you won't be able to go the

24   whole day.  No problem.  All right?  Don't worry about that

25   at all.  We will go on your schedule.  If you don't get

1    anything done today, we will have you back tomorrow

2    morning.  No problem.

3              Please rise for the jury.

4              (Jury out at 1:13 p.m.)

5              THE COURT:  Okay, guys, what's the story?  We

6    would ask you to stay within five minutes.  You're down

7    here, right, Ms. Kostovski?

8              MS. KOSTOVSKI:  Judge, actually, I have a

9    sentencing -- where is Judge Hood, this way.  Just down the

10   hall at 2:00.

11             THE COURT:  All right.  Give Susan your cell

12   phone number, and stay close.  Mr. Gabel is across the

13   street.

14             Anything else from anybody?

15             MR. GABEL:  No.  We have to gather this up and

16   take it back with the exclusion of the guns.  Right?  We

17   will do that.

18             THE COURT:  You can give everything to the jury

19   but not the guns.

20             Anything else?

21             MR. GABEL:  Nothing else from the government.

22             THE COURT:  They are not going to be back here

23   until 2:00 so you can do whatever you want.  Anything else?

24             Let me see counsel down by Karen, please, if you

25   don't mind.

```
 1              (Proceedings adjourned at 1:14 p.m.)

 2                         *      *      *

 3

 4                    CERTIFICATE OF REPORTER

 5              As an official court reporter for the United

 6   States District Court, appointed pursuant to provisions

 7   of Title 28, United States Code, Section 753, I do hereby

 8   certify that the foregoing is a correct transcript of

 9   the proceedings in the above-entitled cause on the date

10   hereinbefore set forth.

11

12

13                    s/ Karen Klerekoper
                   _____

14                 KAREN KLEREKOPER, CSR, RPR

15                   Official Court Reporter

16

17

18

19

20

21

22

23

24

25
```